UNITED STATES BANKRUPTCY COURT
DISTRICT OF OREGON

In re                                    ) Case No. __16-30119-pcm11__
                                         )
**HemCon Medical Technologies, Inc.,**   )
**an Oregon corporation,**               ) NOTICE OF *PRELIMINARY*
                                         ) HEARING ON MOTION
                                         ) ☐ FOR USE OF CASH COLLATERAL
                                         ) ☒ TO OBTAIN CREDIT
Debtor(s)                                ) *(Check One)*

YOU ARE NOTIFIED THAT:

1.    The undersigned moving party, **HemCon Medical Technologies, Inc.**_____, filed a
Motion ☐ For Use of Cash Collateral ☒ To Obtain Credit *(check one)*. A copy of the motion is attached;
and it includes (i) the statement required by <u>Local Form #541.5</u>, and (ii) the following allegations:

      a.  The immediate and irreparable harm that will come to the estate pending a final hearing is
**Debtor will be unable to meet its operating expenses, with the result that the value of the**
**assets of the estate may be severely diminished.**_____.

      b.  The amount of ☐ cash collateral ☒ credit *(check one)* necessary to avoid the harm detailed
above prior to the final hearing is **$400,000**_____.

2.    The name and service address of the moving party's attorney (or moving party, if no attorney) are:
**Albert N. Kennedy/Timothy J. Conway, Tonkon Torp,888 SW 5th Ave., #1600, Portland, OR 97204**.

3.    A *PRELIMINARY* HEARING on the motion WILL BE HELD ON ___**01/20/16**___ AT __**10:00 a.m.**__
IN **U.S. Bankruptcy Court, 1001 SW Fifth Avenue, Courtroom #1, Portland, OR 97204**_____.
Testimony will be received if offered and admissible.

4.    If you wish to object to the motion, you must do one or both of the following: (1) attend the
preliminary hearing; and/or (2) file with the Clerk of Court (i.e., if the 5-digit portion of the Case No. begins
with "3" or "4", mail to 1001 SW 5th Ave #700, Portland OR 97204; OR if it begins with "6" or "7", mail to
405 E 8th Ave #2600, Eugene OR 97401), a written response, which states the facts upon which you will
rely and, if the response is filed within three business days before the hearing, notify the judge's
chambers by telephone immediately after filing the document, as required by LBR 9004-1(b).

5.    On __**01/15/16**__ copies of  this notice  and the motion were served pursuant to FRBP 7004 on the
debtor(s); any debtor's attorney; any trustee; any trustee's attorney; members of any committee elected
pursuant to 11 U.S.C. §705; any creditors' committee chairperson [or, if none serving, on all creditors
listed on the list filed pursuant to FRBP 1007(d)]; any creditors' committee attorney; the U.S. Trustee; and
all affected lien holders whose names and addresses used for service are as follows:

**See attached.**

                          **/s/ Albert N. Kennedy**                                    **821429**
                          Signature of Moving Party or Attorney                OSB #
                          **720 SW Washington St., Ste 260, Portland, OR 97205-1343**
                          (If debtor is movant) Debtor's Address & Taxpayer ID#(s) (last 4 digits)

541.1 (6/1/15)

**Albert N. Kennedy**, OSB No. 821429 (Lead Attorney)
    Direct Dial:   (503) 802-2013
    Facsimile:    (503) 972-3713
    E-Mail:      al.kennedy@tonkon.com
**Timothy J. Conway**, OSB No. 851752
    Direct Dial:   (503) 802-2027
    Facsimile:    (503) 972-3727
    E-Mail:      tim.conway@tonkon.com
**TONKON TORP** LLP
1600 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR 97204

     Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>HemCom Medical Technologies, Inc.,<br><br>          Debtor. | Case No.  16-30119-pcm11<br><br>**DEBTOR'S MOTION FOR AUTHORITY TO OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS**<br><br>*EXPEDITED HEARING REQUESTED* |

      HemCon Medical Technologies, Inc., as debtor and debtor-in-possession ("HemCon" or "Debtor") hereby moves this Court (this "Motion") for entry of interim and final orders authorizing it to obtain secured credit for the purposes and on the terms set forth herein.  In support of this Motion, Debtor respectfully states as follows.

### JURISDICTION AND VENUE

      1.     On January 15, 2016 (the "Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  Debtor continues to operate its business and manage its assets as debtor-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.

**Page 1 of 11 -**    DEBTOR'S MOTION FOR AUTHORITY TO OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

1    2.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C.

2  §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C.

3  §157(b)(2).  The bases for the relief requested herein are Sections 105, 361, 362, 363 and 364

4  of the Bankruptcy Code, Rules 2002, 4001, 6004 and 9014 of the Bankruptcy Rules, and

5  Rule 4001-1 of the Local Rules.

6    3.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and

7  1409.

8                    **SUMMARY OF RELIEF REQUESTED**

9    4.    Debtor requests the immediate entry of an interim order (the "Interim

10  Order") in the form attached hereto as **Exhibit 1**:

11    a.    Authorizing Debtor to obtain post-petition financing pursuant

12  to Sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code from Tricol

13  International Group Limited ("Lender") in an amount up to $800,000 (the "DIP Facility") by

14  entering into that certain DIP Credit and Security Agreement ("DIP Facility Agreement")

15  substantially in the form attached hereto as **Exhibit 2**.

16    b.    Granting to Lender security interests in and liens upon all of

17  the Collateral (as defined in the Interim Order), subject, however, to any and all valid and

18  perfected liens and security interests in existence on the Petition Date, to secure the

19  repayment in full of the DIP Facility, including Lender's Continuing Security Interest (as that

20  term is defined in the DIP Facility Agreement) until the DIP Facility is paid.

21    c.    Providing and granting to Lender super-priority administrative

22  expense claims, subject, however, to the Carve-Out as defined in the DIP Facility

23  Agreement.

24    d.    Scheduling a final hearing (the "Final Hearing") to consider

25  entry of a final order authorizing Debtor to obtain financing under the DIP Facility

26  Agreement (the "Final Order").

**Page 2 of 11** -   DEBTOR'S MOTION FOR AUTHORITY TO OBTAIN SECURED CREDIT
                ON INTERIM AND FINAL BASIS

**SUMMARY OF MATERIAL TERMS OF DIP FACILITY**

2          5.       The material terms of the DIP Facility are:[1]

3                   a.       <u>Borrower</u>.  Debtor is the borrower under the DIP Facility

4    Agreement.

5                   b.       <u>Lender</u>.  Tricol International Group Limited, or its assignee,

6    will be Lender.  Lender is also the proposed stalking horse purchaser of substantially all of

7    Debtor's assets as set forth in the First Day Declaration and Debtor's Motion for Entry of an

8    Order (A) Establishing Bidding and Auction Procedures Relating to the Sale of Substantially

9    All of Debtor's Assets; (B) Approving Related Bid Protections; (c) Scheduling an Auction

10   and Sale Hearing; and (d) Establishing Certain Notice Procedures for Determining Cure

11   Amounts for Executory Contracts and Unexpired Leases to be Assigned (the "Sale Motion").

12                  c.       <u>DIP Facility Agreement</u>.  Subject to the terms and conditions

13   of the DIP Facility Agreement, Lender will make available to Debtor the sum of $800,000 in

14   two advances of $400,000 each, to be made following entry of the Interim Order and the

15   Final Order.

16                  d.       <u>Use of Proceeds</u>.  The DIP Facility will be used to fund the

17   working capital requirements and other general corporate needs of Debtor during the

18   pendency of this case and to pay certain fees and other costs and expenses consistent with the

19   Budget and other administrative expenses as approved by the Court.

20                  e.       <u>Interest Rate</u>.  The outstanding principal balance under the DIP

21   Facility will bear interest at the rate of 12% per annum.

22

23

---

24   [1] A copy of the DIP Facility Agreement is attached hereto as Exhibit 2.  The description of

25   the DIP Facility contained in this Motion is a summary only and should not be construed as
     modifying or limiting the terms thereof.  Capitalized terms that are not defined herein shall

26   have the meanings ascribed to them in the DIP Facility Agreement.

**Page 3 of 11** -   DEBTOR'S MOTION FOR AUTHORITY TO OBTAIN SECURED CREDIT
                     ON INTERIM AND FINAL BASIS

1     f.  <u>Maturity Date</u>.  The DIP Facility shall mature, and all

2 obligations of Debtor under the DIP Facility shall be due and payable in full in cash on the

3 earliest of (i) the closing of a sale of all or substantially all of Debtor's assets pursuant to

4 11 U.S.C. § 363 or otherwise; or (ii) conversion or dismissal of this Chapter 11 case.

5     g.  <u>Collateral</u>.  The DIP Facility will be secured by a perfected

6 security interest in and lien on all Collateral (as defined in the DIP Facility Agreement),

7 including Lender's Continuing Security Interest until the DIP Facility is paid, subject only to

8 security liens and interests that were valid, perfected, enforceable and encumbered Debtor's

9 assets as of the Petition Date.

10     h.  <u>Super-Priority Administrative Expense</u>.  The DIP Facility will

11 be allowed as an administrative expense, with priority pursuant to the provisions of

12 Section 364(c)(1) of the Bankruptcy Code over all other administrative expenses of the kind

13 specified in Section 503(b) or Section 507(b) of the Bankruptcy Code, subject only to the

14 Carve-Out.

15     i.  <u>Carve-Out</u>.  The priorities, security interests and liens granted

16 to Lender will not encumber, burden or affect (i) any and all claims, defenses, causes of

17 action or rights of Debtor or its estate that arise under Sections 502(d), 544, 545, 547, 548,

18 549, 550 or 551 of the Bankruptcy Code, and any proceeds thereof;  (ii) $100,000 of the

19 $200,000 non-refundable deposit made or to be made by Lender pursuant to the Asset

20 Purchase Agreement executed by and between Lender and Borrower; and (iii) any claim of

21 Debtor against Lender arising from a breach by Lender of such Asset Purchase Agreement

22 (the "Excluded Rights").  Lender will not have or assert any right to or interest in the

23 Excluded Rights, either as Collateral or as a source of payment for its super-priority

24 administrative claim.

25     j.  <u>Events of Default</u>.  The occurrence of one or more of the

26 following events will constitute an "Event of Default" under the DIP Facility Agreement:

**Page 4 of 11** - DEBTOR'S MOTION FOR AUTHORITY TO OBTAIN SECURED CREDIT
     ON INTERIM AND FINAL BASIS

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1            (i)     the filing of a motion or taking of any action by Debtor

2 to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code that is

3 secured by liens of equal or senior priority to that of the liens securing the DIP Facility;

4            (ii)    the entry of an order amending, supplementing, staying,

5 vacating or otherwise modifying the Interim Order or Final Order without the written consent

6 of Lender;

7            (iii)   the allowance of any claim or claims under

8 Section 506(c) or 552(b) of the Bankruptcy Code against or in respect to Lender, the

9 Collateral, or the DIP Facility;

10            (iv)   the entry of an order by the Bankruptcy Court

11 appointing an interim or permanent trustee in the Chapter 11 case or an examiner in the

12 Chapter 11 case with enlarged powers to operate or manage the financial affairs, the

13 business, or reorganization of Debtor;

14            (v)    the dismissal of this Chapter 11 case or conversion of

15 this Chapter 11 case to a Chapter 7 case;

16            (vi)   the entry of an order by the Bankruptcy Court granting

17 relief from or modifying the automatic stay to allow Sussex Associates L.P. ("Sussex") to

18 execute upon or enforce a lien on any Collateral;

19            (vii)   the entry of an order in this Bankruptcy Case granting

20 any other super-priority administrative claim or lien equal or superior to that granted to

21 Lender, other than the Carve-Out;

22            (viii)  the Bankruptcy Court shall fail to enter the Interim

23 Order on or before January 18, 2016 or the Sale Order on or before February 15, 2016, or the

24 Interim Order, Final Order or Sale Order, as the case may be, are not in form or substance

25 satisfactory to Lender;

26

**Page 5 of 11** -    DEBTOR'S MOTION FOR AUTHORITY TO OBTAIN SECURED CREDIT
                      ON INTERIM AND FINAL BASIS

1   (ix)   Debtor fails to perform or observe any term, covenant

2   or agreement contained in the DIP Facility Agreement;

3   (x)   Debtor shall default in the observance or performance

4   of any provision contained in the DIP Facility Agreement or any other Loan Document and

5   such default shall continue unremedied for a period of five days after notice to the Borrower

6   from Lender;

7   (xi)   any of the Security Documents shall cease, for any

8   reason, to be in full force and effect or Debtor, or any Affiliate of Debtor, shall so assert, or

9   any Lien created by this Interim Order and/or any of the Security Documents shall cease to

10  be enforceable and of the same effect and priority  purported to be created thereby;

11  (xii)   the Asset Purchase Agreement between Debtor and

12  Lender for  the purchase and sale of Debtor's assets is terminated;

13  (xiii)   Debtor's exclusive right to propose a plan of

14  reorganization  is terminated or expires;

15  (xiv)   Debtor fails to pay any principal or interest of the Loan

16  when due in accordance with the terms hereof or in accordance with the Loan Documents; or

17  (xv)   any representation or warranty made by Debtor herein

18  or in any other Loan Document or that is contained in any certificate, document or financial

19  or other statement furnished by it at any time under or in connection with the DIP Facility

20  Agreement or any such other Loan Document shall prove to have been inaccurate in any

21  material respect on or as of the date made.

22                  **DISCLOSURES REQUIRED BY LBF 541.7**

23       6.     Debtor hereby identifies the following provisions identified in

24  LBF 541.7 that will be included in the DIP Facility Agreement, the Interim Order or the Final

25  Order:

26

**Page 6 of 11** -   DEBTOR'S MOTION FOR AUTHORITY TO OBTAIN SECURED CREDIT
                     ON INTERIM AND FINAL BASIS

1         a.     The DIP Facility Agreement provides that the allowance of a

2 claim under Section 506(c) of the Bankruptcy Code against or with respect to Lender or the

3 Collateral is an Event of Default.

4         b.     The DIP Facility Agreement provides that any attempt to

5 "prime" the secured position of Lender is an Event of Default.

6 **GENERAL BACKGROUND FACTS**

7     7.     HemCon began operations in 2001 and today brings advanced wound

8 care technologies to the worldwide healthcare market. United States headquarters are in

9 Portland, Oregon, with a wholly-owned operating subsidiary in Ireland and the Czech

10 Republic. In total, the company employs 23 individuals. Its broad offering of products and

11 technologies address under-served therapeutic wound care opportunities within rapidly

12 growing markets. The company's unique core competencies are biomaterial design and

13 product realization, in-depth knowledge of the advanced wound care market, and worldwide

14 medical regulatory and quality systems management. HemCon is a global leader in

15 hemostasis and infection control technology in a range of professional medical (e.g.,

16 surgery), interventional cardiology, dental, dialysis, post-procedure recovery, trauma,

17 military, and consumer over-the-counter applications. The company currently has active

18 research programs funded by private and public sources to create new product/technology

19 development in advanced wound care treatment.

20     8.     Sussex holds a claim against Debtor in the approximate amount of

21 $5 million, secured by accounts receivable, inventory, purchase orders, and all intellectual

22 property and patents owned or licensed for use by Debtor, but specifically excluding all

23 property, plant and equipment. Sussex does not have a security interest or lien on Debtor's

24 interests in its subsidiaries, intercompany obligations owing to Debtor by its subsidiaries, or

25 property, plant and equipment. Debtor believes the value of its interests in its subsidiaries,

26 together with its property, plant and equipment, exceeds $2 million.

**Page 7 of 11** -   DEBTOR'S MOTION FOR AUTHORITY TO OBTAIN SECURED CREDIT
                   ON INTERIM AND FINAL BASIS

TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    9.    Debtor's cash flow budget projects that Debtor will need

2    approximately $400,000 of post-petition financing for the next three to four weeks, and a

3    total of approximately $800,000 in post-petition financing for the next 13 weeks.  Debtor

4    needs access to post-petition financing to maintain operations.

5    10.    Debtor requires the DIP Facility to continue to operate as a going

6    concern, pay employees and trade creditors, and to preserve the value of its assets.  Absent

7    such financing, Debtor's estate will be immediately and irreparably harmed.  Debtor believes

8    that consummation of the DIP Facility is in the best interests of Debtor's estate.

9    **THE STALKING HORSE AGREEMENT AND PROPOSED SALE**

10    11.    Debtor and Lender have entered into an Asset Purchase Agreement

11    whereby Lender has agreed to purchase substantially all of Debtor's assets.  Pursuant to the

12    terms of the Asset Purchase Agreement, the aggregate consideration for Debtor's assets shall

13    include (a) $1,600,000 in cash; (b) assumption of obligations owing to Debtor's trade

14    creditors totaling approximately $622,550; (c) assumption and payment of all administrative

15    expenses, including the total obligation owed under the DIP Facility and compensation and

16    expenses allowed to Debtor's professionals;  (d) the amount (up to $150,000) required to

17    maintain directors' and officers' tail insurance for three years following closing of the sale;

18    and (e) the total obligation owed under the Pre-Petition Loan (as defined in the Asset

19    Purchase Agreement) of $200,000.  The total consideration paid or payable by Lender under

20    the Asset Purchase Agreement will approach $4 million.

21    12.    The Asset Purchase Agreement provides Debtor with a firm

22    commitment that is not subject to any financing or due diligence contingencies, and thereby

23    provides Debtor a floor against which other bidders can submit competing bids.  The Asset

24    Purchase Agreement allows for Debtor's creditors to benefit from the going-concern value of

25    the business and also achieves a preservation of jobs, assumption and assignment of contracts

26    and leases, and the assumption of administrative expense claims not paid prior to closing.

**Page 8 of 11** -    DEBTOR'S MOTION FOR AUTHORITY TO OBTAIN SECURED CREDIT
                ON INTERIM AND FINAL BASIS

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

13. Contemporaneously herewith, Debtor has filed the Sale Motion seeking, *inter alia*, (a) the entry of an order (i) establishing bidding and auction procedures (the "Bidding Procedures") in connection with the sale of Debtor's assets; (ii) approving proposed bid protections, including the payment of a reasonable breakup fee; (iii) scheduling an auction (the "Auction"); (iv) setting a date and time for the sale hearing (the "Sale Hearing"); and (v) establishing procedures for noticing and determining cure amounts for contracts and leases to be assumed and assigned in connection with the sale transaction; and (b) at the Sale Hearing, subject to the results of the Auction, the entry of an Order (i) approving and authorizing a sale to the winning bidder; and (ii) authorizing the assumption and assignment of certain contracts and leases.

## THE DIP FACILITY SHOULD BE APPROVED

14. The DIP Facility is the result of extensive arm's length negotiations between Debtor and Lender.

15. Approval of the DIP Facility will provide Debtor with immediate and ongoing access to borrowing availability to pay its current and ongoing operating expenses, including post-petition wages and salaries, and utility and vendor costs. Unless these expenses are paid, Debtor will be forced to cease operations and immediately liquidate. The availability of credit under the DIP Facility Agreement will provide confidence to Debtor's creditors that will enable and encourage them to continue their relationship with Debtor and thereby maintain a going-concern value through the completion of the sale of substantially all of Debtor's assets. Accordingly, the timely approval of the relief requested herein is imperative.

16. Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code, the Court may authorize Debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses, as specified in

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. Debtor proposes to obtain the financing set forth in the DIP Facility Agreement by providing, *inter alia*, super-priority claims, security interests and liens pursuant to Section 364(c)(1), (2) and (3).

17. Debtor is unable to procure sufficient financing in the form of unsecured credit allowable under Section 503(b)(1) as an administrative expense under Section 364(a) or (b), or an exchange for the grant of a super-priority administrative expense claim pursuant to Section 364(c)(1). Debtor has not been able to obtain post-petition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

18. The terms and conditions of the DIP Facility Agreement are fair and reasonable, and were negotiated extensively by well represented, independent parties in good faith and at arm's length. Accordingly, Lender, and all obligations incurred under the DIP Facility Agreement, should be accorded the benefits of Section 364(e) of the Bankruptcy Code.

## INTERIM APPROVAL SHOULD BE GRANTED

19. Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the Motion and authorize use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

20. Pursuant to Bankruptcy Rules 4001(b) and (c), Debtor requests that the Court conduct an expedited preliminary hearing on this Motion and (a) authorize Debtor to

**Page 10 of 11** - DEBTOR'S MOTION FOR AUTHORITY TO OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

borrow under the DIP Facility Agreement, on an interim basis pending entry of a Final Order in order to avoid immediate and irreparable harm and prejudice to Debtor's estate and all parties in interest; and (b) schedule a hearing to consider entry of a final order.

21.     Debtor has an urgent and immediate need for cash to preserve and maximize the value of its assets.  Currently, Debtor does not have sufficient unencumbered funds with which to do so.  Absent authorization from the Court to obtain secured credit on an interim basis pending a final hearing on the Motion, Debtor will be immediately and irreparably harmed.

22.     Notice of this Motion has been given to, among other parties, Sussex, the United States Trustee, and creditors holding the 20 largest unsecured claims.  Further notice is impractical in the circumstances.  Debtor submits that the foregoing constitutes good and sufficient notice and that no other or further notice need be given in the circumstances.

WHEREFORE, Debtor requests entry of an order granting the relief requested herein, setting a final hearing on the Motion, and such other and further relief as is appropriate.

DATED this 15th day of January, 2016.

TONKON TORP LLP

By /s/ Albert N. Kennedy
   Albert N. Kennedy, OSB No. 821429
   Timothy J. Conway, OSB No. 851752
   Attorneys for Debtor

035365/00006/6916994v3

TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

# EXHIBIT 1

## INTERIM ORDER

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

In re

HemCon Medical Technologies, Inc.,

　　　　　　Debtor.

Case No. 16-30119-pcm11

**INTERIM ORDER GRANTING DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS**

　　　　　This matter came before the Court on January _____, 2016, upon the motion [Dkt. No. _____] (the "Motion"), dated January _____, 2016, filed by debtor ("Debtor") in the above-captioned Chapter 11 case (the "Case") pursuant to Sections 105, 361, 362, 363 and 364 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-1 of the Local Rules (the "Local Rules") of the United States Bankruptcy Court for the District of Oregon, requesting, among other things entry of this interim order (this "Interim Order"):

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

**EXHIBIT 1**
**Page 1 of 11**

1.　　　　Authorizing Debtor to execute and enter into the DIP Credit and Security Agreement (the "DIP Facility") between Debtor and Tricol International Group Limited, ("Lender") (a copy of which is attached to the Motion as Exhibit 2), and to perform such other and further acts as may be required in connection with the DIP Facility;

2.　　　　Authorizing Debtor to obtain secured post-petition financing on a super-priority basis (the "DIP Facility Agreement") subject only to the Carve-Out (as that term is defined in the DIP Facility Agreement) and any valid and perfected liens or security interests in existence as of the Petition Date, which security to Lender shall include Lender's Continuing Security Interest (as that term is defined in the DIP Facility Agreement) until the DIP Facility is paid;

3.　　　　Granting super-priority administrative expense claims to Lender for the post-petition financing payable from, and having recourse to all of the pre-petition and post-petition property of Debtor's estate (the "Estate") and all proceeds thereof (except Excluded Rights) and subject to the Carve-Out (as both terms are defined in the DIP Facility), and granting liens for the post-petition financing to Lender in all Collateral in accordance with the DIP Facility and this Interim Order;

4.　　　　Scheduling a final hearing (the "Final Hearing") to be held on January _____, 2016 to consider entry of a final order authorizing, among other things, Debtor to obtain financing under the DIP Facility on a final basis (the "Final Order");

An interim hearing (the "Interim Hearing") on the Motion having been held before the Court on January _____, 2016, to consider entry of this Interim Order, appearances being noted on the record, Debtor and Lender having agreed to the entry of this Interim Order, all objections to the Interim Order being resolved, overruled or withdrawn, and after due deliberation and consideration and sufficient cause appearing therefor:

**Page 2 of 9** - INTERIM ORDER GRANTING DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

**EXHIBIT 1**
**Page 2 of 11**

Case 16-30119-pcm11　Doc 11　Filed 01/15/16

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, THAT:

1.     <u>Jurisdiction; Petition Date</u>

    a.     This Court has jurisdiction to hear this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(D), (K), (M), and (O).

    b.     On January 15, 2016, Debtor filed its Chapter 11 petition (the "Petition Date"). Since the Petition Date, Debtor has remained in possession and control of its assets as a debtor-in-possession pursuant to sections 1107 and 1108 of Title 11 of Bankruptcy Code.

2.     <u>Disposition</u>. The Motion is hereby granted, effective as of the date of the filing of the Motion, on an interim basis on the terms set forth herein. Any objections to the Motion or to the interim relief sought in the Motion have been resolved, withdrawn or are hereby overruled on the merits. This Interim Order shall be valid, binding on all parties in interest and fully effective on an interim basis upon entry by the Court.

3.     <u>Notice</u>. The Interim Hearing with respect to the Motion was held pursuant to the authorization of Bankruptcy Rule 4001(c)(2). Notice was served on the parties listed on the certificate of service filed in respect of the Motion.

4.     <u>Findings Regarding the DIP Facility Based on the Record at the Interim Hearing</u>

    a.     It is necessary for Debtor to obtain post-petition financing for a period of time and in an amount which would allow Debtor to continue to operate as a going concern, to pay employees, and to preserve the value of its assets. An immediate need exists for Debtor to obtain credit from Lender. Without such funds Debtor will not be able to continue the operation of its business and to pay its employees, and protect the value of its Estate.

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

**EXHIBIT 1**
**Page 3 of 11**

b.     Lender has indicated a willingness to extend post-petition secured credit under the terms and conditions of this Interim Order and the DIP Facility.  Debtor is unable to obtain financing on terms more favorable than terms offered by Lender under the DIP Facility and is unable to obtain adequate unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense.  Debtor is also unable to obtain secured credit under Section 364(c) and (d) of the Bankruptcy Code on terms more favorable than those set forth in the DIP Facility.

c.     The terms of the DIP Facility are fair and reasonable, were negotiated by the parties at arm's length and in good faith and are the best available to Debtor under present market conditions and Debtor's financial circumstances.  Based on the foregoing, any credit extended under the DIP Facility by Lender is extended in good faith, as that term is used in Section 364(e) of the Bankruptcy Code.

d.     Debtor, in order to satisfy its interim need for post-petition financing, as determined in the exercise of its sound business judgment, desires the Court to enter this Interim Order.  Entry of this Interim Order is necessary to prevent irreparable harm to Debtor, including the harm that would result from the disruption of Debtor's business, will increase the possibilities for a successful sale of Debtor's assets as a going concern, and is in the best interest of Debtor's Estate.  Absent entry of this Interim Order, Debtor's Estate will be immediately and irreparably harmed.  Consummation of the DIP Facility is in the best interest of Debtor's Estate.

5.     <u>Authorization of the DIP Facility</u>

a.     Debtor is authorized to enter into the DIP Facility and to incur post-petition debt under the DIP Facility pursuant to the terms of the DIP Facility and this Interim Order.  To the extent of any conflict between this Interim Order and the DIP Facility, this Interim Order shall govern.

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

**EXHIBIT 1**
**Page 4 of 11**

b.     In accordance with the terms of this Interim Order, the DIP Facility shall be used to (i) fund the working capital requirements and other financing needs of Debtor during the pendency of the Case, and (ii) pay certain costs and expenses of the administration of the case. Use of funds shall be consistent with the Budget attached hereto as **Exhibit 1**, which may be amended and updated from time to time by delivery of a revised and updated Budget by Debtor to Lender, which is approved by Lender and which shall be effective and become the Budget referred to herein upon Lender's approval. Debtor shall be in compliance so long as its actual net cash flow on a cumulative basis from the Petition Date is not less than 90% of the net cash flow projected in the Budget.

c.     In furtherance of the foregoing and without further approval of the Court, Debtor is authorized and directed on an interim basis to perform all acts, to make, execute and deliver all instruments and documents (including the execution or recordation of security agreements, mortgages and financing statements) that may be required, necessary (including necessary by reason of request by Lender) for Debtor's performance under the DIP Facility or this Interim Order.

d.     Upon execution of the DIP Facility and the entry of this Interim Order, obligations, agreements and covenants of Debtor under the DIP Facility shall be valid and binding and enforceable against Debtor under the terms of the DIP Facility and this Interim Order.

6.     <u>Post-Petition Indebtedness; Liens and Priority</u>

a.     Subject to the Carve-Out as defined in the DIP Facility, the Post-Petition Indebtedness shall be:

(1)     allowable under § 503(b)(1) of the Code as an administrative expense with priority pursuant to the provisions of § 364(c)(1) of the Code over all other administrative expenses of the kind specified in § 503(b) or § 507(b) of the Code and all other expenses and claims, subject only to the Carve-Out; and

**Page 5 of 9** - INTERIM ORDER GRANTING DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

**EXHIBIT 1**
**Page 5 of 11**

Case 16-30119-pcm11   Doc 11   Filed 01/15/16

(2)        secured by (and Lender is hereby granted) a security interest in and lien on all present and future property of the Estate, whether now held or hereafter acquired by the Estate, including Lender's Continuing Security Interest until the DIP Facility is paid (excepting the Excluded Rights), which lien and security interest shall have priority over all other liens, claims and expenses in Debtor's case except with respect to (a) the Carve-Out and (b) all other valid, duly perfected pre-petition security interests and liens in the assets of Debtor.

7.        <u>Perfection of Liens</u>.  Entry of this Interim Order automatically perfects the liens granted by paragraph 6(a)(2) of this Interim Order.  If, however, Lender, in its reasonable discretion, shall determine to file any such financing statements, mortgages, agreements, notices of lien, or similar instruments, or to otherwise confirm perfection of such Liens, all such documents shall be deemed to have been perfected at the time of and on the date of entry of this Interim Order, with the priorities set forth herein, and shall be and hereby are deemed and adjudicated senior to any other post-petition filing by any other person or entity with respect to the same Collateral.  A certified copy of the Interim Order may, in the discretion of Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

8.        <u>Events of Default</u>.  The Events of Default contained in the DIP Facility are hereby approved and incorporated herein by reference.

9.        <u>Lender's Remedies</u>.  Upon the occurrence of an Event of Default:

a.        Lender may refuse to make advances;

b.        Charge the default rate of interest in the DIP Facility Agreement;

c.        Declare the principal and accrued interest, fees and other liabilities of the DIP Facility to be immediately due and payable; and

**Page 6 of 9** -   INTERIM ORDER GRANTING DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

**EXHIBIT 1**
**Page 6 of 11**

Case 16-30119-pcm11    Doc 11    Filed 01/15/16

d.      Lender shall be entitled to an order terminating Debtor's authority to use cash collateral and granting relief from the automatic stay to enforce Lender's rights and remedies under this Interim Order and the DIP Facility, upon (i) filing a motion for relief from stay with the Court certifying the occurrence of an Event of Default; (ii) serving a copy of the motion for relief from stay upon Debtor, any Committee and the U.S. Trustee's Office, and (iii) an expedited hearing regarding relief from the automatic stay, which such hearing may be scheduled on not less than five days' prior notice to Debtor, any Committee, and the U.S. Trustee's office. Debtor shall be entitled to file a response to the motion for relief from stay with the Court, but such response must be limited to whether an Event of Default has occurred that has not been cured. If the Borrower fails to file such a response, the Court may enter an order terminating the automatic stay.

10.     <u>Successors and Assigns</u>. Except as otherwise stated herein, the provisions of this Interim Order shall be binding upon all persons and entities and shall inure to the benefit of Lender, Debtor and their respective successors and assigns, including, without limitation, any subsequent Chapter 11 or Chapter 7 trustee.

11.     <u>Stay; Modification</u>. No subsequent stay, modification, termination, failure to extend the term or vacation of this Interim Order shall affect, limit or modify the validity, priority or enforceability of any liability of Debtor under the DIP Facility or any lien or security interest granted to Lender under this Interim Order. All credit extended under the DIP Facility is made in reliance on this Interim Order, and the obligations Debtor incurs to Lender under the DIP Facility cannot be subordinated, lose superpriority status, or be deprived of the benefit of the liens granted to Lender by any subsequent order in Debtor's Chapter 11 case or a converted Chapter 7 case.

12.     <u>Amendments and Modifications</u>. Debtor and Lender may enter into any non-material amendments or modifications to the DIP Facility without notice or a hearing or

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

**EXHIBIT 1**
**Page 7 of 11**

further order of this Court; provided, however, that any such modifications shall be filed with the Court and shall not be adverse to Debtor or its Estate.

13.   Interim Order Governs.   Except as otherwise specifically provided in this Interim Order, in the event of a conflict between the provisions of this Interim Order, the Motion and the Loan Documents, the provisions of this Interim Order shall govern.

14.   Nothing in this Interim Order, the DIP Facility Agreement, or any other documents related to these transactions, shall in any way be construed or interpreted to impose or allow the imposition upon Lender of any liability for any claims arising from the pre-petition or post-petition activities of Debtor in the operation of its business or in connection with its restructuring efforts.

15.   Final Hearing.  The final hearing on approval of the DIP Facility is scheduled for January _____, 2016, at __:__ _.m. PST in Courtroom No. _____ of the United States Bankruptcy Court, 1001 SW Fifth Avenue, Portland, Oregon.

16.   Notice of Final Hearing; Objections to Entry of Final Order.  Debtor shall mail copies of this Interim Order (which shall constitute adequate notice of the Final Hearing, including notice that Debtors will seek at the Final Hearing a waiver of rights under Section 506(c) of the Bankruptcy Code) within three (3) business days from the date of entry of this Interim Order to the parties that received notice of the Interim Hearing, any other party that has filed a request for notices with the Court, to the Office of the United States Trustee and to counsel for any Committee that may be appointed in the Case.  Any party in interest objecting to the relief sought in the Final Order shall submit any such objection in writing and file and serve such objection so as to be received no later than January _____, 2016, at __:__ _.m. PST on the following:

a.   Tonkon Torp LLP; 1600 Pioneer Tower; 888 SW Fifth Avenue; Portland, Oregon 97204; Attention: Albert Kennedy; Albert.Kennedy@tonkon.com;

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

**EXHIBIT 1**
**Page 8 of 11**

Case 16-30119-pcm11   Doc 11   Filed 01/15/16

     b.  Farleigh Wada Witt, 121 SW Morrison Street, Suite 600, Portland,

Oregon 97204, Attention:  Tara J. Schleicher, tschleicher@fwwlaw.com.

     c.  Office of the United States Trustee for the District of Oregon, 620

SW Main Street, Room 213, Portland, Oregon 97205.

###

I certify that I have complied with the requirements of LBR 9021-1(a).

Presented by:

TONKON TORP LLP


By _____
  Albert N. Kennedy, OSB No. 821429
  Timothy J. Conway, OSB No. 851752
  888 S.W. Fifth Avenue, Suite 1600
  Portland, OR 97204-2099
  Telephone: 503-221-1440
  Facsimile: 503-274-8779
  E-mail:  al.kennedy@tonkon.com
      tim.conway@tonkon.com
  Attorneys for Debtor


cc:  List of Interested Parties

035365/00006/6955678v1

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

# EXHIBIT 1

## BUDGET

**EXHIBIT 1**
**Page 10 of 11**

Case 16-30119-pcm11    Doc 11    Filed 01/15/16

HemCon Medical Technologies Inc- Cash Forecast

## HemCon Inc DIP Budget

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Weeks beginning (on Mondays) | 1/18/2016 | 1/25/2016 | 2/1/2016 | 2/8/2016 | 2/15/2016 | 2/22/2016 | 2/29/2016 | 3/7/2016 | 3/14/2016 | 3/21/2016 | 3/28/2016 | 4/4/2016 | 4/11/2016 | |
| Weeks Ending (on Sundays) | 1/24/2016 | 1/31/2016 | 2/7/2016 | 2/14/2016 | 2/21/2016 | 2/28/2016 | 3/6/2016 | 3/13/2016 | 3/20/2016 | 3/27/2016 | 4/3/2016 | 4/10/2016 | 4/17/2016 | |
| **Operating Account** | | | | | | | | | | | | | | |
| **Beginning Cash Balance** | 3,500 | 228,971 | 33,114 | 70,111 | 413,932 | 319,652 | 120,523 | 164,967 | 101,373 | 93,685 | 30,918 | 47,453 | 30,021 | 3,500 |
| **Total Cash Receipts** | | | | | | | | | | | | | | |
| Accounts receivable | 21,751 | 18,772 | 75,218 | 92,283 | 17,253 | 24,180 | 6,412 | 1,605 | 6,998 | 133 | 784 | | | 265,388 |
| January Revenue | | | | | | | 65,000 | 75,000 | | | | | | 140,000 |
| Febuary Revenue | | | | | | | | | 75,000 | 75,000 | 77,500 | 80,000 | | 307,500 |
| March Revenue | | | | | | | | | | | | | 82,500 | 82,500 |
| DIP - Financing | 400,000 | | | 400,000 | | | | | | | | | | 800,000 |
| **Total Cash Receipts** | 421,751 | 18,772 | 75,218 | 492,283 | 17,253 | 24,180 | 71,412 | 76,605 | 81,998 | 75,133 | 78,284 | 80,000 | 82,500 | 1,595,388 |
| **Cash disbursements- Mandatory** | | | | | | | | | | | | | | |
| Royalties/ External Sales Commissions/ GPO | | 3,000 | | | | 3,000 | | | | | 3,000 | | | 9,000 |
| Patent Costs | | | 5,000 | | | | | | 7,500 | | | | 12,000 | 27,000 |
| Payroll | | 60,750 | | 67,500 | | 72,500 | | 67,500 | | 72,500 | | 67,500 | | 408,250 |
| Commissions | | | | | | 550 | 440 | | 1,565 | | | 2,100 | | 6,400 |
| Health, Dental, Benefits | | 18,000 | | | | 18,000 | | | | 18,000 | | | | 54,000 |
| Payroll Travel Expenses | | 3,000 | | 3,000 | | 3,000 | | 3,000 | | 3,000 | | 3,000 | | 18,000 |
| Insurance - Commercial | | 7,500 | | | | 7,500 | | | | 7,500 | | | | 22,500 |
| Rent | 3,500 | 17,000 | | | | 17,000 | | | 3,500 | | 3,500 | | | 51,000 |
| Bank charges/Credit Card Fees | | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 4,800 |
| IT- Microsoft, Covanent and QBS | | 7,000 | | | | | 7,000 | | | | 7,000 | | | 21,000 |
| Fedex- Freight/ 3PL | | | 3,500 | | 3,500 | | 3,500 | | 3,500 | | 3,500 | | 3,500 | 21,000 |
| ERP | | 20,000 | | 20,000 | | | | | | | | | | 40,000 |
| COD- Innovize | 174,503 | 42,439 | 6,210 | 49,134 | 68,468 | 73,568 | | 59,991 | 16,103 | 35,000 | | 20,303 | | 371,217 |
| COD- WuXi | | 5,000 | | | | | 5,487 | | | | 4,087 | | | 24,338 |
| COD- QBI | 18,278 | 12,795 | | 1,828 | 7,315 | 6,400 | | 6,207 | 5,483 | | 3,261 | 1,828 | 5,483 | 43,867 |
| COD- Raw Materials | | | 17,700 | | 16,450 | | 8,540 | | 16,935 | | 17,302 | | | 77,974 |
| COD- Steris | | 2,700 | | 1,600 | 10,000 | | 1,600 | 1,600 | | | 1,600 | 1,100 | 1,600 | 18,900 |
| Product Development | | 15,045 | 5,411 | 5,000 | 1,500 | 21,391 | | 1,500 | 38,200 | | | 1,200 | 6,378 | 100,201 |
| US- Trustee Fees | | | | | | | | | | 2,500 | | | 6,500 | 6,500 |
| **Total Cash Disbursements** | 196,281 | 214,628 | 38,221 | 148,462 | 111,533 | 223,309 | 26,967 | 140,198 | 89,686 | 137,900 | 61,750 | 97,431 | 35,861 | 1,522,228 |
| **Net Cash Flow** | 225,471 | (195,856) | 36,997 | 343,821 | (94,280) | (199,129) | 44,445 | (63,594) | (7,688) | (62,767) | 16,534 | (17,431) | 46,639 | 73,160 |
| **Ending Cash Balance** | 228,971 | 33,114 | 70,111 | 413,932 | 319,652 | 120,523 | 164,967 | 101,373 | 93,685 | 30,918 | 47,453 | 30,021 | 76,660 | 76,660 |

EXHIBIT 1
Page 1 of 1

EXHIBIT 1
Page 11 of 11

# EXHIBIT 2

## DIP CREDIT AND
## SECURITY AGREEMENT

# DIP CREDIT AND SECURITY AGREEMENT

THIS DIP CREDIT AND SECURITY AGREEMENT ("Agreement"), dated the _____ day of January, 2016, is made and executed by and among Tricol International Group Limited, a Marshall Islands corporation ("Lender"), and HemCon Medical Technologies, Inc., an Oregon corporation ("Borrower").

A.      On January15, 2016 (the "Petition Date"), Borrower commenced a case (the "Chapter 11 Case") under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Oregon (the "Bankruptcy Court"), and Borrower has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as debtor-in-possession.

B.      Borrower has requested that Lender provide Borrower a credit facility (the "Loan") in the principal amount of up to Eight Hundred Thousand Dollars ($800,000) (such amount, the "DIP Loan Amount") to fund, among other things, the working capital requirements of Borrower during the pendency of the Chapter 11 Case.

C.      Lender is willing to make advances (the "Loan") to Borrower up to the DIP Loan Amount upon the terms and conditions set forth herein.

Now, therefore, the parties agree as follows:

## SECTION 1.
## DEFINITIONS

### 1.1      Defined Terms

Terms used but not defined elsewhere in this Agreement shall have the meanings assigned to such terms on **Exhibit A** attached hereto.

## SECTION 2.
## LOAN AND TERMS OF PAYMENT

### 2.1      Loan

A.      **Loan; Advances**.  Subject to the terms and conditions of this Agreement, Lender will make the Loan to Borrower in multiple Advances as follows: (i) $400,000 (the "Interim Advance") on the Interim Order Effective Date; and (ii) $400,000 upon the later of January 28, 2016 or entry of the Final Order.  The Advance following the Interim Advance are referred to herein as the "Additional Advance."  Notwithstanding the above Advance schedule, no Advance will be made unless Borrower has satisfied all conditions for receipt of such Advance as set forth in this Agreement.

B.      **Disbursement of Funds**.  Lender will make each Advance available to Borrower on the applicable Disbursement Date by wire transfer to a separate and segregated account specified by Borrower and acceptable to Lender (the "Tricol DIP Account").  Lender

**EXHIBIT 2**
**Page 1 of 20**

shall be the only Person with a Lien on the Tricol DIP Account. Funds disbursed by Lender into the Tricol DIP Account shall remain in such account until utilized by Borrower as necessary to pay expenses pursuant to the Budget.

C. **Use of Loan Proceeds**. The proceeds of the Advances shall be used by Borrower (a) in accordance with, and for the purposes set forth in, the Budget, and (b) to make any other payments permitted to be made in the Interim Order, the Final Order or in the First Day Orders, or by the Bankruptcy Court to the extent not prohibited by this Agreement, the Interim Order, or the Final Order. Without limiting the preceding, proceeds of Advances will not be used by Borrower to pay down any obligation owing to Sussex Associates, L.P. ("Sussex").

D. **Note.** Upon request of Lender, the Borrower shall execute and deliver a promissory note to the Lender in the amount of the outstanding Loan made by Lender to Borrower in a form acceptable to the Lender.

### 2.2   Interest on Loan

A. **Interest Rate**. The outstanding principal balance of the Loan shall bear interest at the rate of 12% per annum.

B. **Computation of Interest**. Interest on the Loan shall be computed on the basis of a 360-day year and for the actual number of days elapsed in the period during which it accrues. In computing interest on the Loan, the date of the making of an Advance shall be included, and the date of payment of the Loan or the expiration date of an Interest Period shall be excluded.

C. **Default Interest Rate.** If any Event of Default shall occur on or after the Maturity Date, the outstanding Loan amount shall bear interest at the rate of 18% per annum from the date of nonpayment until such amount is paid in full in immediately available funds.

### 2.3   Loan Repayment

A. **Maturity Date.** The Loan, and all accrued but unpaid interest thereon, shall be paid in full on the Maturity Date, in cash, without further application to or order of the Bankruptcy Court.

B. **Prepayment.** The Loan may be prepaid, in whole or in part, from time to time without premium or penalty.

C. **Application of Payments**. Each payment received by Lender from Borrower with respect to the Loan shall be applied in the following order: first, to the repayment of any amounts voluntarily advanced by Lender as protective advances for insurance premiums, taxes, fees hereunder, assessments or for preservation or protection of the Collateral and to the payment of all costs and expenses due Lender hereunder (including all financial advisors' and attorneys' fees and costs payable hereunder); second, to the payment of accrued and unpaid interest on the Loan; and third, to the reduction of the outstanding principal balance of the Loan.

**SECTION 3.**
**CONDITIONS TO EFFECTIVENESS**

### 3.1 Conditions Precedent to Effectiveness of this Agreement

This Agreement shall become effective on the first Business Day that all of the following conditions precedent have been satisfied in a manner satisfactory to Lender in its sole discretion:

A.   Borrower shall have commenced the Chapter 11 Case;

B.   Borrower shall have filed the Sale Motion and the proposed Sale Order with the Bankruptcy Court in the Chapter 11 Case, each of which shall be in form and substance reasonably satisfactory to Lender in its sole discretion. The Sale Motion and the proposed Sale Order must provide that, unless the Loan and until Loan is paid and satisfied in full, any Alternative Purchaser takes the Collateral under a 363 sale subject to the security interest of Lender in the Collateral (the "Lender's Continuing Security Interest");

C.   The Lender shall have received each of the following, each of which shall be originals or electronic copies (followed promptly by originals), each dated on or immediately prior to the Effective Date, each in form and substance satisfactory to the Lender:

(i)   duly executed counterparts of this Agreement; and

(ii)   confirmation that financing statements have been duly filed on or before the Effective Date under the Uniform Commercial Code of all jurisdictions that the Lender may reasonably deem necessary in order to perfect and protect the Liens and security interests created under this Agreement, covering the Collateral;

D.   All of the "first day orders" and related orders submitted on or about the date of the commencement of the Case shall be in form and substance reasonably satisfactory to the Lender and the Borrower and, as entered, shall not deviate from the form thereof approved by the Lender in any material respect which is adverse to the interests of the Lender (such orders hereinafter being referred to as "First Day Orders");

E.   The Lender shall have received an initial Budget satisfactory to the Lender in its sole discretion; and

F.   Each of the representations and warranties made by the Borrower in or pursuant to this Agreement shall be true and correct on and as of such date.

### 3.2 Conditions to Interim Advance

In addition to the conditions precedent to the effectiveness of this Agreement, which conditions shall also be conditions precedent to the Interim Advance and shall be satisfied as of the Interim Order Effective Date, the obligation of Lender to make the Interim Advance is subject to the following further conditions precedent:

**EXHIBIT 2**
**Page 3 of 20**

Case 16-30119-pcm11   Doc 11   Filed 01/15/16

A. The Bankruptcy Court shall have entered the Interim Order, in form and substance satisfactory to Lender, and such Interim Order shall be in full force and effect and shall not have been reversed, stayed, modified or amended;

B. Borrower shall be in compliance with the Budget, subject to any Permitted Deviations;

C. Each of the representations and warranties made by the Borrower in or pursuant to this Agreement shall be true and correct on and as of such date; and

D. No Event of Default shall have occurred and be continuing on such date.

**3.3    Conditions Precedent to Additional Advance**

In addition to the conditions precedent to the effectiveness of this Agreement, which conditions shall also be conditions precedent to the Additional Advance and shall be satisfied as of the applicable Disbursement Date, the obligation of Lender to make an Additional Advance is subject to the following further conditions precedent**:**

A. The Bankruptcy Court shall have entered the Final Order, in form and substance satisfactory to Lender, and such Final Order shall be in full force and effect and shall not have been reversed, stayed, modified or amended;

B. The Bankruptcy Court shall have entered an order approving the proposed sale process set forth in the Sale Motion, which includes the Lender's Continuing Security Interest provision;

C. Borrower shall have submitted to Lender a Disbursement Request two (2) business days prior to the scheduled Disbursement Date;

D. Borrower shall be in compliance with the Budget, subject to Permitted Deviations;

E. Each of the representations and warranties made by the Borrower in or pursuant to this Agreement shall be true and correct on and as of such date; and

F. No Event of Default shall have occurred and be continuing on such date.

**SECTION 4.**
**SECURITY; ADMINISTRATIVE PRIORITY**

**4.1    Collateral; Grant of Lien and Security Interest.**

As security for the full and timely payment and performance of the Loan, Borrower assigns, pledges and grants to Lender a security interest in and to, and Lien on, all of the Collateral.  Upon entry of the Interim Order (and Final Order, as applicable), the Liens and security interests in favor of Lender shall be valid and perfected Liens and security interests in the Collateral, which Liens and security interests in favor of Lender shall be deemed perfected

**EXHIBIT 2**
**Page 4 of 20**

without the recordation or filing of any documents, instruments or financing statements; subject, however, to any and all valid and perfected Liens and security interests in existence on the Petition Date, as set forth in the Interim Order (or Final Order, as applicable). Lender's Liens and security interests, and its priority, shall remain in effect until the Loan has been indefeasibly paid in full.

**4.2  Administrative Priority**

Upon entry of the Interim Order (and the Final Order, as applicable), but subject to the Carve Out set forth below in subsection D, the Loan:

A.  Pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed claims in the Chapter 11 Case having priority over any and all administrative expenses and all other claims against Borrower, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code (including any adequate protection liens granted to existing secured creditors);

B.  Pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and Lien on all Collateral that is unencumbered as of the Petition Date (the "Unencumbered Collateral Liens");

C.  Pursuant to Section 364(c)(3) of the Bankruptcy Code, shall at all times be secured by valid, binding, continuing, enforceable and fully-perfected security interests in and Liens upon Collateral that is subject to the Senior Liens and junior only to such Senior Liens upon such Collateral (the "Junior Liens" together with "Unencumbered Collateral Liens," are referred to collectively as "Liens"); and

D.  The priorities, security interests and liens set forth above shall not encumber, burden or affect the Excluded Assets and the Excluded Assets are carved out from such priorities, security interests and Lien (the "Carve Out").

**4.3  No Discharge; Survival of Claims**

The super priority administrative claim granted to Lender pursuant to the Interim Order and Final Order, and the Liens granted to Lender pursuant to this Agreement, the Interim Order and Final Order, shall continue in full force and effect and maintain their priority as set forth in the Interim Order and the Final Order until the Loan has been repaid in full. The Borrower agrees that (i) its obligations hereunder shall not be discharged by the entry of an order confirming a Plan of Reorganization (the the Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge) and (ii) the super priority administrative claim granted to the Lender pursuant to the Interim Order and Final Order, and described in section 4 herein and the Liens granted to the Lender pursuant to the Interim Order and Final Order, and this Agreement shall not be affected in any manner by the entry of an order confirming a Plan of Reorganization.

**EXHIBIT 2**
**Page 5 of 20**

## SECTION 5.
## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into this Agreement and to make the Loan, Borrower represents and warrants to Lender, on the date of this Agreement, on the Interim Order Effective Date, and on each Disbursement Date, that the following statements are true and correct in all material respects.

### 5.1    Power and Authority

Upon entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), the execution, delivery and performance by Borrower of the Loan Documents and the creation of all Liens provided for therein:  (a) are within Borrower's power; (b) do not conflict with or result in the breach or termination of, constitute a default under, or accelerate or permit the acceleration of any performance required by any indenture, mortgage, deed of trust, material lease, material agreement or other material instrument entered into after the Petition Date to which such Person is a party or by which such Person or any of its property is bound, and (c) have been duly authorized by all necessary corporate action.  Each of the Loan Documents shall be duly executed and delivered by Borrower and, subject to entry of the Interim Order and the Final Order, each such Loan Document shall constitute a legal, valid and binding obligation of Borrower enforceable against it in accordance with its terms.

### 5.2    Chapter 11 Case

The Chapter 11 Case was commenced on the Petition Date in accordance with Applicable Law and proper notice thereof of the hearing for the approval of the Interim Order has been given, and proper notice for the hearing for the approval of the Final Order has or will be given.

### 5.3    Prepetition Liens

The only liens against the Collateral that exist are those held by Sussex as set forth on Exhibit D attached hereto and incorporated herein by this reference.

## SECTION 6.
## AFFIRMATIVE COVENANTS

The Borrower hereby agrees that, so long as the Commitment remains in effect or any Loan or Obligations or other amounts are owing to the Lender hereunder or under the Loan Documents, the Borrower shall:

### 6.1    Further Assurances

At any time or from time to time upon the request of the Lender, at the expense of the Borrower, promptly execute, acknowledge and deliver such additional instruments, certificates of documents, and do all other such acts and things as the Lender may reasonably request for purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, of providing for payment of the Obligations in accordance with the terms of this

**EXHIBIT 2**
**Page 6 of 20**

Case 16-30119-pcm11    Doc 11    Filed 01/15/16

Agreement, the Note and the other Loan Documents, or of more fully perfecting or renewing the rights of the Lender with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds or products thereof or with respect to any other property or assets hereafter acquired by Borrower which may be deemed to be part of the Collateral) pursuant hereto or thereto. Upon the exercise of the Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents that requires any consent, approval, recording, qualification or authorization of any Governmental Authority, the Borrower shall execute and deliver, or shall cause the execution or delivery of, all applications, certifications, instruments and other documents and papers that the Lender may be required to obtain from the Borrower for such governmental consent, approval, recording, qualification or authorization (to the extent the Borrower is permitted by applicable law to do so). The Borrower shall fully preserve or cause to be fully preserved the Liens granted by this Agreement. The Borrower agrees that all costs and expenses reasonably expended or otherwise incurred pursuant to this Section 6.1 (including reasonable attorney fees and disbursements) by the Lender shall constitute Obligations and shall be paid by the Borrower in accordance with the terms hereof.

### 6.2     Preservation of Existence, Business

(a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary in the normal conduct of its business; (c) preserve or renew all of its material registered patents, trademarks, trade names and service marks; and (d) maintain and operate its business in substantially the manner in which it is presently conducted and operated.

### 6.3     Budgets; Financial Information; Default Notices

A.      Not later than Friday of each week (or if such day is not a Business Day, the next succeeding Business Day), an updated Budget for the immediately following 6-week period, together with a flash report as to the actual performance of the prior two-week period ending Friday and a comparison of the actual performance for that period against the forecast for that period in the previous Budget, in each case with written explanations of material variances;

B.      within 25 days following each month end, upon request by the Lender, such consolidated balance sheets of the Borrower, related consolidated statements of income or operations, shareholders' equity and cash flows, cash balance reports or any other financial reports as requested by Lender; and

C.      promptly (and in any event within two Business Days) provide written notice to the Lender of the occurrence of any Default or Event of Default, describing the nature of such Default or Event of Default and any remedial actions being taken with respect thereto.

### 6.4     Insurance

The Borrower shall provide evidence of insurance satisfactory to the Lender in its sole discretion, naming the Lender as additional insured and loss payee.

**EXHIBIT 2**
**Page 7 of 20**

# SECTION 7.
# EVENTS OF DEFAULT; REMEDIES

**7.1     Events of Default**

Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and without application or motion to the Bankruptcy Court or any notice to Borrower, and subject to Section 7.2, the occurrence of any one or more of the following events (regardless of the reason therefore) shall constitute an "Event of Default" hereunder:

A.     The filing of a motion or taking of any action by Borrower:  (i) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code that is secured by Liens of equal or senior priority to that of the Liens securing the Loan, except with the consent of Lender, which consent may be withheld in its sole discretion; (ii) the grant of any lien not permitted hereunder; (iii) the taking of any other action or actions adverse to Lender or its rights and remedies hereunder or its interest in the Collateral, including, without limitation, any such action or actions which seek to reduce, set-off or subordinate the Loan or challenge Lender's Lien in any of the Collateral;

B.     The entry of an order amending, supplementing, staying, vacating or otherwise modifying the Interim Order or Final Order without the written consent of Lender, which consent may be withheld in its sole discretion, or the filing by Borrower of a motion for reconsideration with respect to the Interim Order of the Final Order;

C.     The allowance of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to the Lender, the Collateral, or the Loan;

D.     The entry of an order by the Bankruptcy Court appointing an interim or permanent trustee in the Chapter 11 Case or an examiner in the Chapter 11 Case with enlarged powers to operate or manage the financial affairs, the business, or reorganization of Borrower; or the sale without the prior written consent of Lender, which consent may be withheld in its sole discretion, of all or substantially all of Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise, that does not provide for indefeasible payment in cash in full of the Loan;

E.     The dismissal of the Chapter 11 Case or the conversion of the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code;

F.     The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code without the prior written consent of Lender, which consent may be withheld in its sole discretion, to allow Sussex to execute upon or enforce a lien on any Collateral;

G.     Except as set forth in the Interim Order or the Final Order, the entry of an order in the Chapter 11 Case granting any other super-priority administrative claim or lien  equal or superior to that granted to Lender, other than the CarveOut;

**EXHIBIT 2**
**Page 8 of 20**

H.    (i) The Bankruptcy Court shall have failed to enter the Interim Order on or before January 18, 2016 or the Sale Order on or before February 15, 2016, (ii) the Bankruptcy Court shall not have entered the Final Order prior to the expiration of the Interim Order, or (iii) the Interim Order, the Final Order or the Sale Order, as the case may be, are not in form or substance satisfactory to Lender, or have been vacated, reversed, modified or amended without the consent of Lender, which consent may be withheld in its sole discretion;

I.    The Borrower fails to perform or observe any term, covenant or agreement contained in Sections 4, 5 and 6;

J.    The Borrower shall default in the observance or performance of any provision contained in this Agreement or any other Loan Document and such default shall continue unremedied for a period of five days after notice to the Borrower from the Lender;

K.    Any of the Security Documents shall cease, for any reason, to be in full force and effect or the Borrower, or any Affiliate of the Borrower, shall so assert, or any lien created by this Agreement and/or any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby;

L.    The Asset Purchase Agreement between the Borrower and the Lender for the purchase and sale of the Borrower's assets is terminated;

M.    The Borrower's exclusive right to propose a plan of reorganization is terminated or expires;

N.    The Borrower fails to pay any principal or interest of the Loan when due in accordance with the terms hereof or in accordance with the Loan Documents; or

O.    Any representation or warranty made by the Borrower herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made.

**7.2    Remedies**

Upon the occurrence of an Event of Default, Lender, without further order of or application to the Bankruptcy Court, may (a) deliver a notice of an Event of Default and declare all or any portion of the Loan to be forthwith due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrower; and (b) following a hearing on no less than five (5) days' notice with respect to its motion for relief from stay (a "Stay Motion") to an order (i) terminating Debtor's authority to use cash collateral and (ii) granting relief from the automatic stay authorizing Lender to exercise any and all of its rights and remedies under Applicable Law with respect to the Collateral, or to otherwise liquidate the Collateral (or any part thereof), and to realize on all or part of the Collateral. In connection with a Stay Motion, Lender shall be entitled to seek Bankruptcy Court-ordered access to all of Borrower' properties to allow Lender to obtain possession of and/or dispose of the Collateral following the occurrence of an Event of Default.

**EXHIBIT 2**
**Page 9 of 20**

Case 16-30119-pcm11    Doc 11    Filed 01/15/16

# SECTION 8.
# MISCELLANEOUS

### 8.1    Notices

A.    **Notices Generally**.    Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, or sent by telecopier (without receipt of confirmation obtained) as follows:

| | |
|---|---|
| If to Borrower: | HemCon Medical Technologies, Inc. |
| | c/o Stuart Sands |
| | 720 SW Washington Street, Suite 200 |
| | Portland, OR 97205 |
| | Fax:  503-245-1326 |
| | |
| with a copy to: | Tonkon Torp LLP |
| | c/o Albert N. Kennedy |
| | 1600 Pioneer Tower |
| | 888 SW Fifth Avenue |
| | Portland, OR 97204-2099 |
| | Fax:  503-972-3713 |
| | |
| If to Lender: | Tricol International Group Limited |
| | The First of the South, Chuangxin Road |
| | Linqu County |
| | Weifang City, Shandong Province 261000 |
| | People's Republic of China |
| | Fax:  NEED FAX # |
| | |
| with a copy to: | Farleigh Wada Witt |
| | c/o Tara J. Schleicher |
| | 121 SW Morrison Street, Suite 600 |
| | Portland, OR 97204-3192 |
| | 503-228-1741 |

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).

B.    **Change of Address, Etc.**  Any party hereto may change its address or telecopier number for notices and other communications hereunder by notice to the other parties hereto.

**EXHIBIT 2**
**Page 10 of 20**

Case 16-30119-pcm11    Doc 11    Filed 01/15/16

**8.2    Survival of Representations, Warranties and Agreements**

All representations, warranties and agreements made herein shall survive the execution and delivery of this Agreement and the making of the Loan hereunder.

**8.3    Failure or Indulgence Not Waiver; Remedies Cumulative**

No failure or delay on the part of Lender in the exercise of any power, right or privilege hereunder, or under any other Loan Document, shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  All rights and remedies existing under this Agreement and the other Loan Documents are cumulative to, and not exclusive of, any rights or remedies otherwise available.

**8.4    Severability**

In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**8.5    Headings**

Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

**8.6    Applicable Law; Successors and Assigns**

THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF OREGON, EXCEPT AS GOVERNED BY THE BANKRUPTCY CODE.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns, and shall inure to the benefit of the parties hereto and the successors and assigns of Lender.  Borrower's rights or obligations hereunder, or any interest therein, may not be assigned or delegated by Borrower without the prior written consent of Lender.

**8.7    Consent to Jurisdiction**

A.      EACH PARTY HERETO HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN BORROWER AND LENDER PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED THAT LENDER AND BORROWER ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A UNITED STATES DISTRICT COURT OTHER THAN THE

BANKRUPTCY COURT; PROVIDED FURTHER THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION AFTER THE OCCURRENCE OF AN EVENT OF DEFAULT AND, TO THE EXTENT PERMITTED UNDER AN ORDER ENTERED ON A STAY MOTION, TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE LOAN, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF LENDER.  IF THE BANKRUPTCY COURT ABSTAINS FROM HEARING OR REFUSES TO EXERCISE JURISDICTION OVER ANY OF THE FOLLOWING, THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN OREGON.

**8.8    Waiver of Jury Trial**

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER; AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**8.9    Lender's Attorney Fees and Disbursements**

Borrower agrees to pay on the Maturity Date Lender's attorney fees and disbursements incurred in connection with the enforcement of the terms of this Agreement and the other Loan Documents.

**8.10    Counterparts; Integration; Effectiveness; Miscellaneous**

This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, together with the Interim Order and the Final Order, constitutes the entire contract among the parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by Lender and Borrower, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement, or any document or instrument delivered in connection herewith, by telecopy or other electronic means shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

**EXHIBIT 2**
**Page 12 of 20**

Case 16-30119-pcm11    Doc 11    Filed 01/15/16

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time Modified (subject to any restrictions set forth herein); (b) all references herein to sections, Exhibits and Schedules shall be construed to refer to sections of, and Exhibits and Schedules to, this Agreement (unless expressly referring to another agreement); and (c) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all documents, general intangibles, goods, intellectual property, investment-related property, letter of credit rights, cash, receivables, Commercial Tort Claims, Material Contracts, and proceeds therefrom.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**BORROWER:**

HEMCON MEDICAL TECHNOLOGIES, INC.

**LENDER:**

TRICOL INTERNATIONAL GROUP LIMITED

By _____

Its _____

By _____

Its _____

035365/00006/6910970v6

**EXHIBIT A**
**Definitions**

"***Advance***" means, collectively, the Interim Advance and Additional Advance.

"***Agreement***" means this DIP Credit and Security Agreement as it may be amended, restated supplemented or otherwise modified from time to time.

"***Applicable Laws***" means, collectively, all statutes, laws, rules, regulations, ordinances, the common law, decisions, writs, judgments, decrees, and injunctions of any Governmental Authority affecting Borrower or any Collateral, or any of the other assets of Borrower, whether now or hereafter enacted and in force, and all Governmental Authorizations relating thereto, and all covenants, conditions, and restrictions contained in any instruments, either of record or known to Borrower, at any time in force affecting the Mortgaged Property or any part thereof, including any such covenants, conditions and restrictions which may (a) require improvements, repairs or alterations in or to the Mortgaged Property or any part thereof or (b) limit the use and enjoyment of the Mortgaged Property as used or intended to be used by Borrower.

"***Bankruptcy Code***" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect and applicable to the Chapter 11 Case, or any successor statute.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the District of Delaware, or such other court as is exercising jurisdiction over the Chapter 11 Case or any part thereof.

"***Borrower***" shall have the meaning provided in the introductory paragraph hereof.

"***Budget***" means that certain Budget attached hereto as Exhibit B-1, as updated each week in accordance with this Agreement.

"***Business Day***" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"***Collateral Documents***" means any documents, instruments or agreements delivered by Borrower pursuant to this Agreement or any of the other Loan Documents in order to grant, protect or perfect Liens on any assets of Borrower as security for all or any of the Loan.

"***Collateral***" means all of the properties and assets now or hereafter owned by Borrower, including those upon which Lender has been granted one or more Liens pursuant to this Agreement; including, without limitation, all present and future accounts receivable, inventory, general intangibles, payment intangibles, supporting obligations, investment property, development orders, environmental permits or other approvals to develop any real property, machinery, equipment, subsidiary capital stock, Pledged Interests, chattel paper, documents, instruments, deposit accounts, contract rights, property tax refunds, and all rights, claims, and other causes of action of Borrower and Borrower's estate (including any actions asserted by Borrower or any subsequently appointed trustee or representative of Borrower's estate under any Section of the Bankruptcy Code), chattel paper, leaseholds, fixtures, machinery and equipment,

DIP CREDIT AND SECURITY AGREEMENT - EXHIBIT A– PAGE 1

**EXHIBIT 2**
**Page 14 of 20**

Case 16-30119-pcm11    Doc 11    Filed 01/15/16

deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property that is property of Borrower's estate and on all cash and investments, and in each case, all proceeds resulting therefrom, excluding, however, the Excluded Rights, and provided that super-priority administrative expense claims may not be satisfied from the proceeds of Excluded Rights.

*"**Commitment**"* means the obligation of the Lender to make the Advance.

"***Default***" means a condition or event that, after notice or after any applicable grace period has lapsed, or both, would constitute an Event of Default.

"***Disbursement Date***" means such date as an Advance of Loan proceeds is made hereunder.

"***Disbursement Request***" means a written request for an Additional Advance, in form and substance reasonably acceptable to Lender, delivered by Borrower to Lender with respect to a proposed borrowing, and which, among other things, includes the requested Disbursement Date and certifies that all conditions precedent for Borrower to obtain the Advance have been satisfied.

"***Dollars***" and the sign "***$***" mean the lawful money of the United States of America.

"***Excluded Rights***" means (a) any and all claims, defenses, causes of action or rights of Borrower or its estate as arise under 502(d), 544, 545, 547, 548, 549, 550 or 551 of the Bankruptcy Code and any proceeds therefrom; (b) $100,000 of the $200,000 non-refundable deposit made or to be made by Lender pursuant to the Asset Purchase Agreement executed by and between Lender and Borrower; and (c) any claim of Borrower against Lender arising from a breach by Lender of such Asset Purchase Agreement . It is explicitly understood and agreed by the parties that Lender will not have or assert any right to or interest in the Excluded Rights, either as Collateral or as a source of payment for its super-priority administrative claim under 11 U.S.C. § 364(c).

"***Final Order***" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to Lender in its sole discretion, and which shall be in full force and effect and shall not have been stayed, reversed, vacated, subject to appeal, or otherwise modified in a manner opposed by Lender, together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes Borrower to obtain credit, incur (or guaranty) indebtedness and grant Liens under this Agreement and the other Transaction Documents, as the case may be, and provides for Lender's Liens and super-priority claims of Lender in and to the Collateral, subject to the Carve-Out, *provided that* in all events the terms and provisions of the Final Order shall be consistent with those of the Interim Order.

*"**Governmental Authority**"* means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative

functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"***Interim Order Effective Date***" means the first Business Day following entry of the Interim Order.

"***Interim Order***" means the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing, together with all extension, modifications, and amendments thereto, in form and substance substantially similar to **Exhibit C** attached hereto and otherwise reasonably satisfactory to Lender.

"***Lien***" means any lien, mortgage, pledge, collateral assignment, hypothecation, security interest, fixed or floating charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any security interest) and any option, trust or deposit or other preferential arrangement having the practical effect of any of the foregoing, including the Lender's Continuing Security Interest as defined in Section 3.1 (B) of this Agreement.

"***Loan Documents***" means this Agreement and any security agreements, pledge agreements, Collateral Documents or other documents at any time evidencing or securing the Loan.

"***Loan***" has the meaning assigned to that term in the recitals to this Agreement.

"***Maturity Date***" means the earliest of (a) the closing of a sale of all or substantially all of Borrower's assets pursuant to 11 U.S.C. Section 363 or otherwise; or (b) conversion or dismissal of the Chapter 11 Case.

"***Obligations***" means the unpaid principal of and interest on (including interest accruing after the Maturity Date) the Loan, and all other obligations and liabilities of the Borrower to the Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with this Agreement, any other Loan Documents or any other document made, delivered or given in connection with, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Lender, that are required to be paid by the Borrower pursuant hereto) or otherwise.

"***Order***" means either the Interim Order or the Final Order, as applicable; "***Orders***" means the Interim Order and Final Order, together.

"***Permitted Deviation***" means, a cumulative adverse deviation from the net cash flow line of the Budget in excess of 10%.

"***Person***" means any natural person, corporation, limited liability company, trust, joint venture, joint stock company, association, company, partnership, limited partnership, Governmental Authority or other entity of whatever nature.

"***Petition Date***" has the meaning ascribed to that term in the recitals of this Agreement.

DIP CREDIT AND SECURITY AGREEMENT - EXHIBIT A– PAGE 3

**EXHIBIT 2**
**Page 16 of 20**

Case 16-30119-pcm11    Doc 11    Filed 01/15/16

"**_Pledged Interests_**" means all shares of stock and other equity interests from time to time acquired by or owned by Borrower in any manner and the certificates, if any, representing such additional shares or other equity interests, and all dividends, distributions, return of capital, cash, instruments, and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all such shares or other equity interests and all subscription warrants, rights or options issued thereon or with respect thereto.

"**_Sale Motion_**" means the motion filed by Borrower in the Chapter 11 Case seeking approval of the Sale Order.

"**_Sale Order_**" means the "Order Approving (A) the Form of the Asset Purchase Agreement, (B) the Bidding Procedures, (C) the Sale Notice and (D) the Assumption and Assignment Procedures" (also referred to or known as the "Bidding Procedures Order") entered in the Chapter 11 Case.

"**_Security Documents_**" means any and all security documents hereafter delivered to the Lender granting or perfecting a Lien on any property any Person to secure the Obligations, including this Agreement, the Interim Order and the Final Order.

"**_Senior Liens_**" means any security interest and Liens that were valid, perfected, enforceable and encumbered Borrower's assets as of the Petition Date.

"**_Transactions_**" means the consummation of the transactions contemplated under this Agreement.

"**_Trustee_**" means the United States Trustee for the District of Delaware.

"**_UCC_**" means the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of Delaware or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such state.

**EXHIBIT B-1**
**Budget**


[See Attached]

HemCon Medical Technologies Inc- Cash Forecast

## HemCon Inc DIP Budget

| Operating Account | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Weeks beginning (on Monday) | 1/18/2016 | 1/25/2016 | 2/1/2016 | 2/8/2016 | 2/15/2016 | 2/22/2016 | 2/29/2016 | 3/7/2016 | 3/14/2016 | 3/21/2016 | 3/28/2016 | 4/4/2016 | 4/11/2016 | |
| Weeks ending (on Sundays) | 1/24/2016 | 1/31/2016 | 2/7/2016 | 2/14/2016 | 2/21/2016 | 2/28/2016 | 3/6/2016 | 3/13/2016 | 3/20/2016 | 3/27/2016 | 4/3/2016 | 4/10/2016 | 4/17/2016 | |
| **Beginning Cash Balance** | 3,500 | 228,971 | 33,114 | 70,111 | 413,932 | 319,652 | 120,523 | 164,967 | 101,373 | 93,685 | 30,918 | 47,453 | 30,021 | 3,500 |
| **Total Cash Receipts** | | | | | | | | | | | | | | |
| Accounts receivable | 21,751 | 18,772 | 75,218 | 92,283 | 17,253 | 24,180 | 6,412 | 1,605 | 6,998 | 133 | 784 | - | - | 265,388 |
| January Revenue | - | - | - | - | - | - | 65,000 | 75,000 | - | - | - | - | - | 140,000 |
| February Revenue | - | - | - | - | - | - | - | - | 75,000 | 75,000 | 77,500 | 80,000 | - | 307,500 |
| March Revenue | - | - | - | - | - | - | - | - | - | - | - | - | 82,500 | 82,500 |
| DIP - Financing | 400,000 | - | - | 400,000 | - | - | - | - | - | - | - | - | - | 800,000 |
| **Total Cash Receipts** | 421,751 | 18,772 | 75,218 | 492,283 | 17,253 | 24,180 | 71,412 | 76,605 | 81,998 | 75,133 | 78,284 | 80,000 | 82,500 | 1,595,388 |
| **Cash disbursements - Mandatory** | | | | | | | | | | | | | | |
| Royalties/External Sales Commissions/ GPO | - | 3,000 | - | - | - | 3,000 | - | - | - | - | 3,000 | - | - | 9,000 |
| Patent Costs | - | - | 5,000 | - | 10,000 | - | - | - | - | - | - | - | 12,000 | 27,000 |
| Payroll | - | 60,750 | - | 67,500 | - | 72,500 | - | 67,500 | - | 72,500 | - | 67,500 | - | 408,250 |
| Commissions | - | - | - | - | - | 6,400 | - | - | - | - | - | 2,100 | - | 6,400 |
| Health, Dental, Benefits | - | 18,000 | - | - | - | 18,000 | - | - | - | - | 18,000 | - | - | 54,000 |
| Payroll Travel Expenses | - | 3,000 | - | 3,000 | - | 3,000 | - | 3,000 | - | 3,000 | - | 3,000 | - | 18,000 |
| Insurance - Commercial | - | 7,500 | - | - | - | 7,500 | - | - | 7,500 | 7,500 | - | - | - | 22,500 |
| Rent | - | 17,000 | - | - | - | 17,000 | - | - | - | 17,000 | - | - | - | 51,000 |
| Bank charges/Credit Card Fees | - | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 4,800 |
| IT- Microsoft, Covenant and OBS | - | 7,000 | - | - | - | - | 7,000 | - | - | - | 7,000 | - | - | 21,000 |
| Fedex-Freight/3PL | 3,500 | - | 3,500 | - | 3,500 | - | 3,500 | - | 3,500 | - | 3,500 | - | 3,500 | 21,000 |
| ERP | - | 20,000 | - | 20,000 | - | - | - | - | - | 35,000 | - | - | - | 40,000 |
| COD- Innovize | 174,503 | 42,439 | 6,210 | 49,134 | 68,468 | 73,568 | - | 59,991 | 16,103 | - | 3,261 | 20,303 | - | 371,217 |
| COD- WoVI | - | 5,000 | - | - | 7,315 | 550 | - | 6,207 | 1,565 | - | - | - | 5,483 | 24,338 |
| COD- QBI | 18,278 | 12,795 | - | 1,828 | 16,450 | - | 440 | - | 5,483 | 2,500 | 4,087 | 1,828 | 6,378 | 43,867 |
| COD- Raw Materials | - | - | 17,700 | - | - | - | 5,487 | - | 38,200 | - | - | - | - | 77,974 |
| COD- Steris | - | 2,700 | - | 1,600 | 3,900 | 21,391 | 1,600 | 1,200 | - | - | 5,200 | 1,100 | 1,600 | 18,900 |
| Product Development | - | 15,045 | 5,411 | 5,000 | 1,500 | - | 8,540 | 1,500 | 16,935 | - | 17,302 | 1,200 | - | 100,201 |
| US- Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | - | 6,500 | 6,500 |
| **Total Cash Disbursements** | 196,281 | 214,628 | 38,221 | 148,462 | 111,533 | 223,309 | 26,967 | 140,198 | 89,686 | 137,900 | 61,750 | 97,431 | 35,861 | 1,522,228 |
| **Net Cash Flow** | 225,471 | (195,856) | 36,997 | 343,821 | (94,280) | (199,129) | 44,445 | (63,594) | (7,688) | (62,767) | 16,534 | (17,431) | 46,639 | 73,160 |
| **Ending Cash Balance** | 228,971 | 33,114 | 70,111 | 413,932 | 319,652 | 120,523 | 164,967 | 101,373 | 93,685 | 30,918 | 47,453 | 30,021 | 76,660 | 76,660 |

**EXHIBIT B-1**
**Page 1 of 1**

**EXHIBIT 2**
**Page 19 of 20**

**EXHIBIT C**
**Interim Order**


[Not Attached]

**EXHIBIT 2**
**Page 20 of 20**

Case 16-30119-pcm11    Doc 11    Filed 01/15/16