1  **Albert N. Kennedy**, OSB No. 821429 (Lead Attorney)
      Direct Dial:  (503) 802-2013
2     Facsimile:    (503) 972-3713
      E-Mail:       al.kennedy@tonkon.com
3  **Timothy J. Conway**, OSB No. 851752
      Direct Dial:  (503) 802-2207
4     Facsimile:    (503) 972-3727
      E-Mail:       tim.conway@tonkon.com
5  **TONKON TORP** LLP
   1600 Pioneer Tower
6  888 S.W. Fifth Avenue
   Portland, OR  97204
7
      Attorneys for Debtor
8

9

10             UNITED STATES BANKRUPTCY COURT

11                   DISTRICT OF OREGON

12  In re                                  Case No. 16-30119-pcm11

13  HemCon Medical Technologies, Inc.,     **DEBTOR'S MOTION FOR ORDER APPROVING (A) BID AND SALE**
14              Debtor.                     **PROCEDURES INCLUDING BREAK UP FEE TO TRICOL INTERNATIONAL**
15                                          **GROUP LIMITED AS STALKING HORSE BIDDER; (B) SALE OF DEBTOR'S ASSETS**
16                                          **FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; AND**
17                                          **(C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS**
18                                          *(EXPEDITED HEARING ON REQUESTED)*

19

20             HemCon Medical Technologies, Inc., Debtor and Debtor-in-Possession

21  ("Debtor" or "HemCon"), moves this Court for an order (A) establishing bid and sale

22  procedures including a break-up fee to Tricol International Group Limited ("Tricol") as the

23  stalking horse bidder; (B) approving the sale of Debtor's assets free and clear of all liens,

24  claims, interests and encumbrances to the bidder with the highest and best offer received at

25  an auction (the "Successful Bidder"); (C) determining that the Successful Bidder is not a

26  successor to Debtor; (D) enjoining any person who has received notice from pursuing the

1 Successful Bidder to recover on any claims they may have against Debtor; and (E) approving

2 the assumption and assignment of executory contracts to the winning bidder. Debtor requests

3 an expedited hearing with respect to the bid and sale procedures such that an order can be

4 entered approving the applicable procedures on or before February 5, 2016.

5 **INTRODUCTION**

6 1. Debtor filed its voluntary petition for relief under Chapter 11 of the

7 Title 11 of the United States Code ("Bankruptcy Code") on January 15, 2016 ("Petition

8 Date").

9 2. Debtor is currently operating its business and managing its property as

10 Debtor-in-Possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

11 **JURISDICTION**

12 3. This Court has subject matter jurisdiction to consider this matter

13 pursuant to 28 U.S.C. §§ 157 and 1334. Venue is properly before this Court pursuant to 28

14 U.S.C. §§ 1408 and 1409.

15 4. The statutory predicates for the relief sought herein include Sections

16 105(a), 363, 365, and, if applicable, 1146 and 1129 of the Bankruptcy Code and Rules 2002,

17 6004, 6006, 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and

18 applicable local rules and administrative orders.

19 **BACKGROUND**

20 5. Beginning in February 2015, Debtor's executives began taking actions

21 to address capital requirement needs of Debtor and its affiliates. In May 2015, new equity

22 capital was sought for investment into Debtor's parent company, TriStar Wellness Solutions,

23 Inc. ("TWSI") to operate Debtor. A diligence room, documents and business plans were

24 made available to those with transactional interest. The effort was aimed at three market

25 groups, broker/dealer investment firms; individual investors/funding source finders; and trade

26

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  industry buyers. The data room was opened in early June to all prospects in each group after

2  signing a non-Disclosure Agreement required to access the data room.

3        6.    By June 2015 the strategy changed to focusing on a sale of Debtor's

4  assets. A non-exclusive Advisory Services Agreement was entered into in September 2015

5  with Healthios Capital Markets, LLC ("Healthios"), a registered broker/dealer focused

6  exclusively on HealthCare transactions with offices in Boston, London, Geneva and

7  Bangkok. Healthios targeted 37 industry leaders on the acquisition of Debtor's assets. At the

8  same time, Debtor's executives contacted 38 individual investors and small funding sources.

9  In addition, approximately 12 broker/dealer investment firms were contacted to discuss

10  capital infusions or merger and acquisition interest.

11        7.    From June through December 2015, Debtor engaged in 83 meetings

12  with prospective purchasers and hosted nine site visits regarding a potential sale. The sales

13  efforts resulted in 1,106 document views and downloads from Debtor's due diligence room.

14  Substantive negotiations resulted in two stalking horse offers and proposed asset purchase

15  agreements.

16        8.    After due consultation with its advisors, Debtor exercised its business

17  judgment to enter into the Asset Purchase Agreement with Tricol for the sale of substantially

18  all of Debtor's assets pursuant to a sale under Section 363 of the Bankruptcy Code ("Stalking

19  Horse APA" or "APA"). A copy of the Stalking Horse APA is attached hereto as Exhibit A

20  and incorporated herein by reference.

21        9.    The sale proposed under the Stalking Horse APA is subject to the

22  receipt of higher and better offers received through a court-approved auction or sale process.

23  If the auction yields a higher and better offer, Debtor will seek authority to effect a sale with

24  the winning bidder.

25

26

DEBTOR'S MOTION FOR ORDER APPROVING (A) BID AND SALE PROCEDURES INCLUDING BREAK-UP FEE TO TRICOL INTERNATIONAL GROUP LIMITED AS STALKING HORSE BIDDER, (B) SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS ASSETS AND ENCMBRANCES, AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

**REQUESTED RELIEF**

10.    Debtor requests that the Court enter a bid procedures order in substantially the form attached hereto as Exhibit B ("Bid Procedures Order") which:

    a.    authorizes and approves bid procedures in connection with the receipt and analysis of competing bids, substantially in the form attached as Exhibit 1 ("Bid Procedures") to the Bid Procedures Order;

    b.    authorizes and approves procedures (the "Assumption Procedures") for the assumption and assignment of those executory contracts and unexpired leases designated by the successful bidder at the auction (the "Assumed Agreements");

    c.    approves the form and manner of notice of (i) the sale and hearing thereon, and (ii) the assumption, assignment and proposed cure costs of Assumed Agreements substantially in the form attached hereto as Exhibit C (the "Sale Notice"); and

    d.    establishes the following dates and deadlines, subject to modification as needed, relating to competitive bidding and approval of the sale:

- **Bid Deadline**:  March 18, 2016 at 5:00 p.m. prevailing Pacific time, as the deadline by which all binding bids must be actually received by Debtor's counsel pursuant to the Bid Procedures (the "Bid Deadline").

- **Objection Deadline**:  March 18, 2016 at 5:00 p.m. prevailing Pacific time as the deadline to object to the sale transactions and/or the assumption and assignment of Assumed Agreements or cure costs related thereto.

- **Auction**:  March 28, 2016 at 10:00 a.m. prevailing Pacific time, as the date and time the auction, if one is needed (the "Auction"), will be held at the offices of Tonkon Torp LLP, 888 S.W. Fifth Avenue, Suite 1600, Portland, Oregon, 97204.

- **Sale Hearing**:  March 30, 2016 at 9:30 a.m. or such other time as is announced at the conclusion of the Auction (the "Sale Hearing"), which will be held before the Honorable Peter C. McKittrick, United States Bankruptcy Judge for the United States Bankruptcy Court for the District of Oregon, Courtroom No. 1 1001 S.W. Fifth Avenue, Portland, Oregon.

    e.    approves Tricol as the Stalking Horse Bidder and entitlement to a cash break-up fee for the reimbursement of Tricol's

**Page 4 of 16** - DEBTOR'S MOTION FOR ORDER APPROVING (A) BID AND SALE PROCEDURES INCLUDING BREAK-UP FEE TO TRICOL INTERNATIONAL GROUP LIMITED AS STALKING HORSE BIDDER, (B) SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS ASSETS AND ENCMBRANCES, AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Case 16-30119-pcm11    Doc 16    Filed 01/15/16

reasonable and actual expenses incurred in connection with the proposed transaction up to the sum of $200,000.

11.  By this motion, Debtor also seeks entry of an order (the "Sale Order"), substantially in the form agreed upon with the winning bidder, authorizing and approving (a) the sale of the assets free and clear of all liens, claims, interests and encumbrances and (b) the assumption and assignment of the Assumed Agreements in accordance with the Assumption Procedures or, alternatively, approval of the winning bidder as the purchaser of all common stock of the Reorganized Debtor pursuant to confirmation of the Plan.

## THE PROPOSED SALE

12.  The principal terms of the Stalking Horse APA are as follows[1]:

| | |
|---|---|
| Purchaser: | Tricol or a new entity to be formed by Tricol. |
| Purchase Price: | The purchase price shall be the sum of (a) $1,600,000 plus (b) the total amount of the Assumed Liabilities (as defined in the APA), plus (c) the amount required to maintain D&O tail insurance for Seller following the Closing (up to a maximum of $150,000), plus (d) the total obligation owed by Seller under the DIP Credit Facility (as defined in the APA), and (e) the total obligation owed under the Pre-Petition Loan (as defined in the APA). The total Purchase Price is approximately $3,600,000. |
| Assets to be Acquired: | Substantially all of the assets of Debtor's as more particularly set forth in the Stalking Horse APA. |
| Excluded Assets: | Avoidance actions under Chapter 5 of the Bankruptcy Code. |
| Assumed Liabilities: | Only those liabilities arising from events occurring after the closing date and those expressly set forth in the Stalking Horse APA. It is contemplated that these will include (i) post-petition and pre-petition trade payables with creditors whom Tricol intends to continue to do business; (ii) customer programs; (iii) ordinary course of business liabilities owed to employees that become employees of buyer; (iv) liabilities arising under any Assumed Agreements; (v) administrative expense liabilities; and (vi) the premium for D&O tail insurance. |
| Excluded Liabilities: | All liabilities other than those expressly identified as Assumed Liabilities. |

---

[1] This summary is provided for the convenience of the Court and interested parties. It is not intended to be a complete summary of the Stalking Horse APA. To the extent there is any conflict between this summary and the Stalking Horse APA, the Stalking Horse APA governs in all respects.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

| | | |
|---|---|---|
| 1 | Assumption and Assignment of Executory` Contracts: | Debtor will assume all executory contracts and unexpired leases designated by Buyer, with any cure costs in connection therewith to be paid by Buyer. |
| 2 | | |
| 3 | Closing Conditions: | The Bankruptcy Court shall have entered the Sale Order including the assumption and assignment of the designated executory contracts and leases, which order shall not have been reversed, modified, amended or stayed at the time of closing. The representations and warranties of the parties set forth in the Stalking Horse APA shall remain true and correct and both parties shall have performed in all material respects the covenants set forth therein. Buyer shall have obtained the consents to assignment of patent licenses with Providence and Dr. Gregory. Buyer shall have entered into mutually acceptable employment agreements for the continued employment of Michael Wax, Stuart Sands, and Simon McCarthy. |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | Bid Protections: | Approval of Tricol as Stalking Horse Bidder and break-up fee for expenses up to $200,000. Initial overbid must be at least $250,000 in cash in excess of the Stalking Horse APA Purchase Price. |
| 10 | | |
| 11 | | |

12    13.    In addition to the above general sale provisions, the following sale

13    provisions are disclosed in accordance with applicable local rules and guidelines:

| | | |
|---|---|---|
| 14 | Sale to Insider: | Buyer is not an insider as defined in Bankruptcy Code § 1101(31). |
| 15 | Sale Free and Clear: | The sale will be free and clear of liens and other interests, and the parties with such interest and the nature of those interests are set forth below. |
| 16 | | |
| 17 | Liens: | Certain assets are encumbered by a lien asserted by Sussex Associates, L.P. ("Sussex"). The amount of the secured claim is in excess of $5,000,000. All assets are also be encumbered by Tricol pursuant to post-petition financing obtained in this case in the sum of $800,000, which post-petition lien will continue in the assets until the post-petition financing is paid in full. |
| 18 | | |
| 19 | | |
| 20 | Releases and Insider Benefits: | None, except for employment contracts with Mr. Wax and Mr. McCarthy and termination agreement with Mr. Sands. |
| 21 | | |
| 22 | Closing Deadlines: | The sale shall close on or before March 31, 2016, or the earliest practicable date after entry of the Sale Order. |
| 23 | Good Faith Deposit: | Tricol has deposited the sum of $200,000. Qualified bidders will be required to submit a good faith deposit equal to $400,000 (to cover the Break-Up Fee and their own $200,000 deposit). |
| 24 | | |
| 25 | Interim Arrangement with Proposed Buyer: | None. |
| 26 | | |

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Case 16-30119-pcm11    Doc 16    Filed 01/15/16

| | | |
|---|---|---|
| Use of Proceeds: | Proceeds from the sale will be distributed to the secured and other creditors as set forth in the Stalking Horse APA and pursuant to further order of the Court. | |
| Record Retention: | After the sale, Debtor will have reasonable access to the books and records as necessary to administer the Chapter 11 case and file final returns as appropriate. | |
| Sale of Avoidance Actions: | The sale does not include the sale of any avoidance claims under Chapter 5 of the Bankruptcy Code. | |
| Requested Findings as to Successor Liability: | Buyer shall not be a successor to Debtor and shall have no liability or responsibility for any liability or obligation of Debtor other than as expressly set forth in the Stalking Horse APA. The sale to Buyer will not subject Buyer or its affiliates, successors or assigns or their respective properties to any liability for claims against Debtor or Debtor's Assets. | |
| Credit Bidding: | The motion does not seek to limit credit bidding under Section 363. | |
| Standard for Approval: | The motion seeks approval of the proposed sale pursuant to the business judgment standard. | |
| Relief from Bankruptcy Rule 6004(h): | This motion requests relief from Bankruptcy Rule 6004(h). | |
| Solicitation Process: | Notice of the proposed sale will be given to all parties and creditors in interest, and parties previously expressing an interest in Debtor's assets. | |

## AUCTION AND BID PROCEDURES

14.     The proposed Bid Procedures are intended to permit a fair and efficient competitive sale consistent with the time line of this Chapter 11 case and promptly identify any alternative bid that is higher or otherwise better than the bid set forth in the Stalking Horse APA. Because the Bid Procedures are attached as Exhibit 1 to the proposed Bid Procedures Order, they are not restated herein. Generally speaking, however, the Bid Procedures establish, among other things:

- The deadlines and requirements for becoming a Potential Bidder, submitting competing bids and the method and criteria by which such competing bids are to become entitled to be Qualified Bids sufficient to trigger an Auction, including the minimum consideration that must be provided and the terms and conditions that must be satisfied by any Bidder (other than Tricol) to be entitled to be a

**Page 7 of 16** - DEBTOR'S MOTION FOR ORDER APPROVING (A) BID AND SALE PROCEDURES INCLUDING BREAK-UP FEE TO TRICOL INTERNATIONAL GROUP LIMITED AS STALKING HORSE BIDDER, (B) SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS ASSETS AND ENCMBRANCES, AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Case 16-30119-pcm11    Doc 16    Filed 01/15/16

Potential Bidder and a Qualified Bidder" (*See* Bid. Proc. at ¶¶ B, D).

- The manner in which Qualified Bids will be evaluated by Debtor to determine the starting bid for the Auction (*See* Bid. Proc. at ¶ E).

- The procedures for conducting the Auction, if any (*See* Bid. Proc. at ¶ G).

- The criteria by which the "Successful Purchaser" will be selected by Debtor, in consultation with its advisors (*See* Bid. Proc. at ¶ H-I).

- Various other matters relating to the sale process generally, including the Sale Hearing, designation of a Back-Up Bidder, payment of the bid protections, return of any Sale Deposits and certain reservations of rights (*See* Bid. Proc. at ¶¶ J-M).

15. The Bid Procedures recognize Debtor's fiduciary obligations to maximize sale value, and, as such, do not impair Debtor's ability to consider all qualified bid proposals, and preserve Debtor's right to modify the Bid Procedures as necessary or appropriate to maximize value for Debtor's estate in consultation with key parties set forth therein.

16. The Bid Procedures contain the following provisions that are required to be highlighted pursuant to local rules and guidelines:

(i) Provisions Governing Qualification of Bidders. The provisions governing an entity's right to become a Qualified Bidder are set forth in paragraphs B and D of the Bid Procedures.

(ii) Provisions Governing Qualified Bids. The provisions governing Qualified Bids are set forth in paragraphs D and E of the Bid Procedures. Such provisions include, among other things, the deadlines for submitting a bid, the requirements for submitting a bid, the assets to be included in the bid, the period the bid must remain open, and the requirement to provide the Sale Deposit. Tricol is deemed to have satisfied all of the bidding conditions.

(iii) Provisions Providing Bid Protections to "Stalking Horse" Bidder. Paragraph A of the Bid Procedures sets forth the "stalking horse" bidder protections. The Stalking Horse APA does not include any limitations on Debtor's ability to solicit

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

higher or better bids.  It does provide for the provision of a Break-Up Fee for expenses incurred up to the amount of $200,000, which shall be paid in the event that the Assets are sold to a party other than Tricol.

    (iv)  <u>Bidding Increments</u>.  Paragraphs D and G of the Bid Procedures set forth the amount of the initial bid and any successive bidding increments.

    (v)  <u>Due Diligence Period</u>.  Interested parties shall have until the Bid Deadline to conduct due diligence.  Paragraph C of the Bid Procedures sets forth the requirements for obtaining due diligence access.

    (vi)  <u>Modification of Bidding and Auction Procedures</u>. Paragraph M of the Bid Procedures authorizes Debtor, without further order of the Court, to modify the Bid Procedures.

    (vii)  <u>Closing with Alternative Backup Bidders</u>.  Paragraph J of the Bid Procedures addresses the ability of Debtor to sell the Assets to the Back-Up Bidder.

    (viii)  <u>Provisions Governing the Auction</u>.  Paragraph G of the Bid Procedures sets forth the provisions governing the auction, and this Motion specifies the date, time and place at which the Auction will be conducted and the method for providing notice to parties of any changes thereto.  Further, Paragraph D(1) of the Bid Procedures requires each bidder to identify whether it is bidding for itself or others and if for others, the identities of such parties and whether the bidder is party to any agreement limiting the bidders at the auction.

## SUMMARY OF THE ASSUMPTION AND ASSIGNNMENT PROCEDURES

      17.  Debtor is also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Assumed Agreements in connection with the Sale.  The Assumption Procedures are as set forth below.

    **Notice of Cure Procedures**.  Debtor will file a cure schedule (the "Cure Schedule") and serve such schedule and an Assumption and Assignment Notice by first class mail on the parties to those executory contracts and unexpired leases that will be included in any sale and those other executory contracts and unexpired leases that may be included in the sale (the "Assumed Agreements") by March 4, 2016.  The Cure Schedule will include the (i) Assumed Agreements; (ii) the name and contact information of

DEBTOR'S MOTION FOR ORDER APPROVING (A) BID AND SALE PROCEDURES INCLUDING BREAK-UP FEE TO TRICOL INTERNATIONAL GROUP LIMITED AS STALKING HORSE BIDDER, (B) SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS ASSETS AND ENCMBRANCES, AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

the counterparty to each Assumed Agreement; and (iii) the proposed cure amount for each Assumed Agreement.

**Objections**.  Any objection to the assumption and assignment of the Assumed Agreements identified on the Cure Schedule, including objections to the cure amount set forth on such schedule and to adequate assurance of future performance, must be filed with the Bankruptcy Court no later than March 18, 2016.

**Resolution of Objections**.  If no objection is timely filed to the assumption and assignment of an Assumed Agreement, the counterparty to such Assumed Agreement will be barred from objecting thereto and shall be deemed to consent to the assumption and assignment of such Assumed Agreement.  If no objection is timely filed to the proposed cure amount with respect to an Assumed Agreement, then the cure amount set forth in the Cure Schedule shall be binding upon the non-debtor party to such Assumed Agreement for all purposes in this Chapter 11 case and will constitute a final determination of the total cure amount required to be paid in connection with the assumption and assignment thereof.

If a timely objection is filed and such objection cannot otherwise be resolved by the parties, the Bankruptcy Court may hear such objection at the Sale Hearing, or any adjourned date thereof.  The pendency of a dispute relating to a proposed cure amount will not delay the closing of the sale, including the assumption and assignment of Assumed Agreements necessary to effectuate such closing, provided that, for any dispute relating to a proposed cure amount that is unresolved by the date of the closing on the sale, Buyer shall pay and Debtor shall escrow the claimed cure amount requested with respect to such unresolved objection pending such resolution.

## BASIS FOR RELIEF REQUESTED

### A.   SALE OF ASSETS

18.   Section 363(b)(1) of the Bankruptcy Code provides that "Debtor, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

- DEBTOR'S MOTION FOR ORDER APPROVING (A) BID AND SALE PROCEDURES INCLUDING BREAK-UP FEE TO TRICOL INTERNATIONAL GROUP LIMITED AS STALKING HORSE BIDDER, (B) SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS ASSETS AND ENCMBRANCES, AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

property of the estate." This provision generally allows a trustee (subject to court approval) to sell property of the estate outside the ordinary course of business where the proposed sale is a sound exercise of Debtor's business judgment and when the sale is proposed in good faith and for fair value. *Committee of Equity Security Holders v. Lionel Corporation (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Ernst Home Center, Inc.*, 209 B.R. 974, 980 (Bankr. W.D. Wash. 1997). When a trustee articulates a reasonable basis for its business decisions, "courts will generally not entertain objections to the [trustee's] conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

19.    The decision to sell the assets has been approved by Debtor's board of directors as necessary given Debtor's lack of sufficient capital to continue operations. The assets are fully encumbered by Tricol to secure post-petition financing extended by Tricol to Debtor. Tricol's security interest will continue in the assets until the post-petition financing is paid in full. Debtor's accounts, inventory, purchase orders, intellectual property and patents are encumbered by the Sussex to secure pre-petition loans. A sale will provide the secured creditors with a greater return than liquidation and with prompt payment. The proposed sale will also result in the continued employment of many of Debtor's employees and preserve business relationships and sales for vendors, customers, and other parties who are presently doing business with Debtor. A sale will provide certainty of ownership and continuity of the business which would not otherwise be possible. Debtor does not have sufficient resources to continue operating or file a plan of reorganization prior to the proposed sale. Debtor has determined that it is in the best interests of Debtor's estate to sell the Assets under 11 U.S.C. § 363 to Tricol or another buyer who can continue some or all of Debtor's operations.

20.    The Stalking Horse APA was negotiated at arm's length, in good faith, and Debtor believes its terms are fair and reasonable. Tricol is not an "insider" of Debtor and

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  neither Debtor nor its management has a financial interest in the transactions contemplated

2  by the Stalking Horse APA other than continued employment.

3      21.    Debtor proposes to effect the sale only after holding the Auction

4  pursuant to the Bid Procedures, which procedures are designed to procure the highest and

5  best offer for the sale of the assets.

6

7  **B.    SALE FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES**

8      22.    Debtor requests that the Court authorize the sale free and clear of all

9  liens, claims and encumbrances which may be asserted against the assets, with any such

10  liens, claims, interests and encumbrances attaching to the proceeds of the sale.  The

11  Successful Bidder will have no successor liability to any creditor who holds a claim as of the

12  closing date except as specifically stated in the APA and all such creditors will be forever

13  enjoined from seeking to enforce or collect any such claim from or against the successful

14  bidder.

15      23.    Tricol (and potential bidders in the auction process) will only buy the

16  assets if they are "free and clear" of liens.

17      24.    Holders of liens and interests in the assets will be adequately protected

18  because they will be paid from the sale proceeds or their interests will attach to the proceeds

19  of the sale.

20  **C.    ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS**

21      25.    As described above, as part of the sale contemplated by the Stalking

22  Horse APA, Debtor intends to assume and assign certain executory contracts.

23      26.    Under § 365(a), Debtor may assume or reject an executory contract,

24  subject to the court's approval.  In determining whether to approve a request for approval of

25  assumption of an executory contact, the bankruptcy court applies the business judgment rule.

26

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Case 16-30119-pcm11    Doc 16    Filed 01/15/16

1    27.    In addition to passing the business judgment test, Section 365(b) of the

2    Bankruptcy Code requires that a debtor meet certain additional requirements to assume an

3    executory contract:

4    If there has been a default in an executory
     contract or unexpired lease of the debtor, Debtor may
5    not assume such contract or lease unless, at the time
     of assumption of such contract or lease, Debtor—

6    (A)    cures, or provides adequate assurance
7    that Debtor will promptly cure, such default;

8    (B)    compensates, or provides adequate
     assurance that Debtor will promptly compensate, a
9    party other than the debtor to such contract or lease,
     for any actual pecuniary loss to such party resulting
10   from such default; and

11   (C)    provides adequate assurance of future
     performance under such contract or lease.

12

13   28.    Similarly, Section 365(f)(2) applies similar requirements to the

14   assignment of an executory contract, stating that the contract may be assigned if:

15   (A)    Debtor assumes such contract or lease in
     accordance with the provisions of this section;
16   and

17   (B)    adequate assurance of future performance by the
     assignee of such contract or lease is provided,
18   whether or not there has been a default in such
     contract or lease.

19

20   29.    In this case, Debtor's proposed assumption and assignment of the

21   executory contracts to Tricol or another bidder would fulfill the "cure" and "adequate

22   assurance" requirements for assumption and assignment set forth in the aforementioned

23   statutes.  Any defaults under the contracts and leases would be cured by Tricol at closing or

24   as soon thereafter as the Court establishes the amount of the cure payment needed (or the

25   parties agree on such amount).  If another entity is the successful purchaser, it will have had

26

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Case 16-30119-pcm11    Doc 16    Filed 01/15/16

to satisfy Debtor and the Court of its financial strength and, therefore, similarly will fulfill the "adequate assurance" requirement.

30.     Some, if not all, of the executory contracts at issue may contain provisions purporting to prohibit or condition the assignment to third parties. The Bankruptcy Code specifically prohibits the termination or modification of executory contracts based on such clauses that restrict assignment. 11 U.S.C. § 365(f).

**D.     BID PROTECTIONS**

31.     Debtor also requests approval of a breakup fee of $200,000. The breakup fee would be payable to Tricol in the event another bidder prevails at the Auction and an alternate sale ultimately is approved.

32.     In evaluating breakup and similar fees, courts have applied three basic standards: (a) the business judgment test; (b) the best interests of creditors test; and (c) the "actual and necessary" or administrative expense test. It appears that the Ninth Circuit has not adopted (or rejected) any of the foregoing tests. No matter which test it chooses to apply, however, it would be appropriate for the Court to approve the Break-Up Fee.

33.     Although courts may apply different analytical standards, they generally reach the same conclusion: breakup fees are appropriate when they encourage bidding and are in the best interest of the estate. *See, e.g., In re Integrated Resources, Inc.,* 147 B.R. 650 (S.D.N.Y. 1992), *app. dismissed on jurisdictional grounds*, 3 F.3d 49 (2d Cir. 1993) (applying the business judgment standard to approve breakup fee that helped attract and retain a potentially successful bid and attract other bidders); *In re America West Airlines, Inc.,* 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) (applying the best interest of creditors tests and focusing on "whether the transaction will further the diverse interests of the debtor, creditors and equity holders alike"); *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) (applying the "actual and necessary" test and stating that the estate benefits if the breakup fee induced "a bid that otherwise would not have been made * * *");

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

*In re 995 Fifth Avenue Associates, L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking").

34.     Here, the break-up fee is designed to compensate Tricol for the time and expense of negotiation and due diligence in connection with its proposed purchase. The amount of the break-up fee is the amount of expenses incurred by Tricol in connection with the proposed transaction up to the maximum amount of $200,000.

**E.     NON-APPLICABILITY OF STAY**

35.     In addition to the other sale-related relief sought herein, Debtor requests that the Court specifically find inapplicable any stays that might otherwise inhibit Debtor's ability to close the proposed transactions for the sale of the assets immediately after the Court enters an order approving the transactions, including, without limitation, those arising under Bankruptcy Rules 6004 or 6006. Any delay in a closing of the sale would mean substantial potential harm to Debtor, its creditors and its estate as the terms of the proposed sale require closing on or before April 30, 2016.

**NOTICE**

36.     Debtor proposes to give notice of the Auction, this Motion and the Sale Hearing as follows:  serve a copy of this Motion and the Sale Notice upon (i) counsel for the unsecured creditors committee appointed in this case; (ii) all persons or entities required to be served pursuant to orders of this Court; (iii) all parties who have filed requests for notice under Bankruptcy Rule 2002 as of the date of service; (iv) all persons or entities who to the knowledge of Debtor hold a lien upon the assets; (v) the Office of the United States Trustee; and (vii) all non-debtor parties to the Assumed Agreements. In addition, Debtor shall serve the Notice of Motion to Approve Sale to Tricol or Higher and Better Bidder at Auction, Auction, Bidding Procedures, Sale Hearing, and Objection Deadlines on all creditors and parties in interest reflected in the mailing matrix on file with the Court.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1        37.    Debtor submits that such notice constitutes good and sufficient notice

2   of the competitive offer procedures, this Motion, and all proceedings to be held thereon and

3   that no other or further notice need be given.

4        WHEREFORE, Debtor respectfully requests that the Court (a) enter an order

5   approving the Bid Procedures; and (b) as soon as practicable after completion of the Auction,

6   enter an order (i) approving the sale of the assets (or stock) to Tricol or other successful

7   purchaser, (ii) approving such sale free and clear of all liens, claims and encumbrances with

8   such interests attaching to the sale proceeds; (iii) approving the assumption and assignment

9   of executory contracts and unexpired leases to Tricol or other successful purchaser;

10  (iv) declaring all stays including, without limitation, those arising under Bankruptcy Rules

11  6004 or 6006 inapplicable; and (v) such other and further relief as may be just and proper.

12       DATED this 15th day of January, 2016.

13                  TONKON TORP LLP

14

15                  By  */s/ Timothy J. Conway*
                       Albert N. Kennedy, OSB No. 821429
16                     Timothy J. Conway, OSB No. 851752
                       Attorneys for Debtor

17

18

19

20

21

22

23

24

25

26

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

# EXHIBIT A

## Asset Purchase Agreement

**DEBTOR'S MOTION FOR ORDER APPROVING (A) BID AND SALE PROCEDURES INCLUDING BREAK UP FEE TO TRICOL INTERNATIONAL GROUP LIMITED AS STALKING HORSE BIDDER, (B) SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS**

## ASSET PURCHASE AGREEMENT

Between

### TRICOL INTERNATIONAL GROUP LIMITED
a Marshall Islands corporation
("Buyer")

and

### HEMCON MEDICAL TECHNOLOGIES, INC.,
an Oregon corporation,
in anticipation of it becoming a
Debtor in the United States Bankruptcy Court for the District of Oregon
("Seller")

**January 6, 2016**

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "Agreement") is made and entered into, effective as of January 6, 2016 (the "Effective Date"), by and between **TRICOL INTERNATIONAL GROUP LIMITED,** a Marshall Island corporation, or its assignee, (the "Buyer"), and **HEMCON MEDICAL TECHNOLOGIES, INC.,** an Oregon corporation, in anticipation of it becoming a Debtor in the United States Bankruptcy Court for the District of Oregon ("Seller"), with reference to the following facts:

## RECITALS:

A.    Seller owns and has operated a business providing wound care products and related materials (the "Business").

B.    Seller has committed that, provided the conditions set forth herein have been met, within 15 business days after execution of this agreement (the date Seller actually files being hereinafter called the "Petition Date"), it will file a voluntary petition commencing a Chapter 11 Bankruptcy Case styled *in re Hemcon Medical Technologies, Inc.,* Case No. _____ [to be assigned] (hereinafter, the "Bankruptcy Case") pursuant to Chapter 11 of Title 11 of the United States Code, Section 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Oregon (the "Bankruptcy Court").

C.    Seller desires to sell substantially all of the assets of the Business to Buyer and Buyer desires to purchase such assets from Seller (such transaction, and the related transactions described below, the "Transactions").

D.    The parties intend to effectuate the Transactions pursuant to Section 363 of the Bankruptcy Code.

E.    The execution and delivery of this Agreement and Seller's ability to consummate the Transactions set forth in this Agreement are subject, among other things, to the approval of the Bankruptcy Court and entry of an order acceptable to Buyer authorizing the transactions under 11 USC §363 free and clear of all liens and liabilities other than Permitted Liens and Assumed Liabilities (the "Sale Order").

F.    Those terms not otherwise defined herein shall have the meaning ascribed thereto in Section 14.16, below.

## AGREEMENTS:

**NOW, THEREFORE,** the parties hereto, intending to be legally bound, do hereby agree as follows:

## ARTICLE 1
## PURCHASE AND SALE OF ASSETS

1.1    **AGREEMENT TO SELL.** Upon the terms and subject to all of the conditions contained herein, Seller hereby agrees to sell, assign, transfer and deliver to Buyer at Closing (as defined in Article 3), and Buyer hereby agrees to purchase from Seller at Closing, the Purchased Assets (as defined

in Section 1.2, below), free and clear of all Liens and Liabilities other than Permitted Liens and Assumed Liabilities (as defined in Section 1.4).

 1.2 PURCHASED ASSETS. For purposes of this Agreement and subject to the terms and conditions set forth herein, the term "Purchased Assets" shall mean, all of the assets constituting property (wherever located, whether tangible or intangible), owned, leased, or otherwise held by Seller in connection with the Business as of the Closing Date (as defined in Section 3.1) other than Excluded Assets, including but not limited to the following assets:

 (a) ACCOUNTS RECEIVABLE. All of Seller's accounts receivable (the "Accounts Receivable"), a current listing of which is set forth on Schedule 1.2(a), and which shall be further reflected in a memorandum that Seller shall deliver to Buyer at the Closing, listing the name of each customer, the amount due from such customer, and the aging thereof.

 (b) FURNITURE, FIXTURES, AND EQUIPMENT. All of Seller's tangible personal property (including all furniture, fixtures, computers, and other equipment, wherever located), a complete listing of which is set forth on Schedule 1.2(b).

 (c) INVENTORY AND SUPPLIES. All of Seller's inventory, finished goods, raw materials, work in progress, packaging, supplies and other inventories (the "Inventory"), a complete listing of which is set forth on Schedule 1.2(c) which shall be adjusted to reflect inventory purchased and sold in the ordinary course of business prior to Closing.

 (d) BOOKS AND RECORDS. All of Seller's books, records and files pertaining to the Business (excluding unissued checks drawn on any Seller checking account), including, without limitation, databases, files and lists of customers, supplier lists, catalogues, pricing, sales and promotional literature, trade show booths and display assets, manuals, and copies of equipment records.

 (e) CONTRACTS. Seller's executory contracts pertaining to the Business (each, an "Assumed Contract") and leases (each, an "Assumed Lease"), listed on Schedule 1.2(e), as it may be amended from time to time, provided, however, with respect to any Assumed Lease or Assumed Contract, Buyer shall pay all Cure Costs required under Section 8.6.

 (f) SUBSIDIARIES. All interests in all of Seller's subsidiaries, a list of which is attached hereto as Schedule 1.2(f), including all of the outstanding securities, books, records, logs, papers, files, location files, correspondence, reports, account information, records and other business files and records.

 (g) PREPAID EXPENSES. All prepaid expenses and deposits exclusively associated with the Business and the Assumed Contracts and Assumed Leases.

 (h) INTELLECTUAL PROPERTY. All intellectual property of Seller that is owned by Seller or which Seller has a right to use, including without limitation (A) all rights to all trade names and trademarks (whether registered or unregistered), including but not limited to "Hemcon" and any derivative used exclusively in the Business, (B) all copyrights and other right, title, and interest in and to the product names, trade brochures and marketing materials, and drawings for the products sold in the Business, and (C) all trade secrets, business plans, marketing plans, and other intangible assets used in the Business, (D) all patents, provisional patents, and patent applications, (E) all domain names, and (F) all software used in the business (the "Software"). A list of Seller's Intellectual Property, as that term is defined in Section 4.6(a)(iv), is set forth in Schedule 4.6(b)(i).

2

(i)     **WARRANTIES.** All of Seller's rights under warranties, indemnities and similar rights against third parties related to the Purchased Assets or Assumed Liabilities.

(j)     **GOODWILL.** All goodwill associated exclusively with the Business, including (i) the name **"Hemcon"** and any derivative thereof, (ii) all phone and fax numbers used in the Business, and (iii) all goodwill associated with the existing contracts of Seller.

(k)     **RIGHTS OF ACTION.** All of Seller's rights to any claim or cause of action of any nature available to or being pursued by Seller related to the Business, whether arising by counterclaim or otherwise excluding avoidance powers under Chapter 5 of the Bankruptcy Code.

(l)     **CLAIMS.** The right to tender claims asserted exclusively against Buyer to Seller's insurance companies under Seller's casualty insurance policies (to the extent such right is assignable under the terms of Seller's policies of insurance) relating to the Purchased Assets.

**1.3**     **EXCLUDED ASSETS.** Notwithstanding the foregoing, the Purchased Assets shall not include the following assets (collectively, the "Excluded Assets"):

(a)     **CORPORATE RECORDS.** The corporate seals, organizational documents, minute books, stock books, Tax returns, books of account or other records having to do with the corporate organization of Seller, provided that Seller will allow Buyer or a mutually acceptable third party maintain custody of such records after Closing.

(b)     **INSURANCE.** All insurance policies of Seller and all rights to applicable claims and proceeds thereunder, except to the extent set forth in Section 1.2(k).

(c)     **RIGHTS UNDER AGREEMENT.** The rights which accrue or will accrue to Seller under this Agreement and all agreements related hereto.

(d)     **EXCLUDED CONTRACTS.** All contracts and leases listed on **Schedule 1.3(d)**, as it may be updated from time to time pursuant to Section 6.3 ("Excluded Contracts").

(e)     **BANKRUPTCY AVOIDANCE CLAIMS.** All avoidance powers and claims under Chapter 5 of the Bankruptcy Code.

**1.4**     **ASSUMED LIABILITIES.** Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge only the following Liabilities of Seller as of the Closing Date (collectively, the "Assumed Liabilities"), and no other Liabilities:

(a)     **ACCOUNTS PAYABLE.** The trade accounts payable of Seller to the creditors listed on **Schedule 1.4(a)** that remain unpaid on or after the Closing Date and that arose in the ordinary course of business consistent with past practice. A list of all such trade accounts payable existing as of the Effective Date is set forth on **Schedule 1.4(a)**.

(b)     **ASSUMED CONTRACTS.** All Liabilities in respect of the Assumed Contracts and Assumed Leases.

(c)     **ACCRUED VACATION.** All Liabilities of Seller in respect of any accrued and unpaid vacation and paid time-off benefits with respect to the Employees (such Liabilities, "Accrued PTO").

3

    **(d)**    ADMINISTRATIVE EXPENSES. All unpaid post-petition administrative expense claims allowed by the Bankruptcy Court (including professional fees and expenses).

    **(e)**    NO OTHER ASSUMED LIABILITIES. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, EXCEPT AS SET FORTH IN THIS SECTION 1.4, AT THE CLOSING BUYER SHALL NOT ASSUME ANY LIABILITY WHATSOEVER WITH RESPECT TO ANY OF SELLER'S DEBTS, LIABILITIES, OR OTHER OBLIGATIONS, WHETHER OR NOT ARISING OUT OF OR RELATING TO THE PURCHASED ASSETS OR THE BUSINESS OR ANY OTHER BUSINESS OF SELLER. ALL LIABILITIES AND OBLIGATIONS OF SELLER SHALL BE AND REMAIN SOLELY THE LIABILITIES AND OBLIGATIONS OF SELLER.

    **1.5**    ASSUMED CONTRACTS AND ASSUMED LEASES.

    **(a)**    Seller will provide notice to each counterparty to the contracts and leases listed on **Schedule 1.5(a)** that the contract or lease will be assumed or rejected pursuant to the provisions hereof, and provide each counterparty due notice of the opportunity to object to the terms of the assumption, rejection, or the terms of the assignment, of any such contract or lease prior to entry of the Sale Order.

    **(b)**    With respect to each Assumed Contract and Assumed Lease, on or before the Closing Date Seller shall (i) assume such Assumed Contract or Assumed Lease in the Bankruptcy Case and (ii) subject to Buyer paying any amounts designated in **Schedule 1.2(e)** as Cure Costs and providing adequate assurance of performance to the counterparty thereto to the extent required by the Bankruptcy Court, Seller shall assign such Assumed Contract or Assumed Lease to Buyer pursuant to an Order of the Bankruptcy Court (which may be the Sale Order). Buyer is to have no liability for any Cure Costs except for any Assumed Contract or Assumed Lease that Buyer elects to have assumed. Effective on the Closing Date, Seller shall assign to Buyer each such Assumed Contract or Assumed Lease.

    **(c)**    The Sale Order shall provide that, as of the Closing, each Assumed Contract and Assumed Lease is assigned from Seller to Buyer. All leases, contracts and other rights, property and commitments included in the Purchased Assets shall be transferred or assigned effectively by Order of the Bankruptcy Court.

    **1.6**    PRE-PETITION LOAN

    Immediately upon the Effective Date, Buyer shall make a loan to HemCon Medical Technologies Europe Limited ("HemCon Europe"), Seller's Ireland subsidiary, in the sum of $200,000 pursuant to the terms of a promissory note ("Note") in the form attached hereto as Exhibit A. The Note shall be secured by a lien upon all the assets of HemCon Europe. The Note shall be part of the Purchase Price and be deemed satisfied and paid in full upon the Closing Date, or if an Alternative Transaction is closed, then due and payable by the successful purchaser at closing of the Alternative Transaction. The $200,000 shall be paid to HemCon Europe within two business days after the Effective Date, or this Agreement may be terminated by Seller. Funds advanced under the Note shall be used to fund pre-petition expenses, working capital requirements and other general corporate needs of the Debtor prior to the Petition Date consistent with a budget agreed upon by Buyer and Seller.

# ARTICLE 2
## CONSIDERATION FOR ASSETS

**2.1**    PURCHASE PRICE. The purchase price for the Purchased Assets identified in Section 1.2, above, shall be the sum of (a) $1,600,000 plus (b) the total amount of the Assumed Liabilities, plus (c) the amount required to maintain D&O tail insurance for Seller following the Closing (up to a maximum of $150,000), plus (d) the total obligation owed by Seller under the DIP Credit Facility (as defined herein), and (e) the total obligation owed under the Pre-Petition Loan (as defined herein) (the "Purchase Price"). The Purchase Price shall be payable as follows:

(a) DEPOSIT. No later than fifteen (15) days after the execution of this Agreement, and promptly upon approval of the Chinese Ministry of Commerce or other applicable governmental agency of the transactions contemplated hereby, and prior to filing of the Bankruptcy Case, Buyer shall deposit with Bank of the Cascades Trust Services (the "Escrow Agent"), to be held in trust until disbursed pursuant to Section 13.3, a good faith deposit of $200,000 (the "Deposit"), which shall be applied toward Buyer's payment of the Purchase Price if Buyer is the successful purchaser, or otherwise released to Buyer or Seller, as the case may be, in accordance with Section 13.3.

(b) CLOSING PAYMENT. At the Closing, Buyer shall pay the Purchase Price, less the Deposit, the outstanding amount of the DIP Credit Facility, and the outstanding amount of the Pre-Petition Loan (the "Closing Payment"), to Seller by wire transfer to the account(s) designated by Seller or as otherwise provided in the Sale Order. The DIP Credit Facility and Pre-Petition Loan will be deemed paid and satisfied at Closing if Buyer is the successful bidder.

**2.2**    DIP CREDIT FACILITY. Subject to Bankruptcy Court approval containing the terms set forth below, Buyer will provide debtor-in possession ("DIP") financing to the Seller after the Petition Date in the maximum principal amount of $800,000, subject to the terms of a DIP credit agreement (the "DIP Credit Facility") and such other documents and agreements as may be reasonable or necessary.

(a) Amounts advanced under the DIP Credit Facility, plus interest at the rate of 12% per annum, fees and expenses due under the DIP Credit Agreement, shall be secured by first-priority, perfected secured liens on all unencumbered assets of the Seller and a perfected lien on all other assets of the Seller subject and junior only to liens existing as of the Petition Date, Chapter 5 claims, any Deposits, claims arising under this Agreement, and other liens approved by Buyer;

(b) The DIP Credit Facility shall be treated as a superpriority administrative claim pursuant to 11 USC §364(c)(1), such claims to be senior in right of payment over any and all administrative expenses of the kinds specified in 11 USC §§ 503(b) and 507(b);

(c) The DIP Credit Facility shall be used to fund administrative expenses approved by the Bankruptcy Court, working capital requirements and other general corporate needs of the Debtor during the pendency of the Chapter 11 case consistent with a budget agreed upon by Buyer and Seller, provided that in no case will advances under the DIP Credit Facility exceed $400,000 during the period prior to January 27, 2016;

(d) Seller may not seek any other DIP financing during the pendency of the Chapter 11 case secured by a lien on any of its assets unless Buyer's DIP Credit Facility and the Note for the Pre-Petition Loan are repaid in full.

5

**2.3    NO ASSUMPTION OF LIABILITIES.**  Buyer shall not assume, and Seller shall retain, all of Seller's debts and obligations that exist as of the Closing Date other than the Assumed Liabilities.

## ARTICLE 3
## CLOSING

**3.1    CLOSING.**  Upon the terms and conditions set forth in this Agreement, the closing of the sale of the Purchased Assets (the "Closing") shall occur as promptly as practicable and no later than the 5th business day following the date on which the Sale Order has either been entered, or become a Final Order, at the election of Buyer.  The date and time at which the Closing actually occurs is referred to as the "Closing Date".

**3.2    DOCUMENTS AND CONSIDERATION DELIVERED BY SELLER AT CLOSING.**  At the Closing, Seller shall deliver to Buyer the executed copies of the following documents in a form reasonably satisfactory to Buyer:

(a)    A bill of sale and assignment and assumption agreement in form reasonably acceptable to Buyer, covering all of the Purchased Assets;

(b)    Instruments of assignment of the Seller Intellectual Property included in the Purchased Assets sufficient to vest Seller's rights to the Seller Intellectual Property in Buyer;

(c)    All files, documents, and electronically stored information in the possession of or controlled by Seller relating to the Seller Intellectual Property;

(d)    All agreements of any sort between Seller and Employees or Former Employees relating to the Seller Intellectual Property, whether relating to ownership, assignment, production, development, non-disclosure, non-competition or otherwise;

(e)    To the extent approved by the Sale Order, instruments of assumption and assignment of the Assumed Leases and Assumed Contracts;

(f)    All files for the Assumed Leases and Assumed Contracts, and all keys and the combination of any equipment, machineries, safes, and access codes for any electronic security included in the Purchased Assets; and

(g)    All stock certificates or other documents evidencing ownership of the Subsidiaries.

(h)    Each other document reasonably requested by Buyer to transfer the Purchased Assets in accordance with the terms of this Agreement.

**3.3    DOCUMENTS AND CONSIDERATION DELIVERED BY BUYER AT CLOSING.**  At the Closing, Buyer shall deliver the following to Seller:

(a)    An assignment and assumption agreement covering all of the Purchased Assets and Assumed Liabilities, duly executed by Buyer;

6

**(b)** To the extent approved by the Sale Order, instruments of assumption and assignment of the Assumed Leases and Assumed Contracts, duly executed by Buyer; and

**(c)** The Closing Payment.

# ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth on the Disclosure Schedules attached to this Agreement, which exceptions shall be deemed to be part of the representations and warranties made hereunder, Seller hereby represents and warrants to Buyer that based on Seller's Knowledge:

**4.1 ORGANIZATION OF SELLER.** Seller is (a) a corporation duly organized, validly existing, and in good standing under the laws of the state of Oregon, and qualified to do business in the jurisdictions set forth in **Schedule 4.1** and has all necessary power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted and (b) duly qualified as a foreign entity to do business, and is in good standing, in each jurisdiction set forth in **Schedule 4.1**, which are all jurisdictions where the character of the properties owned, leased or operated by it or the nature of its business makes such qualification necessary.

**4.2 SUBSIDIARIES.** Each Subsidiary of Seller is (a) a corporation, limited company, or similar entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation as set forth in **Schedule 4.2**, and has all necessary power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted and (b) duly qualified as a foreign entity to do business, and is in good standing, in each jurisdiction set forth in **Schedule 4.2**, which are all jurisdictions where the character of the properties owned, leased or operated by it or the nature of its business makes such qualification necessary. Seller is the sole shareholder of each of the Subsidiaries set forth in **Schedule 4.2**.

**4.3 AUTHORITY AND CONSENTS.** Seller has full power and authority to enter into this Agreement, and following the entry of the Sale Order, Seller will have full power and authority to carry out the transactions contemplated by this Agreement. This Agreement and its execution and delivery to Buyer have been duly authorized by Seller. This Agreement, subject to the entry of the Sale Order, constitutes the valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except to the effect, if any, of general principles of equity, including rules of law governing specific performance, injunctive relief, and other equitable remedies.

**4.4 NO VIOLATION.** Except as set forth in **Schedule 4.4**, neither the execution and delivery of this Agreement, nor the consummation of the transactions provided for herein by Seller, will conflict with, or (with or without notice or lapse of time, or both) result in a termination, breach, impairment or violation of, (a) in any material respect, any contract or any other agreement, instrument or commitment pertaining to the Business to which Seller or any of its Subsidiaries is a party or by which it is bound, or (b) any federal, state, local or foreign law, judgment, writ, decree, order, statute, rule or regulation applicable to Seller or any of its Subsidiaries or by which any of their properties or assets is bound or affected, except where the conflict, termination, breach, impairment or violation would not have a Material Adverse Effect. The consummation of this Agreement and Buyer's acquisition of the Purchased Assets and exercise of the rights hereunder in and of themselves will not (x) result in the creation of any Lien upon the Purchased Assets, or (y) require the consent of any third party except for the Sale Order and any consents which would not have a Material Adverse Effect if not obtained. Except as set forth in

7

**Schedule 4.4**, Seller is not a party to, or otherwise subject to any provision contained in, any instrument or agreement which restricts or otherwise limits either Seller's right to transfer the Purchased Assets.

    **4.5**    TITLE TO ASSETS. Seller has, and upon delivery to Buyer on the Closing Date of instruments of transfer contemplated herein, as authorized by the terms of the Sale Order, Seller will thereby transfer to Buyer good and marketable title to, or in the case of property leased or licensed by Seller, a valid and subsisting leasehold interest in or a legal, valid and enforceable licensed interest in or right to use, all of the Purchased Assets free and clear of Liens other than Permitted Liens.

    **4.6**    INTELLECTUAL PROPERTY.

        **(a)**    *Definitions.*

            **(i)**    "Inbound License" means any contract pursuant to or under which any Intellectual Property Rights are licensed to the Seller or any of its Subsidiaries.

            **(ii)**    "Intellectual Property Right(s)" means any or all of the following and all rights in, arising out of, or associated therewith, which in each case may exist or be created under the laws of any jurisdiction in the world: (1) all patents, utility models and rights in inventions, discoveries, methods, apparatuses and processes (whether or not capable of being patented) (collectively, "Patents"); (2) all trade secrets, know-how, methods, processes, developments, discoveries, ideas, designs, algorithms, models, strategies, techniques and confidential or proprietary information ("Trade Secrets"); (3) all rights associated with software (including both source code and executable code and associated application programming interfaces) and works of authorship, including copyrights, moral rights, or rights of publicity associated therewith ("Copyrights"); (4) all mask works, mask work registrations and applications therefore ("Mask Works"); (5) all industrial designs and any registrations and applications therefore throughout the world; (6) all rights in domain names and applications and registrations therefor ("Domain Names"); (7) all trade names, trade dress, logos or other corporate designations, slogans, brand names, trademarks and service marks, and in each case all goodwill associated therewith ("Trademarks"); (8) all rights in databases and data compilations; (9) any and all registrations and applications (including provisional applications) for items (1)-(8), and all reissues, divisionals, re-examinations, corrections, renewals, extensions, continuations and continuations-in-part thereof; and (10) any similar, corresponding or equivalent rights to any of the foregoing.

            **(iii)**    "Registered Intellectual Property Right(s)" means any and all Intellectual Property Rights that are registered, filed, recorded, or issued under the authority of any state, government or other public or private legal authority at any time, including without limitation (1) Patents; (2) registered Trademarks; (3) registered Copyrights; (4) registered Mask Works; (5) Domain Names; and (6) any applications for any of the foregoing.

            **(iv)**    "Seller Intellectual Property" means any and all Intellectual Property Rights owned (in whole or in part) by, purported to be owned by, or exclusively licensed to, the Seller or any of its Subsidiaries.

            **(v)**    "Seller IP Contract" means any contract to which the Seller is a party or by which the Seller is bound that contains any assignment or license of, or covenant not to assert or enforce, any Intellectual Property Right or that otherwise relates to any Seller Intellectual Property or any Intellectual Property Rights developed by, with, or for the Seller.

(vi) "Seller Product" means any product or service presently being (or that in the past 36 months has been) designed, developed, manufactured, marketed, distributed, provided, licensed, or sold by the Seller.

(vii) "Seller Registered Intellectual Property Rights" means all Registered Intellectual Property Rights owned (in whole or in part) by, purported to be owned by, filed in the name of or applied for by, or exclusively licensed to the Seller or any of its Subsidiaries.

(b) *Intellectual Property Representations.*

(i) *Disclosures.* To Seller's Knowledge, **Schedule 4.6(b)(i)** is a complete and accurate list of all of the following:

(A) all Intellectual Property Rights material to the Business that are both (1) licensed to the Seller or any of its Subsidiaries or in which the Seller or any of its Subsidiaries has received or acquired any right or interest and (2) embedded or incorporated into any Seller Product or are used directly in the distribution or support of any Seller Product, and the corresponding Contracts pursuant to or under which such Intellectual Property Rights are licensed to the Seller or such right or interest is received or acquired by the Seller;

(B) all other Intellectual Property Rights that are both (1) licensed to the Seller or in which the Seller has received or acquired any right or interest and (2) material to the business of the Seller as it currently is conducted (other than widely-available commercial software products that are licensed pursuant to a non-exclusive, internal-use license and are generally available on standard terms for less than $5,000, for each such software product, in annual license and maintenance fees for the license type and quantity used by the Seller) and the corresponding Contracts pursuant to or under which such Intellectual Property Rights are licensed to Seller;

(C) each contract pursuant to or under which any Person has been granted any license to or under, or otherwise has received or acquired any right or interest in (whether or not currently exercisable or vested), any Seller Intellectual Property, including, but not limited to, contracts that contain any grant or assignment of any license or other rights in or to any Seller Intellectual Property upon the occurrence of some future event or circumstance; and

(D) the name of each Person who is or was an employee or contractor of the Seller and who is or was involved in the contribution, creation or development of any Seller Intellectual Property and the corresponding contracts with such Persons.

(ii) *Specific Representations.* To Seller's Knowledge:

(A) Seller has provided complete and accurate copies of all contracts identified in **Schedule 4.6(b)(i)**, each of which, is valid and enforceable.

(B) No material confidential information or material Trade Secret of the Seller has been disclosed to any Person other than under a confidentiality or non-disclosure agreement, except to the extent that such disclosure would not adversely affect the Seller Intellectual Property being transferred to Buyer.

(C) No event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time) will, or could reasonably be expected to, result in the delivery,

9

license, or disclosure to any other Person of any material confidential information or material Trade Secret of the Seller.

(D) The Seller is not in material breach of nor has the Seller failed to perform in any material respect under any Inbound License.

(E) The Seller Products and the business of the Seller as it currently is conducted do not infringe, misappropriate or violate any Copyright, Trade Secret or other Intellectual Property Right of any Person. No infringement, misappropriation, or similar claim or proceeding is pending or, to the Knowledge of the Seller, has been threatened against the Seller or against any other Person who may be entitled to be indemnified, defended, held harmless, or reimbursed by the Seller with respect to such claim or proceeding. The Seller has not received any written notice or other communication relating to any actual, alleged, or suspected infringement, misappropriation, or violation of any Intellectual Property Rights of another Person (including any claim that the Seller must license or refrain from using any Intellectual Property Rights of any third party, and including any so-called "invitation to license").

(F) The Seller exclusively owns all right, title and interest to and in the Seller Intellectual Property owned by Seller free and clear of any Liens other than Permitted Liens, and no other party is a joint owner of any Seller Intellectual Property owned by Seller; provided, however, that nothing in this Section 4.5(b)(ii)(F) will be deemed to be or constitute any representation or warranty of non-infringement, which is dealt with exclusively in Section 4.5(b)(ii)(E).

(c) *Additional Intellectual Property Disclosures and Representations.* To Seller's Knowledge:

(i) *Copyrights, Trademarks and Patents.* Schedule 4.6(c)(i) is a complete and accurate list of all Registered Intellectual Property Rights and unregistered Copyrights and Trademarks used by the Seller in the Business and are included in the Seller Intellectual Property. To the Knowledge of the Seller, no trademark or trade name owned, used, or applied for by the Seller conflicts or interferes with any trademark or trade name owned, used, or applied for by any other Person. The Seller has not taken any action that would set a United States patent bar date within 120 days of the Closing Date for any patent application being contemplated or prepared by the Seller as of the Closing Date.

(ii) *Trade Secrets.* The Seller has taken reasonable steps required to protect the Seller's rights in (A) confidential information and Trade Secrets of the Seller and (B) confidential information and Trade Secrets provided by any third Person to the Seller, and to protect such information and Trade secrets against loss, theft and unauthorized access, use or disclosure.

(iii) *Intellectual Property Acquisition, Dispositions and Joint Ownership.* Schedule 4.6(c)(iii) is a complete and accurate list of all Intellectual Property Rights material to the business that were acquired, assigned or transferred by the Seller (other than from Employees) at any time, whether by contract or operation of law.

(iv) *Employees and Contractors.* To the Knowledge of Seller, no employee of the Seller is (A) bound by or otherwise subject to any contract restricting him or her from performing his or her duties for the Seller; or (B) in breach of any contract with any former employer or other Person concerning Intellectual Property Rights or confidentiality due to his or her activities as an employee of the Seller.

10

**(v)** *Government Rights.* Except as set forth on **Schedule 4.6(c)(v)**, no funding, facilities, or personnel of any Governmental Authority or any college, university, or other educational institution were used, directly or indirectly, to develop or create, in whole or in part, any Seller Intellectual Property

**(vi)** *Compliance with Contracts.* (A) The Seller is not in material breach of nor has the Seller failed to perform in any material respect under any Seller IP Contract; (B) to the Knowledge of the Seller, no other party to any such Contract is in breach thereof; and (C) to the Knowledge of the Seller there is no dispute regarding the scope of any such Contract, or performance under any such contract, including with respect to any payments to be made or received by the Seller thereunder.

**(vii)** *Third Party Infringement of Seller Intellectual Property.* To the Knowledge of the Seller, no Person has infringed, misappropriated or otherwise violated any Seller Intellectual Property and no Person is currently infringing, misappropriating or otherwise violating any Seller Intellectual Property.

**(viii)** *Royalties.* Except as provided in **Schedule 4.6(c)(viii)**, the Seller is not and following the Closing Date will not be obligated to pay any royalties or other fees or consideration with respect to Intellectual Property Rights of any third party embedded or otherwise used in conjunction with any Seller Product; provided, however, that nothing in this Section 4.5(c)(viii) will be deemed to be or constitute any representation or warranty of non-infringement, which is dealt with exclusively in Section 4.5(b)(ii)(E).

**(ix)** *Sufficiency.* To the Knowledge of the Seller, the Seller Intellectual Property and the Intellectual Property Rights licensed to the Seller pursuant to the Inbound Licenses constitute, and after the Closing the Buyer will have, all Intellectual Property Rights needed to conduct the business of the Seller in all material respects as currently conducted; provided, however, that nothing in this Section 4.5(c)(xi) will be deemed to be or constitute any representation or warranty of non-infringement, which is dealt with exclusively in Section 4.5(b)(ii)(F).

**(x)** *Transferable.* All Seller Intellectual Property owned by Seller is fully transferable, alienable and licensable by the Seller, without payment of any kind to any Person.

**(xi)** *Free to Operate.* No Inbound License or Seller IP Contract restricts the use of any Intellectual Property rights or the manufacture of any products in countries outside of the United States, the sale of any Seller Products outside of the United States.

**(xii)** *Effects of This Transaction.* Neither this Agreement nor the transactions contemplated by this Agreement, including the assignment to the Buyer, by operation of law or otherwise, of any contracts or agreements to which the Seller is a party, will result in (A) Buyer, or any affiliate of Buyer, being obligated to pay with respect to any Intellectual Property Right any amount or other consideration other than ongoing fees, royalties or payments that the Seller would otherwise be required to pay pursuant to the terms of any agreement to which the Seller is a party or by which it is bound had the transactions contemplated by this Agreement not occurred; (B) a loss of, or Lien on, any Seller Intellectual Property; or (C) a breach of any Seller IP Contract or Inbound License.

**4.7 EMPLOYMENT MATTERS. Schedule 4.7** contains a list of all persons who are employees of Seller as of the Effective Date, and sets forth for each such individual the following: (i) name; (ii) title or position (including whether full or part time); (iii) hire date; (iv) normalized annual

11

base compensation rate; (v) commission, bonus or other incentive-based compensation; and (vi) a description of the fringe benefits provided to each such individual as of the date hereof. Except as provided in **Schedule 4.7**, as of the Effective Date, all compensation, including wages, commissions and bonuses payable to employees of Seller for services performed on or prior to the date hereof have been paid in full or adequately accrued for in accordance with GAAP and there are no outstanding agreements, understandings or commitments of Seller with respect to any compensation, commissions or bonuses.

**4.8    COMPLIANCE WITH LAW; PERMITS.**  To Seller's Knowledge:

(a)  Except as set forth in **Schedule 4.8(a)**, to its Knowledge, the Seller and each of its Subsidiaries is and has been in compliance in all material respects with all Legal Requirements applicable to it in connection with the conduct or operation of the Business and the ownership or use of the Purchased Assets. Neither Seller nor any of its executive officers has received, nor to the Knowledge of Seller is there any basis for, any notice, order, complaint or other communication from any Governmental Authority or any other Person that such Seller or any of its Subsidiaries is not in compliance in all material respects with any such Legal Requirements.

(b)  **Schedule 4.8(b)** sets forth a true and complete list of all permits, licenses and approvals necessary for Seller and its Subsidiaries to own, lease and operate the Purchased Assets and to carry on the Business in all material respects as currently conducted (the "Permits"). Seller and each of its Subsidiaries is and has been in compliance in all material respects with all such Permits. As of the date hereof, no suspension, cancellation, modification, revocation or nonrenewal of any Permit is pending or, to the Knowledge of Seller, threatened.

**4.9    LEGAL PROCEEDINGS.**

(a)  **Schedule 4.9** contains a complete list of each action, arbitration, audit, hearing, investigation, litigation, suit, or other proceeding that is or has been pending at any time in the previous three years or, to Seller's Knowledge, is currently threatened against Seller, except as may be prohibited by law.

(b)  Seller has made available to Buyer complete and accurate copies of all pleadings, correspondence, and other documents relating to each proceeding listed on **Schedule 4.9**.

**4.10    CONSENTS AND APPROVALS.**  Subject to the entry of the Sale Order, no consent, approval or authorization of, or declaration, filing or registration with, any government, regulatory authority or third party is required in connection with the execution, delivery and performance of this Agreement by Seller and the consummation of the transactions contemplated thereby.

# ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller that:

**5.1    AUTHORIZATION; ETC.**  Buyer has full power and authority to enter into this Agreement and to carry out the transactions contemplated hereby. The Buyer has taken all action required by law to authorize the execution and delivery of this Agreement and the transactions contemplated hereby, and this Agreement is a valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as to the effect, if any, of (a) applicable bankruptcy, insolvency and other similar laws

12

affecting the rights of creditors generally and (b) the effect of general principles of equity, including rules of law governing specific performance, injunctive relief and other equitable remedies.

**5.2   NO VIOLATION.**  The execution and performance of this Agreement will not result in a violation of Buyer's organizational or governing documents.  Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will be in conflict with, or constitute a default under or cause the acceleration of the maturity of any debt or obligation pursuant to, any agreement or commitment to which Buyer is a party or by which Buyer is bound, or violate any statute or law or any judgment, decree, order, regulation, or rule of any court or governmental authority. The consummation of this Agreement and Buyer's acquisition of the Assets and exercise of the rights hereunder in and of themselves will not (x) result in the creation of any Lien upon the assets of Buyer, or (y) require the consent of any third party (other than parties to contracts or other agreements or arrangements with Seller). Buyer is not a party to, or otherwise subject to any provision contained in, any instrument or agreement which restricts or otherwise limits either Buyer's right to acquire the Assets or will restrict Buyer's use thereof after transfer to Buyer.

**5.3   CONSENTS AND APPROVALS OF GOVERNMENT AUTHORITIES.**  Other than the approval by the Chinese Ministry of Commerce, no consent, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority is required in connection with the execution, delivery and performance of this Agreement by Buyer and the consummation of the transactions contemplated hereby.

**5.4   NO BROKERS.**  No broker, finder or investment banker is entitled to brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of Buyer.  Buyer shall indemnify, defend, and hold Seller free and harmless from any liability, loss or expense (including attorney's fees) arising in connection with any such claim.

**5.5   SUFFICIENCY OF FUNDS.**  Buyer has, and at the Closing will have, sufficient cash on hand or other sources of immediately available funds to timely enable it to make payment of the Purchase Price including the Pre-Petition Loan, Deposit, DIP Credit Facility and remaining Purchase Price and consummate the transactions contemplated by this Agreement.

## ARTICLE 6
## SELLER'S PRE-CLOSING COVENANTS

During the period from the date of this Agreement until the Closing, Seller covenants and agrees as follows:

**6.1   ADVICE OF CHANGES.**  Seller shall promptly advise Buyer in writing of any event occurring subsequent to the date of this Agreement that (a) would render any representation or warranty of Seller contained in this Agreement, if made on or as of the date of such event or the Closing Date, untrue or inaccurate in any material respect or (b) would constitute a Material Adverse Effect on the Business or Purchased Assets, individually or in the aggregate.

**6.2   MAINTENANCE OF BUSINESS.**  Seller shall use commercially reasonable efforts to carry on and preserve the Business and its relationships with customers, suppliers, employees and others in all material respects in substantially the same manner as it has prior to the date hereof.  If Seller becomes aware of a material deterioration in the relationship with any customer, supplier or key employee of

13

Seller, it will promptly bring such information to the attention of Buyer in writing and, if requested by Buyer, will exert its commercially reasonable efforts to restore the relationship. Seller shall also maintain the current levels of, and policies regarding, the insurance on the Business and Purchased Assets that exist as of the date of this Agreement.

**6.3 CONDUCT OF BUSINESS OF SELLER.** Except as contemplated by this Agreement or consented to in writing by the Buyer (which consent shall not be unreasonably withheld), during the period from the date hereof to the Closing Date, Seller shall conduct the Business in the ordinary course of business consistent with past practice and, to the extent consistent therewith, with no less diligence and effort than would be applied in the absence of this Agreement, use its commercially reasonable efforts to preserve intact its current business operations, keep available the service of its current officers and employees and preserve its relationships with customers, suppliers, distributors, lessors, creditors, employees, contractors and others having business dealings with it, with the intention that its goodwill and ongoing businesses shall be unimpaired at the Closing Date except to the extent such impairment is caused by the Bankruptcy Case. Seller shall provide written notice to Buyer of the entry into any material contract, in which case Buyer shall have 5 days after the receipt of such written notice to add such contract to **Schedule 1.3(d)** as an Excluded Contract.

**6.4 REGULATORY APPROVALS.** Post-closing, Buyer and Seller shall join in the execution and filing, of any application or other document that may be necessary in order to obtain the authorization, approval or consent of any Governmental Authority which may be reasonably required, or which Buyer may reasonably request, in connection with the consummation of the transactions contemplated by this Agreement. Buyer and Seller shall use commercially reasonable efforts to obtain all such authorizations, approvals and consents.

**6.5 CONSENT TO ASSIGNMENT OF PATENT LICENSE.** Seller shall make its best efforts to obtain, by no later than twenty-one (21) days after the Effective Date, a signed written consent from Providence Health System Oregon and Biomedical Research Services, Inc. to the assignment of that Hemcon Technology License Agreement originally dated May 17, 2002, to Buyer at Closing if Buyer is the successful bidder. Buyer shall cooperate by providing its financial statements for presentation to Providence Health System Oregon and Biomedical Research Services, Inc.

**6.6 LITIGATION.** Seller shall notify Buyer in writing promptly after learning of any material actions, suits, proceedings or investigations by or before any court, board or governmental agency, initiated by or against it, or known by it to be threatened in writing against it, except as may be prohibited by law.

**6.7 ACCESS TO INFORMATION.** Until the Closing or termination of this Agreement pursuant to the terms of Article 13, below, Seller shall permit Buyer and its agents full access to all books and records of Seller pertaining to its Business (including, without limitation, any and all information relating to Seller's taxes, at least three years of payroll history, employment compensation rates and incentive programs, employee benefit programs, commitments, contracts, leases, licenses, and real, personal and intangible property and financial condition), and reasonable access to all employees, customers and suppliers thereof, in order to make a reasonable and detailed investigation of Seller's Business; provided all such access shall be at reasonable times and on reasonable prior notice to Seller, and shall be coordinated through the Chief Executive Officer of Seller. Seller will participate and cooperate with Buyer in completing such due diligence. Seller will make available to Buyer and its representatives all information reasonably necessary to facilitate such investigation and will instruct those persons with information concerning the subject matter of such investigation to disclose it to and cooperate with Buyer.

14

**6.8** CONTACT WITH CUSTOMERS, VENDORS AND EMPLOYEES. Seller shall use commercially reasonable efforts to facilitate Buyer's contact and communication with Employees and customers, suppliers, vendors and distributors of the Business and access to facilities where Seller Products are manufactured.

**6.9** SATISFACTION OF CONDITIONS PRECEDENT. Seller shall use commercially reasonable efforts to satisfy or cause to be satisfied all the agreements and conditions precedent which are set forth in Article 8 and Article 10, and Seller will use commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated, and, without limiting the generality of the foregoing, to obtain all consents and authorizations of third parties and to make all filings with, and give all notices to, third parties that may be necessary or reasonably required on its part in order to effect the transactions contemplated hereby.

## ARTICLE 7
## BANKRUPTCY MATTERS

**7.1** Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval. Seller and Buyer acknowledge that (a) to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets, including, but not limited to, giving notice of the transactions contemplated by this Agreement to creditors and certain other interested parties as ordered by the Bankruptcy Court, and (b) Buyer must pay the Cure Costs and cure all defaults and provide adequate assurance of future performance under the Assumed Contracts and Assumed Leases. Further, the Seller and Buyer acknowledge that the Bankruptcy Court will order an auction process for the sale of the Purchased Assets.

**7.2** Provided this Agreement has not been terminated, and Buyer has provided Seller with evidence that it has financing or committed capital sufficient to fund the cash portion of the Purchase Price, Seller will within three (3) business days after the Petition Date file with the Bankruptcy Court a motion (the "Sale Motion") with proposed notices and proposed orders, in form and content reasonably satisfactory to Buyer seeking the Bankruptcy Court's issuance of an order approving bid procedures, scheduling an auction and hearing to consider the sale, and establishing obligation deadlines ("Bid Procedures Order"). The Sale Motion shall also include a request that the proposed Sale Order include, among other things:

(a) that this Agreement was negotiated at arms-length, and the Buyer has acted in good faith and without collusion or fraud of any kind;

(b) the Buyer is not an "insider" or "affiliate" of the Seller as those terms are defined in the Bankruptcy Code;

(c) neither the Seller nor the Buyer has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of Section 363(n) of the Bankruptcy Code with respect to the consummation of the purchase transaction;

(d) Buyer is purchasing the Purchased Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code and is entitled to the protections afforded by Section 363(m) of the Bankruptcy Code;

15

(e) notice of the sale (and any required sale procedures), as sent to all creditors and interested parties, is sufficient to comply with notice requirements of the Bankruptcy Code;

(f) all objections to the sale free and clear of liens, claims, interests and encumbrances have been withdrawn or overruled, and the Buyer therefore purchases the Purchased Assets free and clear of all liens, claims, interests and encumbrances, including free and clear of the Liens and Liabilities, other than Permitted Liens and Assumed Liabilities; and

(g) Buyer is released from any potential liability in connection with the purchase of the Purchased Assets, other than Permitted Liens and Assumed Liabilities.

7.3     Seller shall serve a copy of the Sale Motion on:

(a) all entities that claim any interest in or Lien (other than Permitted Liens) upon the Purchased Assets;

(b) all parties to Assumed Contracts and Assumed Leases;

(c) all governmental taxing authorities that have or as a result of the sale of the Purchased Assets may have claims, contingent or otherwise, against the Seller;

(d) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002;

(e) all creditors or holders of claims (as defined in Section 101(5) of the Bankruptcy Code, whether or not liquidated, contingent, disputed, or unmatured) of the Seller;

(f) all interested governmental, pension, environmental and other regulatory entities;

(g) the Office of the United States Trustee;

(h) the Internal Revenue Service and any governmental taxing authority that has filed a claim against the Seller;

(i) all entities that expressed to the Seller an interest in purchasing the Purchased Assets; and

(j) the Securities and Exchange Commission (the "SEC") in the United States District Court, Southern District of Texas, Houston District, Case No. 4:15-CV-02218 (the "Voight Action").

7.4     Seller shall provide Buyer with copies of all motions, applications and supporting papers prepared by or on behalf of the Seller (including forms of orders) directly relating to the Purchased Assets or this Agreement prior to the filing thereof in the Bankruptcy Case so as to allow Buyer to provide reasonable comments for incorporation into same.

7.5     The Seller will within three (3) business days after the Petition Date file with the Bankruptcy Court a motion in form and content reasonably satisfactory to Buyer seeking approval of the DIP Credit Facility, including but not limited to obtaining such credit on a secured basis and superpriority treatment as set forth in Section 2.2.

16

**7.6** The Seller will within three (3) business days after the Petition Date file with the Bankruptcy Court a motion seeking approval of a bidding process. The Bid Procedures Order shall include the following, without limitation:

(a) Approval of Buyer as the stalking horse bidder;

(b) If Buyer is not the successful purchaser and an Alternative Transaction is closed, Buyer will be entitled to a cash payment in the amount of $200,000 or such other amount as may be approved by the Bankruptcy Court as reasonable out-of-pocket expenses of Buyer (the "Break-Up Fee"), a return of the Deposit, and repayment of all obligations under the DIP Credit Facility and the Pre-Petition Loan;

(c) Competing bidders will be required to overbid as follows: The first competing bidder must bid an initial amount of at least $250,000 in cash over the Purchase Price. Any subsequent bidder, including Buyer, must bid in bid increments of at least $200,000 over the most recently submitted bid. Buyer shall be entitled to credit bid, at each round of the auction, the amount of the Break-Up Fee.

(d) Competing bidders must demonstrate the ability to pay the purchase price in cash at the Closing;

(e) Competing bidders (other than the Buyer) will be required to deposit the sum of $400,000 cash (to cover the Break-Up Fee and an additional deposit of $200,000), and deliver to Seller a signed copy of this Agreement, marked to show such bidder's proposed changes, in order to confirm a commitment to proceed with the purchase; and

(f) If the Buyer is the successful purchaser, then the Sale Order shall contain, among other things, the provisions set forth above in Section 7.2.

(g) Unless otherwise agreed by the parties, the Bankruptcy Court shall have entered the Sale Order, in form and substance satisfactory to Buyer, no later than 75 days after entry of the Bid Procedures Order; provided however, to the extent the Bankruptcy Court is unable to enter the Sale Order on or prior to such date, such order shall be entered on the earliest available date thereafter.

(h) Failure by Seller to comply with the foregoing covenants shall constitute an event of default and shall trigger a right of termination of this Agreement by Buyer.

## ARTICLE 8
## ADDITIONAL AGREEMENTS

**8.1** **FURTHER ASSURANCES.** Subject to the terms and conditions herein provided, the parties hereto shall take or cause to be taken all action and do or cause to be done all things reasonably necessary, proper or advisable under applicable Legal Requirements to consummate and make effective, as soon as reasonably practicable, the transactions contemplated hereby.

**8.2** **COOPERATION ON TAX MATTERS.** The parties shall cooperate, and shall cause their respective representatives to cooperate, in preparing and filing all Tax returns (including amended Tax returns and claims for refund), in handling audits, examinations, investigations, and administrative, court or other Proceedings relating to Taxes, in resolving all disputes, audits and refund claims with respect to

such Tax returns and Taxes, and any earlier Tax returns and Taxes of Seller, and in all other appropriate Tax matters.

**8.3    NO SUCCESSOR LIABILITY TO EMPLOYEES.**  Under no circumstances shall Buyer assume or be obligated to pay, and the Purchased Assets, shall not be or become liable for or subject to, any liabilities to the Seller's Employees arising prior to the Closing Date, including any Liabilities related to Benefit Plans, employment practices, COBRA, equal employment opportunity, nondiscrimination, harassment, wrongful termination, breach of contract, immigration, wage and hour laws, any other state, federal or local labor and employment laws" Liability under the WARN Act, salaries, vacations, sick pay, incentives, severance pay, bonus, overtime, meal period, pension profit sharing retirement and/or deferred compensation and any other compensation or benefits, other than Assumed Liabilities (the "Employee Claims"), which Employee Claims shall be discharged by Seller pursuant to the Sale Order.

**8.4    EMPLOYMENT.**

(a)  Prior to the Closing Date, Seller shall terminate the employment of all Employees. Buyer shall offer employment to all Employees identified on **Schedule 8.4**, as it may be amended from time to time, to commence immediately following the Closing, each such offer contingent upon (i) the issuance of the Sale Order of the Bankruptcy Court, and (ii) the Closing.  Except as set forth on **Schedule 8.4**, Buyer's employment of any individuals previously employed by Seller shall be on an "at will" basis.  Buyer will enter employment agreements with the following individuals: Michael Wax, Stuart Sands, and Simon McCarthy, the forms of which will be negotiated and approved by the parties within fifteen (15) days after the Effective Date and prior to the filing of the Bankruptcy Petition. Employees who accept Buyer's offer of employment and who commence employment with Buyer from and after the Closing Date shall be referred to herein as the "Hired Employees." Under no circumstance shall any individual employed or formerly employed by Seller become an employee of Buyer unless such individual becomes a Hired Employee.

(b)  With respect to each Hired Employee, Seller hereby waives and releases each such individual from any and all contractual, common law or other restrictions enforceable by Seller on the employment, activities or other conduct of such individuals after their termination of employment with Seller; provided, however, that Seller shall assign to Buyer Seller's rights to all obligations of each Hired Employee not to disclose confidential information relating to the Business and all obligations not to compete with the Business owed to Seller by such Hired Employee.

(c)  Nothing herein, express or implied, shall confer upon any Employee any rights or remedies (including any right to employment or continued employment for any specific period) of any nature or kind whatsoever, under or by reason of this Agreement.  Buyer and Seller agree that the provisions contained herein are not intended to be for the benefit of or otherwise be enforceable by, any third party, including any Employee.

(d)  Seller shall retain all Liabilities that are not Assumed Liabilities arising out of the termination of any Employees who are not Hired Employees, including: (i) compliance with the requirements of the WARN Act or under any similar or analogous Legal Requirement having applicability to Seller or the Business; (ii) administration and payment of severance benefits, and if provided, out placement assistance; (iii) accrued salary, vacation and benefits or other payments (other than the Assumed Liabilities); whether or not payable under Contract; and (iv) any other related Liabilities.

18

**8.5**     ADEQUATE ASSURANCES REGARDING ASSUMED CONTRACTS AND ASSUMED LEASES. With respect to each Assumed Contract and each Assumed Lease, Seller and Buyer will use commercially reasonable efforts to provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer of each such Assumed Contract and Assumed Lease. Buyer and Seller agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that all defaults have been cured and that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts and the Assumed Leases, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's and Seller's employees and representatives available to testify before the Bankruptcy Court.

**8.6**     CURE AMOUNTS. Set forth on **Schedule 1.2(e)** is a list of the anticipated costs: (a) that pursuant to Bankruptcy Code Section 365(b) will be required to cure any default on the part of the Seller under the Assumed Contracts and Assumed Leases, which costs must be delivered to the nondebtor under the Assumed Contracts and Assumed Leases, or with respect to which adequate assurance of prompt delivery by Seller must be provided as a prerequisite to the assumption of such Assumed Contracts and Assumed Leases under Bankruptcy Code Section 365(a); and (b) that will be necessary to keep the Seller current on any payments due under any Assumed Contract or Assumed Lease as of the Closing Date, but only to the extent such payments due cannot be funded via the DIP Credit Facility (the "Cure Costs"). Prior to the Closing, Buyer shall cooperate with Seller to resolve any disputes with the nondebtor party to any of the Assumed Contracts or Assumed Leases regarding the amount of the Cure Costs. Subject to entry of the Sale Order and it becoming a Final Order, Buyer shall pay the Cure Costs designated in accordance with the terms and conditions of any Order approving the assumption and assignment of the Assumed Contracts and Assumed Leases.

**ARTICLE 9**
**CONDITIONS TO OBLIGATIONS OF SELLER**

Seller's obligations hereunder are subject to the fulfillment or satisfaction, on or before the Closing Date, of each of the following conditions (any one or more of which may be waived by Seller, but only in a writing signed by Seller):

**9.1**     ACCURACY OF REPRESENTATIONS AND WARRANTIES. The representations and warranties of Buyer set forth in Article 5 shall be true and accurate in every material respect on and as of the Closing with the same force and effect as if they had been made at the Closing, except for changes contemplated by this Agreement and except for those representations and warranties that address matters only as of a particular date (which shall remain true and correct as of such particular date), with the same force and effect as if they had been made at the Closing.

**9.2**     BUYER'S COVENANTS. Buyer shall have performed and complied in all material respects with all of its covenants contained in Article 8 on or before the Closing.

**9.3**     COMPLIANCE WITH LAW. There shall be no order, decree, or ruling by any court or governmental agency or threat thereof, or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by this Agreement.

**9.4**     GOVERNMENT CONSENTS. There shall have been obtained at or prior to the Closing Date such permits or authorizations, and there shall have been taken such other action, as may be required to consummate the transactions contemplated by this Agreement by any regulatory authority

19

having jurisdiction over the parties and the actions herein proposed to be taken, including but not limited to requirements under applicable federal and state securities laws.

**9.5** **CONSENTS.** Seller and Buyer shall have received either (a) duly executed copies of such consents from parties to the contracts listed on **Schedule 9.5** as are required under the terms thereof for such contracts to be assigned and delegated to Buyer hereunder, or (b) the approval of the Bankruptcy Court to the transfer of the contracts listed on **Schedule 9.5**.

**9.6** **NO LITIGATION.** No litigation or proceeding shall be threatened or pending for the purpose or with the probable effect of enjoining or preventing the consummation of any of the transactions contemplated by this Agreement.

**9.7** **SALE ORDER.** The Sale Order shall have been entered.

**9.8** **BUYER CLOSING DELIVERABLES.** Seller shall have received from Buyer those documents and deliverable set forth in Section 3.3 (including executed copies of those items listed therein that call for Buyer's signature).

## ARTICLE 10
## CONDITIONS TO OBLIGATIONS OF BUYER

Buyer's obligations hereunder are subject to the fulfillment or satisfaction, on or before the Closing Date, of each of the following conditions (any one or more of which may be waived by Buyer, but only in a writing signed by Buyer):

**10.1** **ACCURACY OF REPRESENTATIONS AND WARRANTIES.** The representations and warranties of Seller set forth in Article 4 (as qualified by the Seller Disclosure Schedule) shall be true and accurate to Seller's Knowledge as of the Closing with the same force and effect as if they had been made at the Closing, except for changes contemplated by this Agreement and except for those representations and warranties that address matters only as of a particular date (which shall remain true and correct as of such particular date), with the same force and effect as if they had been made at the Closing.

**10.2** **COVENANTS.** Seller shall have performed and complied to Seller's Knowledge with all of its respective covenants contained in Article 6 on or before the Closing.

**10.3** **BANKRUPTCY ORDERS.** The Bankruptcy Court shall have entered the Bid Procedures Order and the Sale Order, each in form and substance satisfactory to Buyer, which orders shall not have been reversed, modified, amended or stayed.

**10.4** **ABSENCE OF MATERIAL ADVERSE CHANGE.** There shall not have occurred any Material Adverse Change with respect to the Purchased Assets.

**10.5** **COMPLIANCE WITH LAW.** There shall be no order, decree, or ruling by any court or governmental agency or threat thereof, or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by this Agreement.

**10.6** **ASSUMED CONTRACTS AND ASSUMED LEASES.** The conditions of Section 1.5 shall be satisfied.

20

**10.7    AUTHORIZATIONS.**  Buyer shall have received corporate resolutions and other evidence of appropriate corporate authorization of Seller with respect to the Transactions in form and substance satisfactory to Buyer.

**10.8    SELLER CLOSING DOCUMENTS.**  Buyer shall have received from Seller those documents set forth in Section 3.2 (including executed copies of those items listed therein that call for Seller's signature), above.

**10.9    CONSENTS.**  Seller and Buyer shall have received either (a) duly executed copies of such consents from parties to the contracts listed on **Schedule 9.5** as are required under the terms thereof for such contracts to be assigned and delegated to Buyer hereunder, or (b) the approval of the Bankruptcy Court to the transfer of the contracts listed on **Schedule 9.5**.

**10.10    EMPLOYMENT AGREEMENTS.**  Buyer shall have entered into employment agreements for the continued employment of the following key employees:  Michael Wax, Stuart Sands, and Simon McCarthy.

**10.11    COMPLIANCE WITH SALE PROCESS DEADLINES.**  Seller shall have complied with the sale process deadlines set forth in the Bid Procedures Order.

**10.12    NO LITIGATION.**  No litigation or proceeding shall be threatened or pending for the purpose or with the probable effect of enjoining or preventing the consummation of any of the transactions contemplated by this Agreement.

**10.13    SALE ORDER; FINAL ORDER.**  The Sale Order shall have been entered, and shall contain, among other things, the provisions described in Section 7.2, and shall, at the option of Buyer, have become a Final Order.

**ARTICLE 11**
**POST CLOSING COVENANTS**

**11.1    TRANSACTION COSTS.**  Each party shall pay and be solely responsible for the costs and expenses of its respective counsel and the other costs and fees incurred by such party in connection with negotiating and closing the transactions contemplated by this Agreement.

**11.2    ACCESS TO BOOKS AND RECORDS.**  Upon request of Seller from time to time after the Closing, Buyer shall provide Seller and its representatives reasonable access to the books and records of the Business, together with reasonable usage of photocopying, telephone, fax and other use of Buyer's facilities, with respect to the period prior to the Closing in order to enable Seller (a) to prepare for and complete financial statements and any audits by its independent auditors, auditors of its lenders and other representatives income Tax returns, (b) to prepare and defend any tax audits, (c) to assert and defend any claims with respect to the Business arising prior to the Closing (other than claims that are assigned or delegated to Buyer hereunder), and (d) any other reasonable purpose.

21

## ARTICLE 12
## SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNITY

**12.1** **SURVIVAL.** The representations, warranties and covenants of Seller and Buyer contained in this Agreement, or in any certificate or schedule or instrument delivered pursuant hereto, shall survive the Closing for a period of 1 year (the "Survival Period"). Accordingly, except for claims of fraud, the parties agree that all claims for breach of such representations, warranties or covenants hereunder shall expire unless a written claim therefor is presented hereunder prior to the expiration of such one-year Survival Period; provided that if the covenant which is alleged to have been breached is a covenant that is required to be performed in the first instance after the Closing Date, then the Survival Period for any breach of such covenant shall be 1 year from the date on which the obligations described in such covenant were first required to be performed.

**12.2** **INDEMNIFICATION BY SELLER.** Subject to Sections 12.4(b) and 12.5, Seller shall indemnify, defend (with counsel of its selection), and hold Buyer and its successors, assigns, partners, employees, and other agents (collectively, the "Buyer Indemnitees"), harmless from and against any and all liabilities, obligations, losses, claims, damage, cost, charges or other expenses of every kind and character (including but not limited to attorneys' fees and litigation costs) (collectively, "Damages"), which may accrue or be sustained by any Buyer Indemnitee arising out of or as a result of (a) any pre-Closing Taxes, (b) any Liabilities of Seller (other than the Assumed Liabilities), and (c) any breach of the representations, warranties, or covenants of Seller contained in this Agreement.

**12.3** **INDEMNIFICATION BY BUYER.** Subject to Sections 12.4(b) and 12.5, Buyer shall indemnify, defend (with counsel of its selection), and hold Seller and its successors, assigns, partners, employees, and other agents (collectively, the "Seller Indemnitees" and together with the Buyer Indemnitees, the "Indemnitees"), harmless from and against any and all Damages which may accrue or be sustained by any Seller Indemnitee arising out of or as a result of (a) Assumed Liabilities and (b) any breach of the representations, warranties, or covenants of Buyer contained in this Agreement.

**12.4** **INDEMNITY PROCEDURES.**

**(a)** **DELIVERY OF CERTIFICATE.** In the event that at any time or from time to time after the Closing Date an Indemnitee shall sustain Damage of any nature whatsoever against which such Indemnitee is indemnified under this Agreement, such Indemnitee shall deliver to Seller (if such Indemnitee is a Buyer Indemnitee) or to Buyer (if such Indemnitee is a Seller Indemnitee) (each, an "Indemnifying Party"), in writing, promptly, on or before the last day of the Survival Period, a certificate signed by Indemnitee (an "Indemnitee Certificate"):

**(i)** Stating the aggregate amount of the Indemnitee's Damages or an estimate thereof, in each case to the extent known or determinable at such time; and

**(ii)** Specifying in reasonable detail the individual items of such Damages included in the amount so stated, the date each such item was paid or properly accrued or arose, the nature of the misrepresentation, breach or claim to which such item is related, and the specific Section of this Agreement alleged to have been violated.

**(b)** **RESOLUTION OF CLAIMS.** If an Indemnifying Party objects in writing to any claim or claims made in any Indemnitee's Certificate, then the Indemnitee shall have 30 days to respond in a written statement to the objection. If after such 30-day period there remains a dispute as to any claims, the Indemnifying Party and Indemnitee shall attempt in good faith for 30 days to agree upon the

22

rights of the respective parties with respect to each of such claims. If the Indemnifying Party and Indemnitee should so agree, a memorandum setting forth such agreement shall be prepared and signed by both parties. If no such agreement can be reached after good faith negotiation, either the Indemnifying Party or Indemnitee may commence an action to pursue such claim.

12.5    CERTAIN LIMITATIONS.

(a) Payments by an Indemnifying Party under Section 12.2 or Section 12.3 in respect of any Damages shall be limited to the amount of any liability or damage that remains after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment received or reasonably expected to be received by the Indemnitee in respect of any such claim. The Indemnitees shall use their commercially reasonable efforts to recover under insurance policies or indemnity, contribution or other similar agreements for any Damages prior to seeking indemnification under this Agreement.

(b) In no event shall either the Buyer or the Seller be liable to any Indemnitee for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple.

12.6    EXCLUSIVE REMEDY. Except for a claim based upon fraud, the rights of indemnification set forth in this Article 12 shall be the sole and exclusive remedy of the Indemnitees for any breach of the other party's representations, warranties, or covenants under this Agreement and the assertion of any claim relating to liabilities of the Business with respect to the conduct of the Business prior to the Closing, the Excluded Liabilities, or otherwise relating to the subject matter of this Agreement.

## ARTICLE 13
## TERMINATION

13.1    TERMINATION. This Agreement may be terminated at any time prior to the Closing only as follows:

(a)    By the mutual written consent of the Buyer and Seller;

(b)    By either the Buyer or the Seller, immediately upon the occurrence of any of the following events:

(i)    The Bankruptcy Court approves an Alternative Transaction, or an Alternative Transaction is consummated;

(ii)    The Closing does not occur on or before April 30, 2016 (the "Outside Date"); provided, however, that the right to terminate this Agreement under this Section 13.1(b)(ii) shall not be available to any party whose breach (or whose Affiliate's breach) of this Agreement has resulted in the failure of the Closing to occur on or before the Outside Date;

(iii)    The Chinese Ministry of Commerce or other applicable governmental agency ("Government Approval") has not approved the Transactions within 15 days of the Effective Date;

(iv)     Any Governmental Authority shall have issued any permanent Order enjoining or otherwise prohibiting the transactions contemplated hereby and all appeals and means of appeal therefrom have been exhausted;

(c)  By Seller if Buyer has not made the Pre-Petition Loan on or before January 8, 2016;

(d)  By Seller if Buyer has not made the Deposit within two business days after Government Approval;

(e)     By Seller, if Buyer shall have materially breached any of its or his representations, warranties, covenants or agreements contained herein and such breach shall not have been cured within 15 days after receipt by the Buyer from Seller of written notice of such breach (provided, however, that no such cure period shall be available or applicable to any such breach which by its nature cannot be cured) and if not cured within the timeframe above and at or prior to the Closing, such breach (individually or together with all other breaches by the Buyer) would result in the failure of any of the conditions set forth in Article 9 to be satisfied;

(f)     By Seller, if any of the conditions specified in Article 9 have not been met or waived prior to such time as such condition can no longer be satisfied, in which case Seller shall be entitled to receive the Deposit;

(g)     By Buyer, if Seller shall have materially breached any of its representation, warranty, covenant or agreement contained herein and such breach shall not have been cured within 15 days after receipt by the Seller from Buyer of written notice of such breach (provided, however, that no such cure period shall be available or applicable to any such breach which by its nature cannot be cured) and if not cured within the timeframe above and at or prior to the Closing, such breach (individually or together with all other breaches by the Seller) would result in the failure of any of the conditions set forth in  10 to be satisfied;

(h)     By Buyer if due diligence conducted by Buyer after execution of this Agreement reveals a Material Adverse Change that would substantially impair Buyer's ability to operate the Purchased Assets;

(i)     By Buyer if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or a trustee is appointed for Seller and such Trustee rejects the transaction contemplated by this Agreement;

(j)     By Buyer if the Bankruptcy Court does not allow the Pre-Petition Loan to be included in calculating the Purchase Price; or

(k)     By Buyer, if any of the conditions specified in Article 10 shall not have been met or waived prior to such time as such condition can no longer be satisfied.

13.2    EFFECT OF TERMINATION.  The right of termination provided in Section 13.1 is in addition to any other rights and remedies a party may have under this Agreement, applicable Legal Requirements or otherwise.  In the event of termination of this Agreement as provided in Section 13.1, this Agreement shall become void and there shall be no liability or obligation on the part of Buyer, Seller, or their respective officers, directors, shareholders or Affiliates; provided, however, that (a) the provisions of this Section 13.2, Section 13.3 and Article 14 shall remain in full force and effect and

24

survive any termination of this Agreement, (b) Buyer shall retain its rights under the DIP Credit Facility, including its secured claims and superpriority status for repayment, and the right to receive the Break-Up Fee, if an Alternative Transaction is consummated, and (c) nothing herein shall relieve any party hereto from liability in connection with any willful breach of such party's representations, warranties, covenants or agreements contained herein.

**13.3** DISBURSEMENT OF DEPOSIT.

(a) DISBURSEMENT OF DEPOSIT TO SELLER. In the event that: (i) this Agreement is terminated by Seller in accordance with Sections 13.1(c) – (f); Or (ii) (A) this Agreement is not earlier terminated in accordance with Sections 13.1(a), 13.1(b), or 13.1(g)-13.1(k), (B) the conditions to Closing set forth in Article 10 have been and remain satisfied (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment of those conditions), (C) the Seller confirms in writing to Buyer that Seller stands ready to proceed with the Closing on or before the Closing Date, and (D) Buyer fails to complete the Closing on or before the Closing Date; then the Buyer and Seller shall jointly instruct the Escrow Agent to distribute to the Seller the entire Deposit within 2 business days following the instruction date.

(b) DISBURSEMENT OF DEPOSIT UPON CLOSING. If the Closing is completed on or before the Outside Date, the Buyer shall instruct the Escrow Agent to transfer the Deposit to Seller in partial offset against the Closing Payment.

(c) DISBURSEMENT OF DEPOSIT TO BUYER. In the event that the Closing has not occurred on or before the Outside Date under any circumstance not described in Section 13.3(a) and this Agreement has been validly terminated pursuant to Section 13.1(a) or (b) or Section 13.1(g) – (k), then the Buyer and Seller will jointly instruct the Escrow Agent to distribute to Buyer the entire Deposit within 2 business days following the instruction date.

# ARTICLE 14
# MISCELLANEOUS

**14.1** NOTICES. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be deemed to be given and received (a) when delivered in person, (b) on the date on which transmitted by facsimile or e-mail, *provided that* there is a confirmation of transmission; (c) on the 3rd business day after the date on which deposited in the United States mail in a sealed envelope, postage prepaid, or (d) on the next business day after the date on which deposited in a sealed envelope with a nationally-recognized overnight courier (*e.g.*, Federal Express or DHL), freight prepaid, addressed to the party for whom intended at the address or facsimile number set forth for such party on the signature page, below, or such other address or facsimile number, notice of which is provided in a manner permitted by this Section 14.1.

**14.2** COOPERATION ON TAX MATTERS. After the Closing, Seller and Buyer shall cooperate with each other in connection with any official inquiry, audit, determination or proceeding affecting the liability of either of them for Taxes and shall make available to each other within a reasonable period of time, at no cost to the other (except as provided in this Section 14.2), any documents, correspondence, reports, books, records, files, or data of either of them and any other materials bearing on such inquiry, audit, examination, proceeding as such other party may reasonably request, provided, however, that (a) either party may charge the other party for any actual out-of-pocket costs or expenses incurred by it in

25

assisting the other party hereunder, and (b) no party shall have any obligation to the other party pursuant to this Section 14.2 after the 36-month anniversary of the Closing Date.

**14.3    CONSULTATIONS.** The parties each acknowledge that they have consulted with their respective accounting and tax advisors in connection with the accounting and tax treatment for this transaction, that each such party will bear all risk in connection with its accounting and tax treatment of the transactions contemplated hereby and that no party is relying on any other party in connection with the same.

**14.4    FORCE MAJEURE.** Neither party shall be liable for delay or failure to perform, in whole or in part, by reason of contingencies beyond the reasonable control of the party affected, whether herein specifically enumerated or not, including among others, acts of God, war, acts of war, revolution, civil commotion, terrorism, riots, acts of public enemies, blockage or embargo, delays of carriers, car shortage, fire, explosion, breakdown of equipment, strike, lockout, labor dispute, casualty or accident, earthquake, epidemic, flood, cyclone, tornado, hurricane or other windstorm, delays of vendors or other contingencies interfering with production or with customary or usual means of transportation, or by reason of any law, order, proclamation, regulation, ordinance, demand, requisition or requirement or any other act of any governmental authority, local, state or federal, including court orders, judgments or decrees, or any other cause whatsoever, whether similar or dissimilar to those above affected; provided, however, that the party so affected shall promptly give notice to the other party whenever such contingency or other act becomes reasonably foreseeable and shall use its best efforts to overcome the effects of the contingency as promptly as possible. Neither party, however, shall be required to resolve a strike, lockout or other labor problem in a manner which it alone does not deem proper and advisable.

**14.5    WAIVER OF COMPLIANCE.** Any failure of Seller, on the one hand, or Buyer, on the other, to comply with any provision of this Agreement may be expressly waived in writing by Buyer or Seller, respectively, but such waiver or failure to insist upon strict compliance with such provision shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure. No failure to exercise and no delay in exercising any right, remedy, or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, or power provided herein or by law or in equity. The waiver by any party of the time for performance of any act or condition hereunder does not constitute a waiver of the act or condition itself.

**14.6    ATTORNEYS' FEES.** If any action or proceeding is commenced to construe or enforce this Agreement or the rights and duties of the parties hereunder, then the party prevailing in such action shall be entitled to recover its costs and attorneys' fees in such action or proceeding, as well as all costs and fees of enforcing or appealing any judgment entered therein.

**14.7    SURVIVAL OF REPRESENTATIONS AND WARRANTIES.** The respective representations and warranties of each party contained herein shall not be deemed waived or otherwise affected by any investigation made by or on behalf of the other party and such representations and warranties shall survive the Closing and the consummation of the purchase of the Assets as contemplated hereby as provided in Article 12. All statements contained in this Agreement or in any schedule, exhibit, certificate, list, or other document delivered pursuant hereto shall be deemed representations or warranties, as the case may be (as such terms are used in this Agreement), of the party making such statements.

**14.8    ASSIGNMENT; SUCCESSORS AND ASSIGNS.** Except as otherwise provided herein, each party agrees that it will not assign, sell, transfer, delegate, or otherwise dispose of, whether voluntarily or

26

Exhibit A
Page 27 of 73

involuntarily, or by operation of law, any right or obligation under this Agreement; notwithstanding the foregoing, Buyer may assign its rights hereunder to an Affiliate without Seller's consent, provided that any such assignment shall not relieve Buyer of its obligations hereunder. Any purported assignment, transfer, or delegation in violation of this Section shall be null and void. Subject to the foregoing limits on assignment and delegation, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. Except for those enumerated above, this Agreement does not create, and shall not be construed as creating, any rights or claims enforceable by any Person or entity not a party to this Agreement.

> **14.9 GOVERNING LAW; DISPUTE RESOLUTION.**

>> **(a)** The validity, interpretation, enforceability, and performance of this Agreement shall be governed by and construed in accordance with the laws of the State of Oregon and the Bankruptcy Code, to the extent applicable. Each party hereby consents to the jurisdiction of the Bankruptcy Court and courts of the State of Oregon for purposes of construing and enforcing the rights created herein.

>> **(b)** During the pendency of the Bankruptcy Case, any proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may only be brought against any of the parties in the Bankruptcy Court, and the parties consent to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to the venue laid therein.

>> **(c) COUNTERPARTS; FACSIMILE SIGNATURES.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. A copy of this Agreement that is executed by a party and delivered by facsimile or by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document shall be binding on such party to the same extent as a copy hereof containing that party's original signature. Any party that executes and delivers this Agreement by facsimile or by electronic mail in .pdf format shall, upon request from the other party, execute and deliver a copy hereof containing that party's original signature

> **14.10 HEADINGS.** The headings of the Sections and Articles of this Agreement are for reference purposes only and shall not constitute a part hereof or affect the meaning or interpretation of this Agreement.

> **14.11 ENTIRE AGREEMENT.** This Agreement, including the Disclosure Schedule and other documents referred to herein, (a) represents the entire understanding of the parties, and supersedes and replaces all prior and contemporaneous understandings, whether oral or written, regarding the subject matter hereof, and (b) may not be modified or amended, except by a written instrument executed after the date hereof by the party sought to be charged by such modification or amendment.

> **14.12 SEVERABILITY.** If any provision of this Agreement, or the application thereof to any Person, place, or circumstance, shall be held by a court of competent jurisdiction to be invalid, unenforceable, or void, the remainder of this Agreement and such provisions as applied to other Persons, places, and circumstances shall remain in full force and effect.

> **14.13 RULES OF CONSTRUCTION.** The parties acknowledge that each party has been represented by counsel and has read and negotiated the language used in this Agreement. The parties agree that, because all parties participated in negotiating and drafting this Agreement, no rule of

27

construction shall apply to this Agreement which construes ambiguous language in favor of or against any party by reason of that party's role in drafting this Agreement.

**14.14   ADDITIONAL DOCUMENTS.**   Each of the parties agrees, without further consideration, to execute and deliver such other documents and take such further action as may be reasonably required to effectuate the provisions of this Agreement.

**14.15   EXHIBITS.**   All Exhibits attached hereto shall be deemed to be a part of this Agreement and are fully incorporated in this Agreement by this reference.

**14.16   CERTAIN DEFINITIONS.**   For purposes of this Agreement:

(a)   "**AFFILIATE**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

(b)   "**ALTERNATIVE TRANSACTION**" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share or stock sale, merger, amalgamation or other similar transaction, including a plan of reorganization approved by the Bankruptcy Court, or resulting from an auction, of a material portion of the Purchased Assets, in a transaction or series of transactions with one or more individuals or entities other than Buyer.

(c)   "**COBRA**" means Section 4980B of the Internal Revenue Code of 1986, as amended (and the regulations and rulings issued thereunder), Part 6 of Subtitle B of Title I of the Employee Retirement Income Security Act of 1974, as amended (and the regulations and rulings issued thereunder), and similar provisions of applicable state Legal Requirements.

(d)   "**EMPLOYEE**" means any full or part-time employee of Seller as of the date of this Agreement as set forth on **Schedule 4.7**.

(e)   "**FINAL ORDER**" means an action taken or Order issued by the applicable Governmental Authority as to which: (i) no request for stay of the action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or Order, protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest is passed; (iii) the Governmental Authority does not have the action or Order under consideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

(f)   "**GAAP**" means United States generally accepted accounting principles in effect from time to time.

(g)   "**FORMER EMPLOYEE**" means any full or part-time employee or independent contractor formerly employed by Seller that is not a current Employee as of the date of this Agreement.

28

(h)     **"GOVERNMENTAL AUTHORITY"** shall mean any:

(i)     Nation, principality, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature;

(ii)     Federal, state, local, municipal, foreign or other government;

(iii)     Governmental or quasi governmental authority of any nature (including any governmental division, subdivision, department, agency, bureau, branch, office, commission, council, board, instrumentality, officer, official, representative, organization, unit, body or Entity and any court or other tribunal);

(iv)     Multinational organization or body; or

(v)     Individual, entity or body exercising, or entitled to exercise, any executive, legislative, judicial, administrative, regulatory, police, military or taxing authority or power of any nature.

(i)     **"KNOWLEDGE,"** with respect to a party, means the knowledge of such party, in the case of an individual, or any officer or director of such party, in the case of an entity, and, in each case, such knowledge as would be imputed to such persons upon due inquiry of Seller's employees and documentation.

(j)     **"LEGAL REQUIREMENT"** means any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, Order, or other requirement or rule of law of any Governmental Authority.

(k)     **"LIABILITY"** means any debt, loss, claim (as defined in section 101(5) of the Bankruptcy Code), damage, demand, fine, judgment, penalty, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, asserted, unasserted, accrued or unaccrued; matured or unmatured, determined or determinable, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability, successor liability or otherwise)" and including all costs and expenses relating thereto (including fees, discounts and expenses of legal counsel, experts, engineers and consultants and costs of investigations).

(l)     **"LIEN"** means any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance, including but not limited to. Any claim to the Purchased Assets arising out of the Voight Action or the SEC's actions with respect to any secured creditor of Seller.

(m)     **"MATERIAL ADVERSE CHANGE"** means materially adverse facts or conditions previously unknown by and not disclosed to Buyer that would substantially impair Buyer's ability to operate the Purchased Assets.

(n)     **"MATERIAL ADVERSE EFFECT"** applies only to the disclosure provisions of the Agreement and means any circumstance, change in, or effect on a party, its subsidiaries, and its business, taken as a whole, that (i) either (A) is materially adverse to the operations, assets or liabilities (including contingent liabilities), earnings or results of operations, the business (financial or otherwise) of such party and its subsidiaries, taken as a whole, or (B) would reasonably be expected to prevent the ability of such party to consummate the transactions contemplated by this Agreement, and (ii) is not cured within a

29

reasonable period of time following notice from the party claiming the occurrence or circumstance that is materially adverse as to the business, properties, assets, liabilities, operations, operating condition (financial or otherwise) of the party; *provided, however*, that such term shall not include any circumstance or change related to (s) general economic or political conditions, (t) conditions generally affecting the industries in which the Business operates, (u) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Buyer; (v) any matter of which Buyer is aware on the date hereof; (w) any changes in applicable Legal Requirements or accounting rules (including GAAP); (x) the announcement, pendency or completion of the Bankruptcy Case or the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with the Seller and the Business (y) any act of God, war, terrorism, or other similar event beyond the control of the party that does not directly and peculiarly impact the assets or premises of the party, or (z) credit markets, securities markets or the economy, unrelated to any event that would otherwise constitute a Material Adverse Effect on the party.

(o)     "ORDER" means any decree, writ, assessment, award, decision, injunction, judgment, order, ruling, subpoena, verdict or arbitration award entered, issued, made, or rendered by any Governmental Authority.

(p)     "PERMITTED LIEN" means (i) Liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures, and (ii) mechanics', carriers', workmen's, repairmen's or other like Liens arising or incurred in the ordinary course of business.

(q)     "PERSON" shall include any individual, partnership, joint venture, corporation, trust, unincorporated organization, any other entity and any government or any department or agency thereof, whether acting in an individual, fiduciary, or other capacity.

(r)     "PRE-CLOSING PERIOD" means, with respect to the Seller and its subsidiaries, any taxable year or period that ends on or before the Closing Date and, in the case of any straddle period, the portion of such period ending on and including the day prior to the Closing Date.

(s)     "PRE-PETITION LOAN" means that $200,000 loan made by Buyer to Seller's Subsidiary HemCon Europe.

(t)     "PRE-CLOSING TAXES" shall mean any Taxes for which the Seller or its Subsidiaries is or could be liable with respect to (i) any Pre-Closing Period (and in case of any straddle period, Seller's portion of the straddle period), (ii) pursuant to Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign Tax law), or by reason of having been a member of any consolidated, combined or unitary group on or prior to the Closing Date, (iii) resulting from the Transaction (including any Transfer Taxes) and (iv) pursuant to any contractual agreement entered into on or before the Closing Date or as a transferee or successor, if the event giving rise to such liability occurred prior to the Closing Date, in each case together with any interest, penalties and additions to Tax with respect to any of the foregoing and any Losses incurred in connection with any of the foregoing.

(u)     "TAX" shall mean any tax (including any income tax, franchise tax, capital gains tax, estimated tax, gross receipts tax, value added tax, surtax, excise tax, ad valorem tax, transfer tax, stamp tax, sales tax, use tax, property tax, business tax, occupation tax, inventory tax, occupancy tax, withholding tax or payroll tax), levy, assessment, tariff, impost, imposition, toll, duty (including any customs duty), deficiency or fee, and any related charge or amount (including any fine, penalty or

interest), (a) imposed, assessed or collected by or under the authority of any Governmental Authority, or (b) payable pursuant to any tax sharing agreement or similar contract.

*[Signatures appear on the following page.]*

31

Agreement as of the date first written above.

"BUYER:"

TRICOL INTERNATIONAL GROUP LIMITED
a Marshall Islands corporation

By _Hongwie Duan_____
    Hongwei Duan, President and CEO

Notices:

_____
_____
_____
Facsimile No.: (___) _____

with a copy to:

Farleigh Wada Witt
ATTN: Paul Migchelbrink and
Tara Schleicher
121 SW Morrison Street, Suite 600
Portland, OR 97204
Facsimile No.: (503) 228-6044
Phone: (503) 228-1741
Email: pmigchelbrink@fwwlaw.com
       tschleicher@fwwlaw.com

"SELLER:"

HEMCON MEDICAL TECHNOLOGIES, INC.,
an Oregon corporation

By _____
    Michael Wax, President

Notices:

_____
_____
_____
Facsimile No.: (___) _____
Email:_____

with a copy to:

Tonkon Torp, LLP
ATTN: Albert N. Kennedy and
Timothy J. Conway
888 SW Fifth Avenue, Suite 1600
Portland, OR 97204
Kennedy Facsimile: (503) 972-3713
Kennedy Phone: (503) 802-2013
Conway Facsimile: (503) 972-3727
Conway Phone: (503) 802-2027
Email: al.kennedy@tonkon.com
       tim.conway@tonkon.com

035365/00004/6932341v3

32

# EXHIBIT A

LOAN NOTE BETWEEN

HEMCON MEDICAL TECHNOLOGIES EUROPE LIMITED

And

WEIFANG TRICOL MARINE BIOLOGICAL HYGIENIC MATERIAL CO. LTD.
a Chinese limited company

## PARTIES

This instrument is entered into by:

1. HemCon Medical Technologies Europe Limited, incorporated in Ireland under company number 255271 with its registered office at Unit 6, Courtyard Business Centre, Blackrock, Co. Dublin, Ireland (the "Company").
2. Weifang Tricol Marine Biological Hygienic Material Co. Ltd. (the "Lender").

## RECITALS

A. By a resolution of the Board of Directors of the Company passed on ___ January 2016 the Company has created a $200,000 Three-Month Loan Note.

B. The Note will be constituted on and subject to the following terms and conditions set out in the remainder of this Instrument.

## TERMS AND CONDITIONS

### 1. DEFINITIONS AND INTERPRETATION

1.1. In this Instrument:

"Business Day" means any day, other than a Saturday or Sunday or any other day on which banks are not open for business in Ireland;

"Instrument" means this instrument including any Schedule to it, as may be amended by the parties in writing from time-to-time;

"Note" means the $200,000 Three-Month Loan Note constituted in accordance with this Instrument or as the case may require the amount for the time being issued and/or outstanding in respect thereof;

"Companies Registration Office" means the central repository of public statutory information on Irish companies and business names;

"Asset Purchase Agreement" means the agreement whereby Lender will acquire all the assets of the HemCon Medical Technologies, Inc., a corporation formed under the laws of

the State of Oregon, United States, and the parent of Company.

"Repayment Date" means the closing date of an Alternative Transaction, as that term is defined in the Asset Purchase Agreement. If Lender and HemCon Medical Technologies, Inc. close the Asset Purchase Agreement, this Note shall be deemed satisfied and paid in full on the closing date.

1.2. In this Instrument:

    1.2.1.1. Unless otherwise specified, references to clauses and Schedules are to clauses and Schedules to this Instrument;

    1.2.1.2. Headings are included for convenience only and shall not affect the construction of this Instrument;

    1.2.1.3. Words denoting the singular shall include the plural and vice versa;

    1.2.1.4. Words denoting any gender shall include a reference to each other gender;

    1.2.1.5. References to persons shall include references to natural persons, firms, partnerships, companies, corporations, associations, organisations and trusts (in each case whether or not having separate legal personality); and

    1.2.1.6. References to a party or to parties shall, where the context so admits, mean a party or parties to this Instrument, their successors and permitted assigns.

2. **SECURITY**

2.1. The principal amount of the Note shall be secured on the assets of HemCon Medical Technologies Europe Limited.

2.2. The security will be filed in the Companies Registration Office.

2.3. The security will be a floating charge over the Plant Property and Equipment, Accounts Receivable, Inventories and other receivables of Company.

3. **INTEREST AND DEFAULT INTEREST**

3.1. The Company will pay to the Lender interest on the principal amount of the Note at an annual rate equal to twelve percent (12.0%) per annum, with effect from the date of receipt of the advance made for the Note.

3.2. Investor will advance funds within two (2) business days of execution of Asset Purchase Agreement

3.3. Funds will be paid into:

| USD Account | |
| --- | --- |
| Account Name | HemCon Medical Technologies Europe Limited |
| Branch | Adelaide Road |
| Account Number | 28838025 |
| Sort | 93-00-67 |
| IBAN | IE82 AIBK 9300 6728 8380 25 |
| BIC | AIBKIE2D |

3.4. Interest shall accrue on a monthly basis and shall be calculated at the end of each month on the principal amount of the Note held at that time (and, in the event of repayment in accordance with Clause 5, interest shall accrue and be calculated on any part-month).

3.5. Interest shall be paid simultaneously with the repayment of the loan.

3.6. If the Company fails to pay any amount payable by it under this Instrument on the due date, then that unpaid amount shall be an "Overdue Amount." Default interest shall accrue on the Overdue Amount from (and including) the due date to (but excluding) the date such Overdue Amount is paid in full. Default Interest shall be payable on an Overdue Amount at a rate per annum equal to four percent (4.0%) above the rate specified in Clause 4.1.

4. **PREPAYMENT**

4.1. The Company may prepay the full principle amount on the Note and all accrued and unpaid interest on the Note any time prior to the repayment date on not less than two Business Days' notice to Lender.

4.2. Any such notice shall be irrevocable by the Company and the Company shall be bound to prepay the Notes and interest or pay default interest in accordance with Clause 4.1 on any unpaid amount.

4.3. Payment of the full principle amount on the Note and all accrued and unpaid interest on the Note shall be by electronic transfer to an account nominated by Lender to the Company. All payment shall be made free and clear of any deductions, save as the

Company is required to make by law.

## 5. REPAYMENT

5.1. On the Repayment Date, the Company shall pay to Lender the full principle amount of the Note and all accrued and unpaid interest on the Note by way of electronic transfer to an account nominated by Lender to the Company. All payment shall be made free and clear of any deductions, save as the Company is required to make by law.

5.2. Payment of the full principle amount on the Note and all accrued and unpaid interest on the Note shall be by electronic transfer to an account nominated by the Investor to the Company. All payment shall be made free and clear of any deductions, save as the Company is required to make by law.

5.3. Upon receipt of full payment, the Note shall be cancelled and the Company shall have no further obligations or liability in respect of it and Lender.

5.4. Security Charge registered with the Companies Registration Office will be satisfied in full and such satisfaction will be filed.

## 6. EVENTS OF DEFAULT

6.1. Each of the events set out below is an Event of Default (whether or not caused to any extent by any reason or matter outside the control of the Company):

6.1.1. the Company failing to pay any principal monies and/or interest under the Note within 5 days of the due date for payment;

6.1.2. if the Company otherwise fails to materially comply with any of the covenants, undertakings, conditions or provisions contained in the instrument and such default being capable of remedy fails to be so remedied within 5 days of receipt of a notice from Lender requiring such remedy;

6.1.3. the Company being deemed unable to pay its debts or any compromise, composition, arrangement or agreement is made with the creditors of the Company, further to a convened meeting of the creditors (other than as approved by Lender);

6.1.4. distress or execution (or other similar process) is levied upon, or enforced against all or a material part of the assets or property of the Company and is not fully paid out or discharged within 21 days unless and for so long as the same is being contested in good faith; or

6.1.5. the Company takes any corporate action or other steps are taken or legal or other proceedings are started for its winding-up, dissolution or re-organisation, or for the appointment of a receiver, administrator, administrative receiver, liquidator, trustee or similar officer of it or of any or all of its assets.r

6.2. If an Event of Default shall have occurred then, if Lender so elects, the Note shall become immediately repayable on demand at the principal amount then outstanding together with interest accrued up to but excluding the date of repayment.

6.3. The Company shall notify Lender forthwith of the happening of any Event of Default.

## 7. GENERAL MEETING OF THE COMPANY

The Note does not carry the right to attend or vote at General Meetings of the Company.

## 8. SUCCESSORS

This document shall be binding upon and for the benefit of the parties, their respective successors (including in the case of natural persons their legal personal representatives) and permitted assigns.

## 9. CONTRACTS (RIGHTS OF THIRD PARTIES)

No term of this Instrument is enforceable by any person other than the parties.

## 10. GOVERNING LAW

This Instrument shall be governed by and construed in accordance with Irish law and the parties submit to the exclusive jurisdiction of the Courts of Ireland.

IN WITNESS that this Instrument has been executed on the date first written above:

"**LENDER:**"                                                "**COMPANY:**"

**WEIFANG TRICOL MARINE BIOLOGICAL**            **HEMCON MEDICAL TECHNOLOGIES EUROPE**
**HYGIENIC MATERIAL CO. LTD.,**                      **LIMITED,**
a Chinese limited company                          an Irish Limited Liability Company


By_____        By_____
    Hongwei Duan, President and CEO                Stuart Sands, Director

## Schedule 1.2 (a) Accounts Receivable

| Customer Number | Sum of Current Trx Amount |
|---|---|
| NAR0001 | $ 61,532.2 |
| ZER0001 | $ 29,043.5 |
| OWE0001 | $ 19,454.4 |
| MED0001 | $ 17,371.4 |
| BMP0001 | $ 12,616.6 |
| MHB0001 | $ 7,400.4 |
| SEN0001 | $ 6,622.9 |
| AHS0001 | $ 6,384.0 |
| HAL0001 | $ 5,973.0 |
| SSH0001 | $ 5,162.2 |
| FAI0002 | $ 4,752.5 |
| MHH0001 | $ 4,332.0 |
| DUH0001 | $ 3,828.0 |
| CLC0001 | $ 3,672.0 |
| REN0001 | $ 3,561.3 |
| MER0001 | $ 2,959.0 |
| BBM0001 | $ 2,884.4 |
| IUH0001 | $ 2,872.3 |
| UHC0001 | $ 2,795.2 |
| MHU0001 | $ 2,736.0 |
| MUH0001 | $ 2,389.7 |
| HMC0001 | $ 2,000.0 |
| UCS0001 | $ 1,969.9 |
| JMH0001 | $ 1,934.0 |
| AMO0001 | $ 1,900.0 |
| ISS0001 | $ 1,855.0 |
| TVF0001 | $ 1,627.0 |
| SSM0001 | $ 1,591.4 |
| DVT0002 | $ 1,554.0 |
| CVV0001 | $ 1,483.7 |
| CVI0001 | $ 1,388.0 |
| OHH0001 | $ 1,254.0 |
| EGH0001 | $ 1,224.0 |
| DSC0001 | $ 1,155.0 |
| NCH0001 | $ 1,140.0 |
| UWH0001 | $ 1,086.0 |
| RSF0001 | $ 967.8 |
| QMC0001 | $ 950.0 |
| AMC0001 | $ 927.0 |

## Schedule 1.2 (a) Accounts Receivable

| Customer Number | Sum of Current Trx Amount |
|---|---|
| PRI0001 | $ 920.2 |
| SPS0001 | $ 895.0 |
| HEM0006 | $ 874.6 |
| WFH0001 | $ 798.0 |
| MCH0001 | $ 732.8 |
| TQM0001 | $ 706.9 |
| FRM0001 | $ 607.2 |
| ORE0002 | $ 547.0 |
| MHC0001 | $ 512.0 |
| CCS0001 | $ 471.0 |
| CGC0001 | $ 457.8 |
| LEG0002 | $ 456.0 |
| EHC0001 | $ 456.0 |
| SLM0001 | $ 456.0 |
| MHS0001 | $ 456.0 |
| SSM0002 | $ 444.7 |
| MHC0002 | $ 436.0 |
| RUM0001 | $ 435.0 |
| MMC0001 | $ 430.4 |
| UPM0001 | $ 350.0 |
| AHF0001 | $ 350.0 |
| SCH0002 | $ 338.4 |
| REM0001 | $ 324.7 |
| SRM0001 | $ 300.2 |
| NOV0001 | $ 283.2 |
| NOR0001 | $ 262.7 |
| MCC0002 | $ 243.0 |
| NFM0001 | $ 240.0 |
| BSC0001 | $ 233.0 |
| WBH0001 | $ 228.0 |
| UVM0001 | $ 228.0 |
| SJH0002 | $ 181.4 |
| BHS0002 | $ 160.0 |
| MHS0002 | $ 114.0 |
| PHS0003 | $ 82.9 |
| HRT0001 | $ 57.0 |
| AMZ0001 | $ 35.0 |
| PRR0001 | $ 30.0 |
| STC0001 | $ 17.4 |
| FOC0001 | $ (414.0) |
| **Grand Total** | **$ 249,087.1** |

## Schedule 1.2 (b) Fixtures, Fittings and Equipment

### Computer Equipment

| Agent IP Address | Agent Name | Agent Type | Agent Manufacturer | Agent Mainboard |
|---|---|---|---|---|
| 192.168.1.9 | DUB-NB02 | Laptop | Hewlett-Packard | HP EliteBook 2540p |
| 10.5.73.130 | FEDEX-HP | WorkStation | Hewlett-Packard | HP rp5800 |
| 10.5.74.209 | INSTRON-PC | WorkStation | Dell | Precision T3610 |
| 172.16.70.126 | OMNICADMIN-PC | WorkStation | Dell | OptiPlex 9020 |
| 192.168.0.4 | POR-NB01 | Laptop | Hewlett-Packard | HP EliteBook 2540p |
| 10.5.74.205 | POR-NB02 | Laptop | Hewlett-Packard | HP EliteBook 8560p |
| 192.168.0.3 | POR-NB07 | Laptop | Hewlett-Packard | HP EliteBook 2540p |
| 10.5.76.170 | POR-NB09 | Laptop | Hewlett-Packard | HP EliteBook 2540p |
| 10.5.76.117 | POR-NB10 | Laptop | Hewlett-Packard | HP EliteBook 2540p |
| 10.5.76.161 | POR-NB11 | Laptop | Hewlett-Packard | HP EliteBook 2540p |
| 10.5.73.159 | POR-NB12 | Laptop | Hewlett-Packard | HP EliteBook 2540p |
| 10.5.76.149 | POR-NB13 | Laptop | Hewlett-Packard | HP EliteBook 2540p |
| 10.5.74.229 | POR-NB15 | Laptop | Hewlett-Packard | HP EliteBook 2540p |
| 10.5.76.167 | POR-NB16 | Laptop | Hewlett-Packard | HP EliteBook 2530p |
| 10.5.76.108 | POR-NB17 | Laptop | Hewlett-Packard | HP EliteBook 8460p |
| 10.5.76.125 | POR-NB18 | Laptop | Hewlett-Packard | HP EliteBook 2560p |
| 10.5.76.113 | POR-NB19 | Laptop | Hewlett-Packard | HP EliteBook 8460p |
| 10.5.76.199 | POR-NB20 | Laptop | Hewlett-Packard | HP EliteBook 2560p |
| 10.5.76.184 | POR-NB21 | Laptop | Hewlett-Packard | HP EliteBook 2560p |
| 10.5.76.142 | POR-NB24 | Laptop | Hewlett-Packard | HP EliteBook 2560p |
| 10.0.0.14 | POR-NB25 | Laptop | Hewlett-Packard | HP EliteBook 8460p |
| 10.5.76.160 | POR-NB26 | Laptop | Hewlett-Packard | HP EliteBook 2560p |
| 10.5.72.132 | POR-NB27 | Laptop | Hewlett-Packard | HP EliteBook 8460p |
| 10.5.76.156 | POR-NB28 | Laptop | Hewlett-Packard | HP EliteBook 2540p |
| 10.0.1.24 | POR-NB29 | Laptop | Hewlett-Packard | HP EliteBook 840 G1 |
| 10.5.73.157 | POR-NB30 | Laptop | Dell | Latitude E5440 |
| 192.168.0.5 | POR-NB31 | Laptop | Dell | Latitude E5440 |
| 10.5.75.112 | POR-NB32 | Laptop | Dell | Latitude E6440 |
| 10.5.76.107 | POR-NB33 | Laptop | Hewlett-Packard | HP EliteBook 8460p |
| 10.5.76.191 | POR-NB34 | Laptop | Hewlett-Packard | HP EliteBook 840 G1 |
| 10.5.73.124 | POR-NB35 | Laptop | LENOVO | 20DKS16300 |
| 10.0.1.16 | Simon's MacBook Pro | WorkStation | Apple | Apple; MacBook Pro; MBP81.0047.B2C |
| 172.16.255.10 | WUS-HEMCON-AD1 | Server | Microsoft Corporation | Virtual Machine |
| 172.16.255.11 | WUS-HEMCON-AD2 | Server | Microsoft Corporation | Virtual Machine |
| 172.16.255.13 | WUS-HEMCON-CRM | Server | Microsoft Corporation | Virtual Machine |
| 172.16.255.14 | WUS-HEMCON-GP | Server | Microsoft Corporation | Virtual Machine |
| 172.16.255.15 | WUS-HEMCON-NAV | Server | Microsoft Corporation | Virtual Machine |
| 172.16.255.12 | WUS-HEMCON-SYNC | Server | Microsoft Corporation | Virtual Machine |
| 10.5.76.151 | XPNB36 | Laptop | Hewlett-Packard | HP EliteBook 2530p |
| 10.5.73.3 | XPWS25 | WorkStation | Dell | OptiPlex GX270 |

# Equipment at Innovize location

| Equipment ID | Description | Estimated Replacement cost |
|---|---|---|
| #1 | 1 large table for Sartorius/WIP gauze + stool | $ 500 |
| #2 | Sartorius Balance for Bulk Gauze | $ 500 |
| #3 | WIP rack for cores and gauze stock (covered) | $ 200 |
| #4 | WIP Rack for Gauze in Lg Foil | $ 200 |
| #5 | Additional foil bags for WIP storage | $ 500 |
| | | |
| #6 | Moisture Analyzer + Printer (Asset 0061) | $ 15,937 |
| #7 | 1 small table +stool, moisture analysis | $ 500 |
| #8 | Balance for moisture testing | $ 10,000 |
| #9 | Gas drying tube for moisture test | $ 250 |
| #10 | Accessories consumables for moisture test | $ 250 |
| | | |
| #11a | Tunnel Dryer Feeder | |
| #11b | Tunnel Dryer Main Body | |
| #11c | Tunnel Dryer Delivery | $ 340,000 |
| #12 | Gel Dispensing Pump Assy | $ 500 |
| #13 | Dispenser pump head, spares + 2 pitchers | $ 2,500 |
| #14 | 1 small table for coat weight | $ 500 |
| #15 | Balance for coat weight + printed ruled mat | $ 500 |
| #16 | Tall Storage Cabinet for Coating Line, tan | $ 1,000 |
| #17 | 2x Lg plastic vessel for gel pumping + 2 Lids | $ 2,000 |
| #18 | 1 roll cart for gel 20L | $ 500 |
| #19 | Disposable tubing for gel dispenser | $ 300 |
| #20 | Tub for tubing and tube cutter | $ 50 |
| #21 | Go/No-Go Gauge for Gauze width | $ 150 |
| #22 | EXTRA GEL DISPENSER/PUMP HEAD from R&D | |
| | | |
| #1 | Band Sealer | $ 500 |
| #2 | Band Sealer | $ 500 |
| #3 | 2 sm. Tables for band sealers | $ 1,000 |
| #4 | 2 roll carts for rewinders | $ 500 |
| #5 | 2 rewinders | $ 500 |
| #6 | Custom stand for RO spool | $ 300 |
| | | |
| #1 | Labels Applicators | $ 24,000 |
| #2 | Labels Applicators | $ 24,000 |
| #3 | Box of parts/spools/clips for Doranix | $ 500 |
| #4 | 1 large table for label applicators + chairs | $ 1,500 |
| | | |
| #1 | Sealer | $ 5,000 |
| #2 | Sealer A-Line heat seal | $ 13,000 |
| #3 | Sealer | $ 5,000 |
| #4 | Sealer | $ 5,000 |
| #5 | Sealer | $ 5,000 |
| #6 | Sealer | $ 5,000 |
| #7 | Sealer | $ 5,000 |
| #8 | Sealer | $ 5,000 |
| #9 | Sealer | $ 5,000 |
| #10 | 8' Table with wheels | $ 1,000 |
| | | |
| #11 | WIP Racks 1 & Flat Bins & Totes | $ 500 |
| #12 | 4x 5' tables, 2x 8' tables for sealers + work | $ 5,000 |
| #13 | 2 sets N2/Vac Manifolds for Gramatech | $ 500 |
| #14 | 3-4 blue comfort floor mats | $ 500 |

# Equipment at Innovize

| Description | Estimated Replacement cost |
|---|---|
| Oven | $ 100,000 |
| Timer (currenlty in Room 309) | $ 150 |
| Steel cabinet with small plastic long trays | $ 1,500 |
| Cases + cookie sheets + teflon + stops | $ 1,500 |
| Press + Elephant Trunks | $ 1,500 |
| Manifold/valves for CDA into Press | $ 1,500 |
| | |
| Z-Folder, 1 | $ 30,000 |
| Z-Folder, 2 | $ 30,000 |
| 1 long table | $ 1,500 |
| 4 chairs for pouching | $ 1,500 |
| manifold CDA for Z-folders | $ 1,500 |
| 2 tables supporting Z-Folders | $ 1,500 |
| 2 custom stands for Gauze Spool | $ 1,500 |
| 2 roll carts | $ 1,500 |
| | |
| 30" PRESS | $ 218,277 |
| Dressing cutter | |
| Dressing Softener/Backing Applicator | $ 31,500 |
| Dressing Softener | |
| Patch Punch, 1.5x1.5 | $ 199,184 |
| Patch Punch, 2x2 | $ - |
| Cutter | $ 6,840 |
| 2 large, 8' long tables for punches/backing | $ 1,500 |
| Rolls of teflon sheeting for product handling | $ 750 |
| 1 small table, 3' for softening | $ 750 |
| 1 storage cabinet patch punch tools, tan | $ 1,000 |
| 1-2 WIP cookie sheets + cases | $ 1,500 |
| Hembosser | |
| Hembosser | $ 99,246 |
| 2 tables | $ 1,000 |
| 2 stools for Hembosser | $ 750 |
| small rack near Hembosser | |
| small table near Hembosser | |
| All racking & tables in Hembosser Room | |
| Comfort Mats | $ 500 |
| 8 Racks | $ 500 |
| 2 racks with 200 totes | $ 150 |
| 2 8ft tables | $ 1,500 |
| | |
| Labels Printer | $ 2,500 |
| Zebra3 Label Printer not yet validated | $ 2,500 |
| 2x Small computer stations for Zebra/Citizen | $ 2,500 |
| 2x tables/stools used for computers+printers | $ 1,500 |
| Tall cabinet in label room for printer suppl. | $ 500 |
| Paper printer for WIP labels in label room. | $ 500 |
| Sartorius for packaging 1 | $ 15,000 |
| Sartorius for packaging 2 | $ 15,000 |
| 2 long tables for packaging area | $ 2,000 |
| 1 long table | $ 1,000 |
| Teflon sheeting for product handling | $ 200 |
| 50g NIST certified weight | $ 200 |
| 50g NIST certified weight | $ 200 |
| Racks for boxed labels/RMs in label room | $ 500 |
| Minipak 350 dehumidifier | $ 35,000 |
| HEPA unit | $ 2,500 |
| Chicago Blower | $ 5,000 |
| Dehumidifer | $ 84,400 |
| Cooling Coils | |
| AC Unit | $ 2,500 |
| | |
| Gurly Tester | $ 6,000 |
| Tooling - See PO069266 for additional information./ Dot | $ 19,245 |
| Subtotal | $ 1,429,480 |

## EQUIPMENT AT QBI

| Equipment ID | Description | Cost |
|---|---|---|
| #1 | Filtration Cart/Stand | |
| #1 | Filtration housings & Storage totes | |
| #1 | 50 micron disposable filters | |
| #1 | Dispensing tube (clear 5/8") + metal tip | |
| #1 | 200 micron disposable filters | $ 1,000.00 |
| #1 | 8' x 3' steel table for carboy filling | $ 1,000.00 |
| | | |
| #1 | 2 x Utility Sinks + all attachments | $ 3,900.00 |
| canceled | DI water manifold for sinks | |
| canceled | Hot water manifold for sinks | |
| #4 | 2x Wire Racks + 40-50 carboys | $ 200.00 |
| #5 | Mold Washer | $ 110,000.00 |
| #6 | Carboy Washing kit | $ 1,000.00 |
| | | |
| #7 | 3 lyo loads = 380 to 400 molds. 3" x 10" by 1"tall | $ 120,000.00 |
| #8 | 12 palletainers | $ 32,536.00 |
| #9 | 2 Large alumalifts | $ 27,000.00 |
| #10 | 1 small alumalift | $ 8,000.00 |
| | | |
| #1 | Balance | |
| #2 | 200 g calibrated weight | |
| #3 | Gel disp. Pump | |
| #4 | Pump head assembly | |
| #5 | 8' x 3' steel table for lyo unload | |
| #6 | heavy duty roller cart for lyo load | |
| #7 | blue totes for tubing + pads | |
| #8 | misc. equipment on table (scissors/etc) | $ 12,000.00 |
| | | |
| #1 | Balance | |
| #2 | 200 g calibrated weight | |
| #3 | Gel disp. Pump | |
| #4 | Pump Head Assembly | |
| #5 | 8' x 3' steel table for lyo unload | |
| #6 | heavy duty roller cart for lyo load | |
| #7 | blue totes for tubing + pads | |
| #8 | misc. equipment on table (scissors/etc) | |
| #9 | Broken gel dispensing pump? | $ 12,000.00 |
| | | |
| #1 | Moisture tester | |
| #3 | Analytical balance tied to moisture testing | $ 20,000.00 |
| | | |
| | | $ 445,166.60 |
| | | |

At Rose City Storage

| #0302 | | Particle Counter | MetOne |
|-------|--|------------------|--------|
| #0001 | | Oven | CascadeTek |
| #0140 | | Press | Altman Browning |
| | | Moisture Analyzer + Printer | Arizona Instruments |
| | | Moisture Analyzer + Printer | Arizona Instruments |
| | | Balance | Arizona Instruments |
| | | Labels Printer - Doesn't work | Citizen |
| | | Labels Printer - Doesn't work | Citizen |

| 720 SW Washington St | | |
|----------------------|------|--------|
| **Description** | **Date** | **Amount** |
| FastTrack Schedule 10 software | 6/1/2014 | 2,396.00 |
| CRM Software | 6/30/2014 | 10,062.25 |
| Piston Vacuum Pump for Lyo 3 | 8/13/2014 | 12,000.00 |
| FastTrack Schedule 10 software - additional licenses | 9/30/2014 | 359.90 |
| Rose City New furniture, for new office | 12/12/2014 | 87,571.00 |
| Other Misc Items | 12/12/2014 | 3,032.31 |
| OBS- IT Infrastructure | 12/12/2014 | 14,835.00 |
| Hatfield Communications LLC | 1/1/2015 | 10,850.00 |
| LEAD IT Consulting LLC | 1/1/2015 | 1,935.36 |
| Online Business Systems | 1/1/2015 | 1,600.00 |
| Sartorius (220g x 0.1 mg) S/N 28850326 and Sartorius Data Printer | 1/1/2015 | 2,915.82 |
| Dell High Performance Computer (S/N and Dell 22in Flat Panel LCD | 1/1/2015 | 3,099.56 |
| Morgan Building Leasehold Improvements | 1/1/2015 | 48,043.73 |
| HEMCON Remote Desktop (RDS) Additional CAL's | 1/1/2015 | 3,318.48 |
| Navision Implementation - Connector Recurring & Development A | 1/1/2015 | 2,082.50 |
| Printer-- Xerox Workcentre 7655 | | - |
| Various Laptop computers- see log | | |
| | | 204,101.91 |

| Equipment at WuXi | | | |
|-------------------|------|--------------|-------------|
| **Equipment ID Number** | **Make** | **Model/Serial** | **Description** |
| 430 | Arizona Instruments | CT-3100-I/280570 | Moisture Analyzer |
| 431 | Arizona Instruments | ZSP150AZI//310517 | Balance |
| 284 | Precision Instruments | 4171E/0605689 | Gurly Tester |
| 280 | Altman Brawning | SAWS3.2 | Tester |

## Schedule 1.2 (c) Inventory

| Item Number | Item Type | Sum of Quantity | Average of Unit Cost | Sum of Extended Cost |
|---|---|---|---|---|
| 1001 | 2x2 | 1865 | 9.61 | $ 17,923 |
| 1002 | 2x4 | 3025 | 11.71 | $ 35,423 |
| 1003 | 4x4 | 1983 | 6.33 | $ 12,552 |
| 1004 | Patch | 7990 | 4.2 | $ 33,558 |
| 1005 | Patch 2x2 | 1270 | 4.84 | $ 6,147 |
| 1006 | Strip | 4280 | 3.66 | $ 15,665 |
| 1007 | Strip | 4100 | 4 | $ 16,400 |
| 1008 | Chf 1x3 | 6085 | 3.21 | $ 19,533 |
| 1010 | Chf 3x28 | 70 | 29.36 | $ 2,055 |
| 1012 | GuardaCare 2x2 | 640 | 2.75 | $ 1,760 |
| 1013 | GuardaCare 4x4 | 580 | 5.13 | $ 2,975 |
| 1017 | ChitoGauze | 30 | 7.36 | $ 221 |
| 1031 | XR Surgical 2x2 | 3140 | 7.56 | $ 23,738 |
| 1032 | XR Surgical 4x4 | 1270 | 10.59 | $ 13,449 |
| 1033 | XR Surgical 4x2yd | 665 | 12.67 | $ 8,426 |
| 1045 | Strip | 725 | 4.09 | $ 2,965 |
| 1050 | Dnt 10x12 | 1782 | 2.97 | $ 5,293 |
| 1051 | Dnt 10x12 | 277 | 2.33 | $ 645 |
| 1052 | Dnt 1x3 | 2076 | 2.83 | $ 5,875 |
| 1089 | XR External | 1000 | 5.29 | $ 5,290 |
| 1093 | Dot | 24000 | 1.15 | $ 27,600 |
| 132 | Nasal Plugs | 4690 | 0.6 | $ 2,814 |
| 302 | 4x4 Training | 1623 | 4.98 | $ 8,083 |
| AP1003 | 4x4 | 3032 | 5.8 | $ 17,586 |
| AP1004 | Patch | 3380 | 3.88 | $ 13,114 |
| AP1005 | Patch 2x2 | 2840 | 4.53 | $ 12,865 |
| AP1012 | GuardaCare 2x2 | 3880 | 2.28 | $ 8,846 |
| AP1017 | ChitoGauze | 965 | 6.68 | $ 6,446 |
| AP1044 | Patch | 3140 | 4.84 | $ 15,198 |
| AP1050 | Dnt 10x12 | 5039 | 2.59 | $ 13,051 |
| AP1051 | Dnt 10x12 | 12110 | 2.07 | $ 25,068 |
| AP1073 | Patch 2x2 | 5043 | 5.55 | $ 27,989 |
| AP1076 | Patch | 5080 | 4.49 | $ 22,809 |
| AP1077 | Strip | 6160 | 3.46 | $ 21,314 |
| AP1078 | GuardaCare 2x2 | 2970 | 2.9 | $ 8,613 |
| AP1079 | GuardaCare 4x4 | 2810 | 4 | $ 11,240 |
| AP1089 | XR External | 5046 | 4.9 | $ 24,725 |
| AP1090 | XR External | 2642 | 5.63 | $ 14,874 |
| RM5000 | RMCHTN | 122440 | 0.17 | $ 20,859 |
| RM5015 | RMO | 35210 | 0.02 | $ 853 |
| RM5018 | RMO | 2625800 | 0 | $ 12,210 |
| RM6015 | RMPKG | 269 | 0.11 | $ 32 |
| RM6016 | RMPKG | 302 | 0.11 | $ 36 |
| RM6072 | RMPKG | 60012 | 0 | $ 255 |
| RM6138 | RMPKG | 29081 | 0.01 | $ 419 |
| RM6148 | RMPKG | 4333 | 0.03 | $ 133 |
| RM6153 | RMPKG | 194 | 0.27 | $ 53 |
| RM6154 | RMPKG | 213 | 0.27 | $ 58 |
| RM6155 | RMPKG | 156 | 0.27 | $ 43 |
| RM6156 | RMPKG | 42 | 0.27 | $ 11 |

| Item Number | Item Type | Sum of Quantity | Average of Unit Cost | Sum of Extended Cost |
|---|---|---|---|---|
| RM6157 | RMPKG | 237 | 0.27 | $ 65 |
| RM6158 | RMPKG | 249 | 0.27 | $ 68 |
| RM6159 | RMPKG | 240 | 0.27 | $ 66 |
| RM6161 | RMPKG | 163 | 0.27 | $ 45 |
| RM6162 | RMPKG | 222 | 0.27 | $ 61 |
| RM6168 | RMPKG | 1183 | 0.12 | $ 144 |
| RM6170 | RMPKG | 106 | 0.08 | $ 9 |
| RM6181 | RMPKG | 182 | 0.27 | $ 50 |
| RM6182 | RMPKG | 188 | 0.27 | $ 51 |
| RM6183 | RMPKG | 303 | 0.07 | $ 23 |
| RM6189 | RMPKG | 3026 | 0.2 | $ 619 |
| RM6195 | RMPKG | 5384 | 0.11 | $ 640 |
| RM6196 | RMPKG | 13000 | 0.11 | $ 1,545 |
| RM6197 | RMPKG | 275 | 0.51 | $ 142 |
| RM6201 | RMPKG | 134 | 0.07 | $ 10 |
| RM6207 | RMPKG | 1453 | 0.33 | $ 484 |
| RM6210 | RMPKG | 1673 | 0.33 | $ 558 |
| RM6211 | RMPKG | 1099 | 0.33 | $ 366 |
| RM6216 | RMPKG | 1944 | 0.07 | $ 150 |
| RM6222 | RMPKG | 22112 | 0.07 | $ 1,705 |
| RM6266 | RMPKG | 274 | 0.57 | $ 158 |
| RM7000 | RMPKG | 11190 | 0.31 | $ 3,514 |
| RM7017 | RMPKG | 12338 | 0.14 | $ 1,790 |
| RM7107 | RMPKG | 3475 | 0.32 | $ 1,138 |
| RM7135 | RMPKG | 3516 | 0.14 | $ 496 |
| RM7136 | RMPKG | 1144 | 0.66 | $ 763 |
| RM7137 | RMPKG | 400 | 1.97 | $ 792 |
| RM7138 | RMPKG | 1018 | 0.4 | $ 413 |
| RM7139 | RMPKG | 3174 | 0.57 | $ 1,836 |
| RM7140 | RMPKG | 604 | 1.2 | $ 731 |
| RM7141 | RMPKG | 1668 | 0.91 | $ 1,531 |
| RM7142 | RMPKG | 2142 | 0.66 | $ 1,429 |
| RM7144 | RMPKG | 739 | 0.89 | $ 658 |
| RM7145 | RMPKG | 2203 | 0.89 | $ 1,962 |
| RM7146 | RMPKG | 347 | 0.3 | $ 107 |
| RM7148 | RMPKG | 1488 | 0.34 | $ 518 |
| RM7150 | RMPKG | 891 | 0.24 | $ 220 |
| RM7151 | RMPKG | 839 | 0.24 | $ 207 |
| RM7155 | RMPKG | 869 | 0.82 | $ 715 |
| RM7158 | RMO | 156 | 2.27 | $ 354 |
| RM7170 | RMPKG | 105 | 0.82 | $ 86 |
| RM7171 | RMO | 16828 | 1.37 | $ 23,054 |
| RM7173 | RMO | 3953 | 0.79 | $ 3,127 |
| RM7179 | RMO | 5215 | 0.87 | $ 4,547 |
| RM7180 | RMPKG | 2705 | 1.01 | $ 2,734 |
| RM7242 | RMPKG | 1971 | 0.38 | $ 761 |
| SA3016 | Gel | 1664000 | 0 | $ 13,029 |
| SA3071 | Gauze | 324817 | 0.01 | $ 4,353 |
| SA3091 | ChitoFlex | 4779 | 22.33 | $ 106,724 |
| SA3092 | 4x4 | 2332 | 1.45 | $ 3,383 |
| **Grand Total** | | 5143708 | 4.657180851 | $ 735,020 |

## Schedule 1.2 (e) Assumed Contract / Assumed Lease

| Contracts | Nature of Contract | Cure Cost |
|---|---|---|
| Innovize | Manufacturing | $ 200,000 |
| Regence BlueCross Blue Shield | Health benefits for employees | $ 12,000 |
| Quality Bioresources, Inc. | Manufacturing for products | $ 60,000 |
| GPO Morgan LLC | Lease at 720 SW Washington St | $ 16,000 |
| IPFS (Imperial Credit Corp) | Insurance policy | $ 8,000 |
| Rose City Moving & Storage | Storage Unit | $ 200 |
| Online Business Systems | IT Infrastructure and support | $ 4,000 |
| NSAI (National Standards Authority) | Notified body for CE mark | $ 15,000 |
| WuXi AppTec, Inc. | Release testing on manufacturing | $ 5,000 |
| Dr. Kenton Gregory | Lisence agreement on Chitosan Technology | $ 15,000 |
| Providence Health Sys - Oregon | Lisence agreement on Chitosan Technology | $ 15,000 |
| Perrin Pacific Corp | Commission / Agent for Japan | $ 7,500 |
| STERIS Isomedix (Libertyville) | Sterilization of Products | $ 5,000 |
| Allegiance Benefit Plan Mgmt | Employee Benefits | $ 1,000 |
| PAETEC, a Windstream Company | Phones | $ - |
| OHSU Proposal & Award | Grant with OHSU regenerative medicine | $ 3,000 |
| MedAssets, Inc | GPO | $ 1,500 |
| STERIS Isomedix (Ontario) | Sterilization of Products | $ 3,000 |
| Tigers Global Logistics | 3PL | $ 1,000 |
| MetLife Local Market | Dental insurance- employees | $ - |
| LifeMap/Regence Life and Health | Disability insurance | $ - |
| CEpartner4U BV | EU Agent of authority | $ - |
| TSI Manufacturing LLC | Manufacturer | $ 15,000 |
| eSoftware Professionals | ERP implemetation VAR | $ 5,000 |
| Covenant Technology Solutions, Inc. | IT Infrastructure and support | $ 3,500 |
| Avalara | Sales tax plug in to manage sales taxes | $ - |
| Archive Systems, Inc. | Off site document storage | $ - |
| AFLAC | Health benefits for employees | $ - |
| Yankee Alliance Supply Chain Cooperative, | GPO | $ - |
| Hua Xie- Commission | China Agent Commission | $ 7,500 |
| Michel A. Boileau | Medical Advisor | $ - |
| SAIF Corporation | Workers Comp | $ - |
| Oregon Health & Science Univ | Peterkort Rental | $ - |
| Premier Purchasing Partners, LP | GPO | $ - |
| Business Accelerator (PSU) | Lab and Storage space at PSU | $ - |
| Integra Telecom, Inc. | Broadband | $ - |
| Standard Life 401K | 401K | $ - |
| Stuart Sands | Employment agreement | $ - |
| Zeria Pharmaceutical Co., Ltd. | Sales and distribution | $ - |
| Medline Industries, Inc. | Sales and distribution | $ - |
| Prometheus Medical Ltd. | Distribution | $ - |
| Prometheus Medical Ltd. | Production Agreement | $ - |
| Prometheus Medical Ltd. | Sub License Agreement | $ - |
| Bard Access Systems - M.Doc | M doc License and Supply agreement | $ - |
| BetaKang (ShenZhen) Health Technologies | Sales and distribution | $ - |
| Medline (Poland) | Sales and distribution | $ - |
| Solaris Electro Medical | Sales and distribution | $ - |
| Rene Smit International bv | Distribution and sales agreements | $ - |
| National Institute of Health | 1R43DK104564-01- GI | $ - |
| National Institute of Health | 2R42DK078400-02A1- TURP | $ - |
| Essential Health Management | Sales support and consultancy | $ - |
| | | $ 403,200 |

**Schedule 1.2 (f) Subsidiaries**

| Name | Registration Territory |
|---|---|
| Castlerise Investments Limited | Irish |
| HemCon Medical Technologies Europe Limited | Irish |
| HemCon Medical Technologies (IP) Limited | Irish |
| HemCon Medical Technologies CZ s.r.o. | Czech |
| Alltracel Laboratories Spol s.r.o | Czech |

**Schedule 1.3 (d)**

None

**Schedule 1.4 (a) Assumed AP including Cure Amounts listed on 1.2(e) above**

**Schedule 1.5 All Contracts**

## Schedule 1.5 All Contracts

| Contracts | Nature of Contract |
|---|---|
| Biotest Laboratories | QC release testing |
| Avalara | Sales tax plug in to manage sales taxes |
| Archive Systems, Inc. | Off site document storage |
| Adaptive Planning/Insights | SAAS planning tool |
| AFLAC | Health benefits for employees |
| Micrex Corporation | Convertor |
| Yankee Alliance Supply Chain Cooperative, | GPO |
| hi-tech Products | Convertor |
| Hua Xie- Commission | China Agent Commission |
| Michel A. Boileau | Medical Advisor |
| IPFS (Imperial Credit Corp) | Insurance Policy |
| Food and Drug Administration | FDA |
| SAIF Corporation | Workers Comp |
| Oregon Health & Science Univ | Peterkort Rental |
| Premier Purchasing Partners, LP | GPO |
| Sigma-Aldrich, Inc. | Miscellaneous lab consumables |
| VanderHouwen & Assoc | Recruitment firm |
| ULINE Shipping Supply Spec | Miscellaneous lab consumables |
| Professional Testing Lab | Miscellaneous lab consumables |
| Xenium Resources | HR Consulting |
| Business Accelerator (PSU) | Lab and Storage space at PSU |
| Integra Telecom, Inc. | Broadband |
| Original Cin | Collateral Materials |
| Standard Life 401K | 401K |
| Concord Technologies | E-fax |
| Stuart Sands | Employment agreement |
| Zeria Pharmaceutical Co., Ltd. | Sales and distribution |
| Owens & Minor | Sales and distribution |
| Medline Industries, Inc. | Sales and distribution |
| Prometheus Medical Ltd. | Distribution |
| Prometheus Medical Ltd. | Production Agreement |
| Prometheus Medical Ltd. | Sub License Agreement |
| Bard Access Systems - M.Doc | M doc License and Supply agreement |
| Seneca Medical | Sales and distribution |
| TQM Inc. | Sales and distribution |
| Advanced Scientific | Sales and distribution |
| The Dental Box Company, Inc. | Sales and distribution |
| Hospital pricing agreements (various) | Sales and distribution |
| BetaKang (ShenZhen) Health Technologies | Sales and distribution |
| Medline (Poland) | Sales and distribution |
| Solaris Electro Medical | Sales and distribution |
| Rene Smit International bv | Distribution and sales agreements |
| National Institute of Health | 1R43DK104564-01- GI |
| National Institute of Health | 2R42DK078400-02A1- TURP |
| Essential Health Management | Sales support and consultancy |

**Schedule 4.1**

Oregon

**Schedule 4.2**

Ireland
Czech Republic


**Schedule 4.4**

SBIR Grant- Small Business Innovation Research
NIH Grant- National Institute of Health

**Schedule 4.6 (b) (i) Intellectual Property**

    **(A)** Sublicense Agreement with Providence and Biomedical Research Services

| Title | Country | Application No. | Patent No. | Annuity Due | Assignee | Status |
|---|---|---|---|---|---|---|
| Chitosan Foam Medical Devices and Methods | EP | 09819771.8 | | 10/6/2013 | Providence Health Systems-Oregon & Providence and Biomedical Research Services, Inc. (identified as applicant on face of published international application) | Published |
| Wound Dressing and Method for Controlling Severe, Life-Threatening Bleeding | EP | 04815198.9 | | 12/23/2013 | HemCon, Inc. & Providence Health Systems-Oregon | Published |
| Tissue Dressing Assemblies, Systems and Methods Formed from Hydrophilic Polymer Sponge Structures Such as Chitosan | EP | 04815250.8 | | 12/22/2013 | HemCon, Inc. | Published |
| Compositions, Assemblies, and Methods Applied During or After a Dental Procedure to Ameliorate Fluid Loss and/or Promote Healing, Using a Hydrophilic Polymer Sponge Structure | CA | 2627483 | | 8/2/2013 | HemCon Medical Technologies, Inc. | Published |
| Compositions, Assemblies, and Methods Applied During or After a Dental Procedure to Ameliorate Fluid Loss and/or Promote Healing, Using a Hydrophilic Polymer Sponge Structure | EP | 06800712.9 | | 8/2/2013 | HemCon Medical Technologies, Inc. | Published |
| Compositions, Assemblies, and Methods Applied During or After a Dental Procedure to Ameliorate Fluid Loss and/or Promote Healing, Using a Hydrophilic Polymer Sponge Structure | HK | 09100688.6 | | | HemCon Medical Technologies, Inc. | Published |
| Systems and Methods for Introducing and Applying a Bandage Structure Within a Body Lumen or Hollow Body Organ | EP | 07795251.3 | 2026850 | 5/23/2014 | Providence Health System-Oregon d/b/a St. Vincent's Medical Center | Published |
| Wound Dressing Devices and Methods | EP | 09739250.0 | | 5/1/2014 | Providence Health System-Oregon d/b/a St. Vincent's Medical Center | Published |
| Chitosan Foam Medical Devices and Methods | US | 13/122,723 | | | Unknown | Published |
| CHITOSAN MATERIALS FROM CARBONIC ACID SOLUTION | US | 14/614,315 | | 2/4/2015 | HemCon Medical Technologies, Inc. | Published |
| CHITOSAN MATERIALS FROM CARBONIC ACID SOLUTION | PCT | PCT/US2015/01450 7 | | 2/4/2015 | HemCon Medical Technologies, Inc. | Published |
| RADIAL ACCESS BAND WITH CHITOSAN PATCH | PROV | US62/101948 | | 1/9/2015 | HemCon Medical Technologies, Inc. | Provisional |
| Chitosan Foam Medical Devices and Methods | HK | 12100040 | | | Providence Health Systems-Oregon & Providence and Biomedical Research Services, Inc. (identified as applicant on face of published international application) | Pending |
| Wound Dressing and Method for Controlling Severe, Life-Threatening Bleeding | AU | 2002312493 | 2.002E+09 | 6/14/2014 | Providence Health System-Oregon & Kenton Gregory | Granted |
| Wound Dressing and Method for Controlling Severe, Life-Threatening Bleeding | CA | 2450668 | 2450668 | 6/14/2014 | Providence Health System-Oregon & Kenton Gregory | Granted |
| Wound Dressing and Method for Controlling Severe, Life-Threatening Bleeding | IL | 159339 | 159339 | 6/29/2014 | Providence Health System-Oregon & Kenton Gregory | Granted |
| Wound Dressing and Method for Controlling Severe, Life-Threatening Bleeding | JP | 2003-504865 | 4332030 | 6/26/2014 | Providence Health System-Oregon & Kenton Gregory | Granted |
| Wound Dressing and Method for Controlling Severe, Life-Threatening Bleeding | KR | 10-2003-7016418 | 953465 | 4/9/2014 | Providence Health System-Oregon & Kenton Gregory | Granted |
| Wound Dressing and Method for Controlling Severe, Life-Threatening Bleeding | KR | 10-2009-7001826 | 953466 | 4/9/2014 | Providence Health System-Oregon & Kenton Gregory | Granted |
| Wound Dressing and Method for Controlling Severe, Life-Threatening Bleeding | US | 10/480,827 | 7482503 | 7/27/2016 | Providence Health System-Oregon & Kenton Gregory | Granted |
| Wound Dressings, Apparatus, and Methods for Controlling Severe, Life-Threatening Bleeding | US | 11/981,111 | 7820872 | 4/26/2014 | Providence Health System-Oregon & Kenton Gregory | Granted |
| Wound Dressing and Method for Controlling Severe, Life-Threatening Bleeding | US | 10/743,052 | 7371403 | 1/13/2015 | Providence Health System-Oregon d/b/a St. Vincent's Medical Center & Kenton Gregory | Granted |

| Title | Country | Application No. | Patent No. | Annuity Due | Assignee | Status |
|---|---|---|---|---|---|---|
| Wound Dressing and Method for Controlling Severe, Life-Threatening Bleeding | JP | 2006-547298 | 4854084 | 11/4/2014 | HemCon Medical Technologies, Inc. & Providence Health System-Oregon d/b/a St. Vincent's Medical Center | Granted |
| Wound Dressing and Method for Controlling Severe, Life-Threatening Bleeding | KR | 10-2006-7011684 | 10-1148248 | 5/14/2015 | HemCon Medical Technologies, Inc. & Providence Health and Services, Oregon | Granted |
| Wound Dressing and Method for Controlling Severe, Life-Threatening Bleeding | US | 12/925,292 | 8,668,924 | | Providence Health System-Oregon d/b/a St. Vincent's Medical Center & Kenton Gregory | Granted |
| Method for Preparing a Compressed Wound Dressing | US | 12/002,401 | 8313474 | 5/20/2015 | HemCon Medical Technologies, Inc. | Granted |
| Tissue Dressing Assemblies, Systems and Methods Formed from Hydrophilic Polymer Sponge Structures Such as Chitosan | JP | 2006-547315 | 4812630 | 9/2/2014 | HemCon Medical Technologies, Inc. | Granted |
| Tissue Dressing Assemblies, Systems and Methods Formed from Hydrophilic Polymer Sponge Structures Such as Chitosan | KR | 10-2006-7012470 | 10-1105081 | 1/4/2015 | HemCon Medical Technologies, Inc. | Granted |
| Antimicrobial Barriers, Systems, and Methods Formed from Hydrophilic Polymer Structures such as Chitosan | IL | 184044 | 184044 | 12/20/2015 | HemCon, Inc. | Granted |
| Compositions, Assemblies, and Methods Applied During or After a Dental Procedure to Ameliorate Fluid Loss and/or Promote Healing, Using a Hydrophilic Polymer Sponge Structure | US | 11/261,351 | 7897832 | 9/1/2018 | HemCon Medical Technologies, Inc. | Granted |
| Compositions, Assemblies, and Methods Applied During or After a Dental Procedure to Ameliorate Fluid Loss and/or Promote Healing, Using a Hydrophilic Polymer Sponge Structure | CN | 200680047819.X | | | HemCon Medical Technologies, Inc. | Granted |
| Compositions, Assemblies, and Methods Applied During or After a Dental Procedure to Ameliorate Fluid Loss and/or Promote Healing, Using a Hydrophilic Polymer Sponge Structure | JP | 2008-537698 | 5474351 | | HemCon Medical Technologies, Inc. (as of 10/2012) | Granted |
| Compositions, Assemblies, and Methods Applied During or After a Dental Procedure to Ameliorate Fluid Loss and/or Promote Healing, Using a Hydrophilic Polymer Sponge Structure | KR | 10-2008-7012624 | 10-1406566 | | HemCon Medical Technologies, Inc. | Granted |
| Compositions, Assemblies, and Methods Applied During or After a Dental Procedure to Ameliorate Fluid Loss and/or Promote Healing, Using a Hydrophilic Polymer Sponge Structure | US | 12/804,010 | 9,004,918 | | HemCon Medical Technologies, Inc. | Granted |
| Systems and Methods for Introducing and Applying a Bandage Structure Within a Body Lumen or Hollow Body Organ | France | | 2026850 | | | Granted |
| Systems and Methods for Introducing and Applying a Bandage Structure Within a Body Lumen or Hollow Body Organ | Germany | | 2026850 | | | Granted |
| Systems and Methods for Introducing and Applying a Bandage Structure Within a Body Lumen or Hollow Body Organ | Italy | | 2026850 | | | Granted |
| Systems and Methods for Introducing and Applying a Bandage Structure Within a Body Lumen or Hollow Body Organ | Netherlands | | 2026850 | | | Granted |
| Systems and Methods for Introducing and Applying a Bandage Structure Within a Body Lumen or Hollow Body Organ | UK | | 2026850 | | | Granted |
| Systems and Methods for Introducing and Applying a Bandage Structure Within a Body Lumen or Hollow Body Organ | US | 12/004,297 | 8920514 | | Providence Health System-Oregon d/b/a St. Vincent's Medical Center | Granted |
| Systems and Methods for Hemorrhage Control and/or Tissue Repair | US | 11/084,888 | 9,204,957 | | Providence Health System-Oregon & Kenton Gregory | Granted |
| Systems and Methods for Hemorrhage Control and/or Tissue Repair | CA | 2539382 | 2539382 | 3/19/2014 | Providence Health System-Oregon & Kenton Gregory | Granted |
| Hemostatic compositions, assemblies, systems, and methods employing particulate hemostatic agents formed from hydrophilic polymer foam such as chitosan | US | 11/485,886 | 8741335 | | HemCon Medical Technologies, Inc. | Granted |
| Absorbable Tissue Dressing Assemblies, Systems, and Methods Formed from Hydrophilic Polymer Sponge Structures Such as | US | 12/218,568 | 8269058 | 3/18/2016 | HemCon Medical Technologies, Inc. | Granted |
| Wound Dressing Devices and Methods | US | 12/387,378 | 9,205,170 | | Providence Health System-Oregon d/b/a St. Vincent's Medical Center | Granted |
| Wound Dressing Devices and Methods | CN | 200980124430.1 | 102076364 | | Providence Health System-Oregon d/b/a St. Vincent's Medical Center | Granted |
| Wound Dressing Devices and Methods | JP | 2011-507474 | 5726068 | 4/10/2016 | Providence Health System-Oregon d/b/a St. Vincent's Medical Center | Granted |
| Wound Dressing Devices and Methods | KR | 10-2010-7027038 | | | Providence Health and Services, Oregon | Granted |

| Folio | CaseTypeID | StatusCode | ApplicationNumber | PatentNumber | FilingDate | NextRenewalDate | Title | ApplicantName |
|---|---|---|---|---|---|---|---|---|
| ALLT01/C/AU | AU | Granted | 60043/98 | 726617 | 30/01/1998 | 1/30/2016 | Cellulose derivatives | Alpenstock Holdings Limited |
| ALLT01/C/CA | CA | Granted | 2,279,649 | 2279649 | 30/07/1998 | 1/30/2016 | Cellulose derivatives | Alpenstock Holdings Limited |
| ALLT01/C/DE | DE | Granted | 98903269.3. | 698 02 666.7-08 | 30/07/1998 | 1/30/2016 | Cellulose derivatives | Alpenstock Holdings Limited |
| ALLT01/C/ES | ES | Granted | 98903269.3. | 0956305 | 30/07/1998 | 1/30/2016 | Cellulose derivatives | Alpenstock Holdings Limited |
| ALLT01/C/FR | FR | Granted | 98903269.3. | 0956305 | 30/07/1998 | 1/30/2016 | Cellulose derivatives | Alpenstock Holdings Limited |
| ALLT01/C/GB | GB | Granted | 9916279.4 | 2335921 | 30/07/1998 | 1/30/2016 | Microdispersed polyanhydroglucuronic acid and salts thereof | Alpenstock Holdings Limited |
| ALLT01/C/IE | IE | Granted | 980056 | 82995 | 30/07/1998 | 1/30/2016 | Microdispersed polyanhydroglucuronic acid and salts thereof | Alpenstock Holdings Limited |
| ALLT01/C/IT | IT | Granted | 98903269.3. | 0956305 | 30/07/1998 | 1/30/2016 | Cellulose derivatives | Alpenstock Holdings Limited |
| ALLT01/C/JP | JP | Granted | 10-532681 | 4362620 | 30/07/1998 | 8/28/2015 | Cellulose derivatives | Alpenstock Holdings Limited |
| ALLT01/C/NL | NL | Granted | 98903269.3. | 956305 | 30/07/1998 | 1/30/2016 | Cellulose derivatives | Alpenstock Holdings Limited |
| ALLT01/C/US | US | Granted | 09/359,588 | 6372718 | 30/01/1998 | | Composition containing stable microdispersed polyanhydroglucuronic acids and salts thereof | Alpenstock Holdings Limited |
| ALLT02/C/US | US | Granted | 09/359,381 | 6372196 | 30/01/1998 | | Hemostatically active aerosol composition of polyanhydroglucuronic acids and its salts | Alpenstock Holdings Limited |
| ALPE01/C/CN | CN | Granted | 99808685.1 | ZL99808685.1 | 21/07/1999 | 7/21/2015 | Polymer complexes of glucuronoglucanes | Alpenstock Holdings Limited |
| ALPE01/C/CZ | CZ | Granted | PV2001-230 | 301410 | 21/07/1999 | 7/21/2015 | Biocompatible intermolecular polymer complex, compositions and formulations containing the same | Alpenstock Holdings Limited |
| ALPE01/C/DE | DE | Granted | 99935016.8 | 699 14 928.2-08 | 21/07/1999 | 7/21/2015 | Polymer complexes of glucuronoglucanes | Alpenstock Holdings Limited |
| ALPE01/C/FR | FR | Granted | 99935016.8 | 1115747 | 21/07/1999 | 7/21/2015 | Polymer complexes of glucuronoglucanes | Alpenstock Holdings Limited |
| ALPE01/C/GB1 | GB | Granted | 99935016.8 | 1115747 | 21/07/1999 | 7/21/2015 | Polymer complexes of glucuronoglucanes | Alpenstock Holdings Limited |
| ALPE01/C/US | US | Granted | 09/764,346 | 6596791 | 21/07/1999 | | Polymer complexes of glucuronoglucanes | Alpenstock Holdings Limited |
| ALPE04/C/US | US | Granted | 09/764,340 | 6706695 | 21/07/1999 | 9/16/2015 | An antilipemic formulation | Alltracel Development Services Limited |
| ALPE11/C/EP | EP | Pending-C | 6780358.5 | | 01/09/2006 | 9/1/2015 | A method for preparing polyanhydroglucuronic acid and/or salts thereof | Alltracel Development Services Limited |
| ALPE11/C/IE | IE | Pending-C | 2006/0652 | | 01/09/2006 | 9/1/2015 | A method for preparing polyanhydroglucuronic acid and/or salts thereof | Alltracel Development Services Limited |
| ALPE11/C/JP | JP | Granted | 2008-528648 | 5331994 | 01/09/2006 | 8/9/2015 | A method for preparing polyanhydroglucuronic acid and/or salts thereof | Alltracel Development Services Limited |
| ALPE11/C/US | US | Granted | 11/991,153 | 8445671 | 01/09/2006 | 11/21/2016 | A method for preparing polyanhydroglucuronic acid and/or salts thereof | Alltracel Development Services Limited |
| ALPE15/C/EP | EP | Pending-C | 11728064.4 | | 01/06/2011 | 6/1/2016 | A surgical gel system | Hemcon Medical Technologies (IP) Limited |
| ALPE15/C/US | US | Granted | 13/690,529 | 8865680 | 01/06/2011 | 4/21/2018 | A surgical gel system | Hemcon Medical Technologies (IP) Limited |

**(B)** Software
- a. Microsoft Great Plains
- b. Microsoft Navision 2007 &2015
- c. Microsoft Office Suite
- d. Microsoft CRM
- e. Fastrack- Project Management Software
- f. Microsoft Azure
- g. SQL Server
- h. Q-pulse

**(C)** Interest in IP
- a. Prometheus Medical
- b. Bard Access Systems

**(D)** Employees who had a contribution to the creation- each employee assigns IP on staring with the company.

| | | |
|---|---|---|
| a. | HemCon Inc. | Current |
| b. | HemCon Inc. | Past |
| c. | HemCon Inc. | Past |
| d. | HemCon Europe | Past |
| e. | HemCon Europe | Current |
| f. | HemCon CZ | Current |
| g. | HemCon CZ | Past |
| h. | HemCon CZ | Past |
| i. | HemCon Inc. | Past |
| j. | HemCon Inc. | Past |
| k. | HemCon Inc. | Past |
| l. | HemCon Inc. | Past |
| m. | HemCon Inc. | Past |
| n. | HemCon Inc. | Past |
| o. | HemCon Inc. | Past |
| p. | HemCon Inc. | Past |
| q. | HemCon Inc. | Past |
| r. | HemCon Inc. | Current |
| s. | HemCon Inc. | Past |
| t. | HemCon Inc. | Current |
| u. | HemCon Inc. | Current |
| v. | HemCon Inc. | Current |
| w. | HemCon Inc. | Current |
| x. | HemCon Inc. | Past |
| y. | HemCon Inc. | Past |
| z. | HemCon Inc. | Past |
| aa. | HemCon Inc. | Past |
| bb. | HemCon Inc. | Past |

## Assignment of IP form:

*INSTRUCTIONS - Employees of HemCon Medical Technologies frequently produce or have access to product formulas, marketing plans, and other nonpublic information that is treated as confidential. This agreement describes restrictions on the disclosure and use of that information. The agreement also assigns rights in inventions and other intellectual property to HemCon, and states your agreement not to compete with HemCon.*

*This agreement is legally binding. Please read it carefully before signing. You should keep a copy for your records.*

### CONFIDENTIALITY, INVENTIONS, AND NONCOMPETITION AGREEMENT

I, the undersigned employee of HemCon, Inc. (the "Company" or "HemCon"), enter into this Confidentiality, Inventions, and Noncompetition Agreement (this "Agreement") with HemCon, as of the date shown below.

In consideration of and as a condition of my employment, I agree as follows:

1. Protection of Confidential Information.

(a) Defined. "Confidential Information" is all nonpublic information relating to HemCon Medical Technologies Medical Technologies or its business that is disclosed to me, that I produce, or that I otherwise obtain during employment. "Confidential Information" also includes information received from third parties that HemCon Medical Technologies has agreed to treat as confidential. Examples of Confidential Information are:

  (i)     Research plans or results.

  (ii)    Product formulas and manufacturing information.

  (iii)   Marketing plans.

  (iv)    Customer lists.

  (v)     Financial information.

"Confidential Information" does not include information: (i) that is or becomes available on a nonconfidential basis from other sources, without breach of this Agreement; (ii) that I can convincingly show I already knew before receiving it from HemCon; or (iii) that I can convincingly show I developed independently, outside the scope of my employment.

(b) Access to Information. I acknowledge that in the course of my employment I will have access to Confidential Information, that such information is a valuable asset of HemCon, and that its disclosure or unauthorized use will cause HemCon Medical Technologies Medical Technologies substantial harm.

Page 1 of 7

Revised 12/07

210420-2001/091013/PDXDOCS:1384603.3

Case 16-30119-pcm11    Doc 16    Filed 01/15/16

Exhibit A
Page 60 of 73

(c) Use and Disclosure Restrictions. I will use Confidential Information only in the course of and for the purposes of my employment with HemCon. I will not otherwise use or disclose Confidential Information, either during or after my employment.

(d) Ownership of Information. I acknowledge that Confidential Information is the property of HemCon, and that I will obtain no right, title or interest in Confidential Information, even if I prepare it in whole or in part.

(e) Return of Information. I will return all Confidential Information to HemCon Medical Technologies upon termination of my employment, and at any other time at HemCon's request, without keeping any copies. I will certify under oath whether I have complied with this section upon request.

2. Return of Property. During my employment with HemCon, I may be provided with equipment, supplies, and other property for business use (collectively, "HemCon Medical Technologies Property"). I will return all HemCon Medical Technologies Property immediately upon termination of my employment with HemCon, and at any other time at HemCon's request.

3. Assignment of Intellectual Property.

   (a) Intellectual Property. "Intellectual Property" means:

      (i)     All patentable subject matter;

      (ii)    All works of authorship that are subject to copyright protection;

      (iii)   All words, designs, and other designations of origin that are subject to trademark or service mark protection; and

      (iv)    All trade secrets.

   (b) Covered Work. "Covered Work" means Intellectual Property conceived or developed by me (alone or with others) (i) relating to HemCon's actual or anticipated business, or (ii) conceived or developed during working hours or developed with the aid of HemCon Medical Technologies personnel or assets.

   (c) Ownership; Assignment. HemCon Medical Technologies will be the exclusive owner of all Covered Work and of all related rights and proceeds. I hereby assign all Covered Work and related rights (including patent, copyright, moral, and trademark, service mark, and trade secret rights) and proceeds to HemCon.

   (d) Disclosure. I will discuss the status of Intellectual Property and Covered Work I conceive or develop with my supervisor at HemCon Medical Technologies on a regular basis, and will promptly disclose any significant developments to my supervisor. If I conceive or develop any Intellectual Property during my employment that I believe does not belong to HemCon Medical Technologies under this Agreement, I will promptly notify my supervisor and will give a written explanation of the reasons for my belief.

   (e) Disclosure after Termination. I acknowledge that it is sometimes difficult to tell when Intellectual Property is conceived or developed. Therefore, if I conceive or develop any Intellectual

210420-2001/091013/PDXDOCS:1384603.3

Exhibit A
Page 61 of 73

Case 16-30119-pcm11   Doc 16   Filed 01/15/16

Property relating to my work at HemCon Medical Technologies within one year after I stop working for the Company, I will promptly disclose the Intellectual Property to HemCon's president in writing, so that HemCon Medical Technologies can consider whether all or part of the Intellectual Property is Covered Work.

(f) Cooperation. I will take all action reasonably requested by HemCon Medical Technologies to vest ownership of Covered Work in HemCon Medical Technologies and to permit HemCon Medical Technologies to seek patent, copyright, trademark or similar protection in its name, even after I no longer work for HemCon. I appoint HemCon Medical Technologies as my agent and attorney-in-fact for the following limited purposes: to take any action to obtain patents, copyrights, or other kinds of legal protection in Covered Work; to confirm assignment of those rights to HemCon; and to protect those rights from infringement. This appointment and power of attorney are irrevocable. Any action taken by HemCon Medical Technologies under this power of attorney will have the same legal effect as if I did it myself.

4. Prior IP. Any Intellectual Property that I conceived or developed before being hired by HemCon Medical Technologies ("Prior IP") remains my own. To avoid uncertainty, I have listed all Prior IP on Schedule A. If no items are on Schedule A, I have no Prior IP. I will notify an appropriate officer of HemCon Medical Technologies in writing before I make any disclosure or perform any work on behalf of the Company which appears to threaten or conflict with rights I claim in any Intellectual Property. If I do not give such notice, I will make no claim against the Company with respect to any such Intellectual Property.

5. No Violation of Contract. I certify that my working for HemCon Medical Technologies does not violate any contractual obligations I owe to any third party. I will not disclose to HemCon Medical Technologies or use during my employment any confidential information or trade secrets of any third party without that party's consent. I acknowledge that HemCon Medical Technologies wishes me to abide strictly by the terms of valid and enforceable obligations I have to prior employers or clients. I will inform an appropriate officer of HemCon Medical Technologies whenever I believe a task I am to perform for HemCon Medical Technologies would put my ability to abide by those obligations at risk.

6. Conflict of Interest. While I am employed by HemCon, I will not work, directly or indirectly, for any business which competes with HemCon, nor will I solicit HemCon Medical Technologies customers, potential customers or contacts for the purpose of developing or selling products or services for any person or entity other than HemCon.

7. Noncompetition. For one year after my employment with HemCon Medical Technologies ends, I will not:

(a) Engage or prepare to engage in any Competitive Business, as defined below, anywhere HemCon Medical Technologies is doing or planning to do business during that period;

(b) Induce or attempt to induce any person employed by HemCon Medical Technologies to leave the Company;

(c) Solicit, divert, or accept orders for products or services that are substantially competitive with the products or services sold by HemCon Medical Technologies from any customer of the Company; or

210420-2001/091013/POXDOCS:1384603.3

(d) Own an interest in or provide services to any business that engages or plans to engage in any activity listed above. This clause does not apply to ownership of not more than 5 percent of the outstanding stock of a corporation, the stock of which is actively publicly traded.

"Competitive Business" means the sale, production and/or development of products or the rendering of services of a kind similar to or competitive with that sold, produced, developed or rendered by HemCon Medical Technologies as of the date my employment ends in the United States.

8. Continuation of Obligations; Termination Certification. Except to the extent this Agreement provides otherwise, the restrictions of and my obligations under this Agreement will continue after my employment ends, regardless of the reason. Upon termination of my employment, I will execute and deliver to HemCon Medical Technologies the Termination Certification in the form attached as Exhibit B.

9. Consent to Injunction. I acknowledge that HemCon Medical Technologies would suffer irreparable harm for which monetary damages alone would not adequately compensate HemCon Medical Technologies if I breached this Agreement. For that reason, I agree HemCon Medical Technologies will be entitled to injunctive relief, without posting bond, to enjoin any breach or threatened breach of this Agreement, in addition to any other available remedies.

10. Miscellaneous.

(a) Attorney Fees. In any litigation relating to this Agreement, the prevailing party will be entitled to recover from the other party all costs and expenses incurred in connection with the litigation, including without limitation all reasonable attorney fees incurred at hearing, trial, and on any appeal or petition for review. For purposes of this Agreement, "prevailing party" means the party that prevails (whether affirmatively or by means of a successful defense) with respect to claims having the greatest value or importance as reasonably determined by the court.

(b) Benefit. This Agreement is for the benefit of HemCon Medical Technologies and its successors and assigns.

(c) Entire Agreement. This Agreement and any related agreement that the Company and I are entering concurrently constitute my entire agreement with HemCon Medical Technologies with respect to the subject matter of the agreements. The rights, obligations, and remedies provided for in these agreements are to be cumulative.

(d) Governing Law and Jurisdiction. This Agreement is to be interpreted and enforced in accordance with the laws of the State of Oregon. The exclusive jurisdiction for any action to interpret or enforce this Agreement will be Multnomah County, Oregon.

(e) No Employment Contract. This is not a contract of employment and does not require that the Company employ me for any particular period, for any particular position, or on any particular terms.

(f) Notices. Notices under this Agreement must be in writing and will be deemed given when delivered in person, one business day after being sent by overnight courier, or four business days after being mailed by certified mail. Notices to the Company must be addressed to HemCon, Inc., Attention: Human Resources Director, at the Company's headquarters address. Notices to me are to be sent to the

210420-2001/091013/PDXDOCS:1384603.3

Exhibit A
Page 63 of 73

last address I have provided from time to time to the Company's human resources department. Either party may change its address for notices by giving notice of the change to the other party.

(g) **Severability.** Any provision of this Agreement which is held invalid is to be modified as necessary to render it valid and enforceable. If any provision of this Agreement is held invalid and cannot be modified to render it valid and enforceable, the invalidity will not affect other obligations, provisions, or applications of this Agreement that can be given effect without the invalid provisions.

(h) **Waiver.** HemCon's failure to demand strict performance of any provision of this Agreement will not constitute a waiver of any provision, term, covenant, or condition of this Agreement or the right to demand strict performance in the future.

11. **Opportunity for Review.** I acknowledge that I have carefully read this Agreement, understand its contents, and was provided this Agreement two weeks in advance of employment with a written offer or am signing in at a bona fide advancement.

Signature: _____

Printed Name: _____

Date: _____

## Schedule 4.6 (c) (i) Trademarks

| | | | Schedule of Trade Marks | | | |
|---|---|---|---|---|---|---|
| Folio | Country | Registration No | Applicant | Mark | Renewal Due | Status |
| 22875 | Ireland | 239131 | Alltracel Development Services Limited | MANEWKA logo | 13/05/2018 | Registered |
| 22758 | Ireland | 237134 | Alltracel Pharmaceuticals Limited | CHOLMATE & Device | 23/07/2017 | Registered |
| 22385* | Ireland | 230316 | Alltracel Pharmaceuticals Limited | blotters & Device | 30/08/2014 | Registered |
| 22384* | Ireland | 230317 | Alltracel Pharmaceuticals Limited | blotters | 30/08/2014 | Registered |
| EU0315 | CTM | 5432117 | Alltracel Development Services Limited | PHYTOPEUTICS | 20/10/2016 | Registered |
| EU0264 | CTM | 3713005 | Alltracel Pharmaceuticals Limited | blotters & Device - (Class 3) - In colour | 12/03/2014 | Registered |
| EU0263 | CTM | 3715034 | Alltracel Pharmaceuticals Limited | blotters | 12/03/2014 | Registered |
| EU0254 | CTM | 3287604 | Alltracel Pharma Limited | SEAL-ON & Device | 24/07/2013 | Registered |
| EU0250 | CTM | 3231784 | Alltracel Pharmaceuticals Limited | blotters & Device - (Class 5) - In Colour | 11/06/2013 | Registered |
| EU0121 | CTM | 1337013 | Alltracel Pharmaceuticals PLC | m.doc & Device | 05/10/2019 | Registered |
| EU0116 | CTM | 1276419 | Alltracel Pharmaceuticals PLC | M-DOC | 06/08/2019 | Registered |
| EU0030 | CTM | 535914 | Alltracel Pharmaceuticals Limited | ALLTRACEL | 02/05/2017 | Registered |
| T.6350 | Japan | 4948754 | Alltracel Pharmaceuticals Limited | SEAL-ON & Device - (In Colour) | 28/04/2016 | Registered |
| T.6357 | USA | 3113890 | Alltracel Pharmaceuticals Limited | blotters & Device - (Class 5) - B & W | 11/07/2016 | Registered |
| T.6336 | USA | 3094881 | Alltracel Pharma Limited | SEAL-ON & Device | 23/05/2016 | Registered |
| T.6081 | USA | 3090535 | Alltracel Pharmaceuticals PLC | m.doc & Device | 09/05/2016 | Registered |
| T.6070 | USA | 3083109 | Alltracel Pharmaceuticals PLC | M-DOC | 18/04/2016 | Registered |
| IR0015 | WIPO - | 928155 | Alltracel Development Services Limited | PHYTOPEUTICS | 18/04/2017 | Registered |
| IR0010 | WIPO - | 861408 | Alltracel Pharmaceuticals PLC | M-DOC | 04/01/2015 | Registered |
| IR0009 | WIPO - | 860375 | Alltracel Pharmaceuticals PLC | m.doc & Device | 04/01/2015 | Registered |
| IR0006 | WIPO - | 837501 | Alltracel Pharmaceuticals Limited | blotters & Device - (Class 3,5 in B&W) | 10/09/2014 | Registered |
| IR0005 | WIPO - | 836252 | Alltracel Pharmaceuticals Limited | blotters | 10/09/2014 | Registered |

| Trademark | Case Number / Country | SubCase / Case Type | Status / Classes | Application Number/Date | Registration Number/Date |
|---|---|---|---|---|---|
| CHITODOT | 210420-0001 / United States of America | 0001 / ORD | Allowed / 05 Int. | 86/477,734 / 11-Dec-2014 | |
| Goods: 05 Int. | bandages, namely, hemostatic bandages for skin wounds, puncture wounds, internal wounds; surgical bandages, hemostatic wound dressings | | | | |
| CHITOFLEX | 210420-0001 / United States of America | 6409 / ORD | Registered / 05 Int. | 77-003,188 / 20-Sep-2006 | 3,264,070 / 17-Jul-2007 |
| Goods: 05 Int. | Bandages, namely, hemostatic bandages for skin wounds, puncture wounds, and internal wounds; surgical bandages; hemostatic wound dressings | | | | |
| CHITOGAUZE | 210420-0001 / United States of America | 6826 / ORD | Registered / 05 Int. | 77-611,455 / 10-Nov-2008 | 3,825,898 / 27-Jul-2010 |
| Goods: 05 Int. | Bandages for skin wounds | | | | |
| CHITOGAUZE (and katana characters) | 210420-0001 / Japan | 7126 / ORD | Registered / 05 Int. | | 5412125 / 13-May-2011 |
| Goods: 05 Int. | Gauze for dressings, chitosan impregnated bandages for skin wounds made of gauze, chitosan impregnated adhesive plasters made of gauze | | | | |
| CHITOPULSE | 210420-0001 / United States of America | 0002 / ORD | Allowed / 10 Int. | 86/585,387 / 02-Apr-2015 | |
| Goods: 10 Int. | Medical devices, namely, vascular compression devices to facilitate hemostasis | | | | |
| GUARDACARE | 210420-0001 / United States of America | 7051 / ORD | Registered / 05 Int. | 77-856,516 / 23-Oct-2009 | 3,915,050 / 01-Feb-2011 |
| Goods: 05 Int. | bandages, namely, hemostatic bandages for skin wounds, puncture wounds, internal wounds; surgical bandages, hemostatic wound dressings | | | | |
| GUARDACARE (and katakana characters) | 210420-0001 / Japan | 7127 / ORD | Registered / 05 Int. | 37307/2010 | 5362703 / 22-Oct-2010 |
| Goods: 05 Int. | pharmaceutical preparations and hemostat preparations | | | | |
| GUARDIVA | 210420-0001 / United States of America | 7052 / ORD | Registered / 05 Int. | 77-856,523 / 23-Oct-2009 | 3,915,051 / 01-Feb-2011 |
| Goods: 05 Int. | bandages, namely, hemostatic bandages for skin wounds, puncture wounds, internal wounds; surgical bandages, hemostatic wound dressings | | | | |
| GUARDIVA (and katana characters) | 210420-0001 / Japan | 7128 / ORD | Registered / 05 Int. | 37308/2010 | 5362704 / 22-Oct-2010 |
| Goods: 05 Int. | gauze for dressings, bandages for dressings, adhesive plasters | | | | |
| HEMCON | 210420-0001 / Australia | 6218 / MPR | Registered | 29-Apr-2004 | 829,855 / 29-Apr-2004 |
| Goods: | | | | | |

| Trademark | | Case Number Country | SubCase Case Type | Status Classes | Application Number/Date | Registration Number/Date |
|---|---|---|---|---|---|---|
| HEMCON | | 210420-0001 Austria | 6219 MPR | Registered | 29-Apr-2004 | 829,855 29-Apr-2004 |
| | Goods: | | | | | |
| HEMCON | | 210420-0001 Benelux | 6220 MPR | Registered | 29-Apr-2004 | 829,855 29-Apr-2004 |
| | Goods: | | | | | |
| HEMCON | | 210420-0001 Canada | 6122 ORD | Registered 05 Int., 10 Int. | 1,215,479 30-Apr-2004 | TMA688,056 22-May-2007 |
| | Goods: 05 Int. 10 Int. | Bandages, namely, bandages for skin wounds, bandages for internal wounds, and surgical bandages for internal and external use; wound dressing Bandages, namely, bandages for anatomical joints, compression bandages for internal and external use | | | | |
| HEMCON | | 210420-0001 China (People's Republic) | 6221 MPR | Registered | 29-Apr-2004 | 829,855 29-Apr-2004 |
| | Goods: | | | | | |
| HEMCON | | 210420-0001 Czech Republic | 6222 MPR | Registered | 29-Apr-2004 | 829,855 29-Apr-2004 |
| | Goods: | | | | | |
| HEMCON | | 210420-0001 Denmark | 6223 MPR | Registered | 29-Apr-2004 | 829,855 29-Apr-2004 |
| | Goods: | | | | | |
| HEMCON | | 210420-0001 Estonia | 6224 MPR | Registered | 29-Apr-2004 | 829,855 29-Apr-2004 |
| | Goods: | | | | | |
| HEMCON | | 210420-0001 Finland | 6225 MPR | Registered | 29-Apr-2004 | 829,855 29-Apr-2004 |
| | Goods: | | | | | |
| HEMCON | | 210420-0001 France | 6226 MPR | Registered | 29-Apr-2004 | 829,855 29-Apr-2004 |
| | Goods: | | | | | |
| HEMCON | | 210420-0001 Germany | 6227 MPR | Registered | 29-Apr-2004 | 829,855 29-Apr-2004 |
| | Goods: | | | | | |

| Trademark | | Case Number<br>Country | SubCase<br>Case Type | Status<br>Classes | Application<br>Number/Date | Registration<br>Number/Date |
|---|---|---|---|---|---|---|
| HEMCON | | 210420-0001<br>Greece | 6228<br>MPR | Registered | 29-Apr-2004 | 829,855<br>29-Apr-2004 |
| | Goods: | | | | | |
| HEMCON | | 210420-0001<br>Hungary | 6229<br>MPR | Registered | 29-Apr-2004 | 829,855<br>29-Apr-2004 |
| | Goods: | | | | | |
| HEMCON | | 210420-0001<br>Int'l Registration - Madrid<br>Agreement / Protocol | 6045<br>ORD | Registered<br>05 Int., 10 Int. | Z1230813<br>29-Apr-2004 | 829,855<br>29-Apr-2004 |
| | Goods: 05 Int.<br><br>10 Int. | Bandages, namely, bandages for skin wounds, bandages for internal wounds, surgical bandages, and spray foam bandages for internal and external use; wound dressings<br>Bandages, namely, bandages for anatomical joints, compression bandages, spray foam bandages for internal and external use | | | | |
| HEMCON | | 210420-0001<br>Ireland | 6230<br>MPR | Registered | 29-Apr-2004 | 829,855<br>29-Apr-2004 |
| | Goods: | | | | | |
| HEMCON | | 210420-0001<br>Israel | 6193<br>ORD | Registered<br>05 Int. | 177,853<br>23-Jan-2005 | 177853<br>06-Mar-2006 |
| | Goods: 05 Int. | Bandages, namely, bandages for skin wounds, bandages for internal wounds, and surgical bandages for internal and external use; wound dressing | | | | |
| HEMCON | | 210420-0001<br>Israel | 6194<br>ORD | Registered<br>10 Int. | 177,854<br>23-Jan-2005 | 177,854<br>06-Mar-2006 |
| | Goods: 10 Int. | Bandages, namely, bandages for anatomical joints, compression bandages for internal and external use | | | | |
| HEMCON | | 210420-0001<br>Italy | 6231<br>MPR | Registered | 29-Apr-2004 | 829,855<br>29-Apr-2004 |
| | Goods: | | | | | |
| HEMCON | | 210420-0001<br>Japan | 6232<br>MPR | Registered<br>05 Int. | 29-Apr-2004 | 829,855<br>21-Mar-2008 |
| | Goods: 05 Int. | Bandages for dressings, namely, bandages for skin wounds, surgical dressings | | | | |
| HEMCON | | 210420-0001<br>Japan | 7147<br>ORD | Registered<br>05 Int. | 37303/2010 | 5362702<br>22-Oct-2010 |
| | Goods: 05 Int. | pharmaceutical preparations | | | | |
| HEMCON | | 210420-0001<br>Latvia | 6233<br>MPR | Registered | 29-Apr-2004 | 829,855<br>29-Apr-2004 |
| | Goods: | | | | | |

Case 16-30119-pcm11    Doc 16    Filed 01/15/16

| Trademark | | Case Number<br>Country | SubCase<br>Case Type | Status<br>Classes | Application<br>Number/Date | Registration<br>Number/Date |
|---|---|---|---|---|---|---|
| HEMCON | | 210420-0001<br>Lithuania | 6234<br>MPR | Registered | 29-Apr-2004 | 829,855<br>29-Apr-2004 |
| | Goods: | | | | | |
| HEMCON | | 210420-0001<br>Mexico | 6121<br>ORD | Registered<br>05 Int. | 654,335<br>30-Apr-2004 | 859300<br>23-Nov-2004 |
| | Goods: 05 Int. | Bandages, namely, bandages for skin wounds, bandages for internal wounds, and surgical bandages for internal and external use; wound dressing | | | | |
| HEMCON | | 210420-0001<br>Mexico | 6125<br>ORD | Registered<br>10 Int. | 654,334<br>30-Apr-2004 | 859299<br>23-Nov-2004 |
| | Goods: 10 Int. | Bandages, namely, bandages for anatomical joints, compression bandages for internal and external use | | | | |
| HEMCON | | 210420-0001<br>Norway | 6235<br>MPR | Registered | 29-Apr-2004 | 829,855<br>29-Apr-2004 |
| | Goods: | | | | | |
| HEMCON | | 210420-0001<br>Poland | 6236<br>MPR | Registered | 29-Apr-2004 | 829,855<br>29-Apr-2004 |
| | Goods: | | | | | |
| HEMCON | | 210420-0001<br>Portugal | 6237<br>MPR | Registered | 29-Apr-2004 | 829,855<br>29-Apr-2004 |
| | Goods: | | | | | |
| HEMCON | | 210420-0001<br>Russian Federation | 6238<br>MPR | Registered | 29-Apr-2004 | 829,855<br>29-Apr-2004 |
| | Goods: | | | | | |
| HEMCON | | 210420-0001<br>Slovakia | 6239<br>MPR | Registered | 29-Apr-2004 | 829,855<br>29-Apr-2004 |
| | Goods: | | | | | |
| HEMCON | | 210420-0001<br>Slovenia | 6240<br>MPR | Registered | 29-Apr-2004 | 829,855<br>29-Apr-2004 |
| | Goods: | | | | | |
| HEMCON | | 210420-0001<br>Spain | 6241<br>MPR | Registered | 29-Apr-2004 | 829,855<br>29-Apr-2004 |
| | Goods: | | | | | |
| HEMCON | | 210420-0001<br>Sweden | 6242<br>MPR | Registered | 29-Apr-2004 | 829,855<br>29-Apr-2004 |

| Trademark | Case Number<br>Country | SubCase<br>Case Type | Status<br>Classes | Application<br>Number/Date | Registration<br>Number/Date |
|---|---|---|---|---|---|
| | **Goods:** | | | | |
| HEMCON | 210420-0001<br>Switzerland | 6243<br>MPR | Registered | 29-Apr-2004 | 829,855<br>29-Apr-2004 |
| | **Goods:** | | | | |
| HEMCON | 210420-0001<br>Turkey | 6244<br>MPR | Registered | 29-Apr-2004 | 829,855<br>29-Apr-2004 |
| | **Goods:** | | | | |
| HEMCON | 210420-0001<br>United Kingdom | 6245<br>MPR | Registered | 29-Apr-2004 | 829,855<br>29-Apr-2004 |
| | **Goods:** | | | | |
| HEMCON | 210420-0001<br>United States of America | 6039<br>ORD | Registered<br>05 Int., 10 Int. | 76-268,991<br>07-Jun-2001 | 2,735,347<br>08-Jul-2003 |
| **Goods:** 05 Int.<br>10 Int. | Bandages, namely, bandages for skin wounds, bandages for internal wounds, surgical bandages, and spray foam bandages for internal and external use; wound dressings<br>Bandages, namely, bandages for anatomical joints, compression bandages, spray foam bandages for internal and external use | | | | |
| HEMCON (katakana characters) | 210420-0001<br>Japan | 7122<br>ORD | Registered<br>05 Int., 10 Int. | 37304/2010 | 5406497<br>15-Apr-2011 |
| **Goods:** 05 Int.<br>10 Int. | Bandages for dressings, namely, bandages for skin wounds, surgical dressings<br>Bandages, namely, bandages for anatomical joints, compression bandages for internal and external use | | | | |
| HEMCON DENTAL DRESSING<br>(and katana characters) | 210420-0001<br>Japan | 7186<br>ORD | Registered<br>05 Int. | 71243/2010<br>09-Sep-2010 | 5422469<br>01-Jul-2011 |
| **Goods:** 05 Int. | Pharmaceutical preparations, hemostatics, bandages, adhesive plasters, dental materials | | | | |
| HEMCON Design Only | 210420-0001<br>Japan | 7124<br>ORD | Registered<br>05 Int., 10 Int. | 373052010 | 5406498<br>15-Apr-2011 |
| **Goods:** 05 Int.<br>10 Int. | Bandages, namely, bandages for skin wounds, bandages for internal wounds, surgical bandages for internal and external use; wound dressings<br>Bandages, namely, bandages for anatomical joints, compression bandages for internal and external use | | | | |
| HEMCON Design Only | 210420-0001<br>United States of America | 6032<br>ORD | Registered<br>05 Int., 10 Int. | 78/321,224<br>30-Oct-2003 | 2,941,755<br>19-Apr-2005 |
| **Goods:** 05 Int.<br>10 Int. | Bandages, namely, bandages for skin wounds, bandages for internal wounds, surgical bandages for internal and external use; wound dressings<br>Bandages, namely, bandages for anatomical joints, compression bandages for internal and external use | | | | |
| HEMCON PATCH | 210420-0001<br>United States of America | 6942<br>ORD | Registered<br>05 Int. | 77-732,990<br>08-May-2009 | 3,851,037<br>21-Sep-2010 |

| Trademark | Case Number Country | SubCase Case Type | Status Classes | Application Number/Date | Registration Number/Date |
|---|---|---|---|---|---|
| Goods: 05 Int. | Bandages, namely, adhesive bandages, bandages for skin wounds, bandages for internal wounds, surgical bandages for internal and external use, wound dressings | | | | |
| KYTOSTAT (and katakana characters) | 210420-0001 Japan | 7130 ORD | Registered 05 Int. | 37309/2010 | 5362705 22-Oct-2010 |
| Goods: 05 Int. | bandages for skin wounds | | | | |
| M.DOC (and katakana characters) | 210420-0001 Japan | 7131 ORD | Registered 05 Int. | 37310/2010 | 5362706 22-Oct-2010 |
| Goods: 05 Int. | Gauze for dressings, bandages for dressings, adhesive plasters | | | | |
| NASAL PLUG (and katakana characters) | 210420-0001 Japan | 7159 ORD | Registered 05 Int. | 71244/2010 | 5382077 07-Jan-2011 |
| Goods: 05 Int. | Pharmaceutical preparations, hemostatics, bandages, adhesive plasters | | | | |
| SURGICAL GEL (and katakana characters) | 210420-0001 Japan | 7187 ORD | Registered 05 Int. | 71245/2010 | 5382078 07-Jan-2011 |
| Goods: 05 Int. | Pharmaceutical preparations, hemostatics, bandages, adhesive plasters, collodion for pharmaceutical purposes | | | | |

## Schedule 4.6 (c) (iii) Intellectual Property Acquisition, Dispositions and Joint Ownerships- to the best of our knowledge

- The government has a paid-up, non-exclusive, non-transferable license to practice or have practiced on behalf of the United States intellectual property owned by HemCon to the extent that the development of such IP was funded by payments or advances from the United States government.
- Bard Access Systems- Purchase of GuardIVa
- Prometheus Medical Limited- Sub license to 1089
- Sligo Institute of Technology- non renewal of Mycosinate
- Various patent abandonments

## Schedule 4.6 (c) (v) Funding from Government, College, University, or other educational institute

| | |
|---|---|
| USAMRAA – | USA Medical Research Acq Activity |
| NIH- | National Institute of Health |
| SBIR- | Small Business Innovation Research Program, Department of Health and Human Services |
| OHSU- | Oregon Health Science University |
| ONR- | Office of Naval Research |
| USSOCOM- | United States Special Operations Command |

**Schedule 4.6 (c) (viii) Royalties**

**Payments to be made to**

Providence Hospital                estimate $15,000
Biomedical Research Center    estimate $15,000

**Schedule 4.7 Schedule of Employees**

| Employee | Salary Current | Hire Date | Position | FT/ I | Commissions/ Bonus |
|---|---|---|---|---|---|
| | $ | 11/3/2014 | | FT | Bonus |
| | $ | 10/21/2013 | | FT | Bonus |
| | $ | 4/23/2007 | | FT | Bonus |
| | $ | 8/4/2014 | | FT | Bonus |
| | $ | 4/7/2014 | | FT | Bonus |
| | $ | 8/25/2003 | | FT | Bonus |
| | $ | 8/4/2015 | | FT | Bonus |
| | $ | 6/14/2004 | | FT | Bonus |
| | $ | 2/17/2015 | | FT | Bonus |
| | $ | 1/29/2010 | | FT | Bonus |
| | $ | 6/23/2011 | | FT | Bonus |
| | $ | 1/16/2006 | | FT | Bonus |
| | $ | 8/26/2013 | | FT | Commission |
| | $ | 10/20/2014 | | FT | Bonus |
| | $ | 11/11/2013 | | FT | Bonus |
| | $ | 7/20/2015 | | FT | Bonus |
| | $ | 1/9/2013 | | FT | Bonus |
| | $ | 6/4/2007 | | FT | Bonus |
| | $ | 2/14/2014 | | FT | Bonus |
| | $ 1,492,223.05 | | | | |

**Schedule 4.8 (a)**

None

**Schedule 4.8 (b) License, Permits and Approvals**

FDA registration
ISO 13485
International Registrations in:

- Canada
- Jordan
- UAE
- Israel
- Mexico
- Argentina

- China
- Japan
- South Korea
- Pakistan
- South Africa
- Chile
- Malaysia
- Hong Kong

Ethanol License- Tisnov Lab- Czech Government

## Schedule 4.9 Arbitration, Action, Audit, Hearing, Investigation, Litigation, Suit since May 2013

- Barry Starkman: Arbitration for breach of contract of employment
- Icon Owner Pool 3: Suit claim for payment for unpaid rent and remedial works carried out on Cascade Ave
- SSOE: Threatened suit claim for payment for remedial works carried out on Cascade Ave
- Apex Systems: Threatened suit for unpaid invoices for work carried out- dispute over system accuracy
- Grace Christian Ministry: Threat of exercising rights on overdue loan note

## Schedule 8.4 Employees to be offered employment

As per 4.7 above

## Schedule 9.5

*Consents*

Providence
Biomedical Research Services
Innovize Inc.
Quality Bio resources Inc.

# EXHIBIT B

## Bid Procedures Order

**DEBTOR'S MOTION FOR ORDER APPROVING (A) BID AND SALE PROCEDURES INCLUDING BREAK UP FEE TO TRICOL INTERNATIONAL GROUP LIMITED AS STALKING HORSE BIDDER, (B) SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No. 16-30119-pcm11 |
| HemCon Medical Technologies, Inc., | **ORDER (A) APPROVING BID PROCEDURES, (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER SALE, AND (C) ESTABLISHING OBJECTION DEADLINES** |
| Debtor. | |

This matter came before this Court on Debtor's Motion for Order Approving

(A) Bid and Sale Procedures Including Break-Up Fee to Tricol International Group Limited

("Tricol") as Stalking Horse Bidder; (B) Sale of Debtor's Assets Free and Clear of Liens, Claims

and Encumbrances; and (C) Assumption and Assignment of Executory Contracts (the "Motion")

[ECF #_____] filed by Debtor on January ___, 2016.  The Court having held an initial hearing on

the Motion on February ___, 2016 and having considered the submissions and arguments of

counsel and the files and records herein, and being now fully advised of the premises,

THE COURT FINDS as follows:

A.      This Court has jurisdiction over the Chapter 11 case of HemCon Medical

Technologies, Inc. ("Debtor") (the "Bankruptcy Case"), this Motion and the parties and property

**Page 1 of 6** -   ORDER (A) APPROVING BID PROCEDURES, (B) SCHEDULING AN
AUCTION AND HEARING TO CONSIDER SALE, AND (C) ESTABLISHING
OBJECTION DEADLINES

Case 16-30119-pcm11    Doc 16    Filed 01/15/16

affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     The notice provided regarding the Motion constitutes sufficient and adequate notice.  No other or further notice in connection with the entry of this Order is or shall be required.

C.     The Bid Procedures (attached as Exhibit 1 to this Order) were proposed by Debtor in good faith with the goal of maximizing the value of the Assets (defined below) for the benefit of all creditors of the estate and other parties-in-interest.  Debtor has articulated good and sufficient reasons for authorizing and approving the Bid Procedures, which are reasonable and appropriate under the circumstances and designed to maximize the recovery on, and realizable value of, the Assets.

D.     Debtor's proposed sale notice (attached as Exhibit 2 to this Order) is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of this Order, the sale, the auction, and the assumption procedures.

E.     Approval of the reasonable out-of-pocket expense reimbursement to Tricol up to the maximum amount of $200,000 as a Break-Up Fee is necessary and appropriate to compensate Tricol for (1) making the initial offer that serves as the floor for further bidding, and (2) negotiating and entering into an Asset Purchase Agreement.

F.     The Bid Procedures (including the Break-Up Fee) are fair and reasonable. The Bid Procedures represent an exercise of the Debtor's sound business judgment, will facilitate an orderly sale process, and are in the best interests of Debtor's estate.

G.     On or about January 6, 2016, the Debtor entered into an Asset Purchase Agreement providing for the sale to Tricol (or its newly formed affiliate) of substantially all of Debtor's assets ("Assets") as more particularly described in the Asset Purchase Agreement (the "APA").

**Page 2 of 6** -   ORDER (A) APPROVING BID PROCEDURES, (B) SCHEDULING AN
             AUCTION AND HEARING TO CONSIDER SALE, AND (C) ESTABLISHING
             OBJECTION DEADLINES

H.      Entry of this Order is in the best interests of Debtor, its estate, creditors and other parties-in-interest.

Now, therefore,

IT IS HEREBY ORDERED as follows:

1.      The Motion is granted as set forth below.

2.      The Bid Procedures attached as Exhibit 1 are hereby approved and shall be used in connection with the proposed sale of the Assets.

3.      All responses or objections to the relief requested in the Motion that have not been withdrawn, waived or settled are overruled.

4.      Any objections to the proposed sale shall be in writing and filed with this Court no later than **March 18, 2016 at 5:00 p.m. Pacific time**.  Any party filing such an objection must attend the Sale Hearing and advocate its objection at such hearing.  Any objection not filed, served, and/or advocated in accordance with this paragraph may be deemed waived and may be forever barred.

5.      The Auction for the Assets will be held on **March 28, 2016, at 10:00 a.m. Pacific time**, at the offices of Tonkon Torp LLP, 888 SW Fifth Avenue, Suite 1600, Portland, Oregon 97204.

6.      The Sale Hearing will be conducted on **March 30, 2016 at _____ a.m. Pacific Time** before the Honorable Peter C. McKittrick in U.S. Bankruptcy Court, Courtroom No. 1, 1001 SW Fifth Avenue, Portland, Oregon 97204, to consider the entry of an order providing and approving, *inter alia*, the following:  (a) the sale or other disposition of Debtor's assets to Successful Bidder or Bidders free and clear of all liens, claims, interests, obligations, and encumbrances in accordance with 11 U.S.C. § 363(f); (b) that Successful Bidder or Bidders have not assumed any liability or obligations (except as specifically assumed); (c) that Successful Bidder or Bidders are not successors to Debtor; (d) that all persons who have received

**Page 3 of 6** -   ORDER (A) APPROVING BID PROCEDURES, (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER SALE, AND (C) ESTABLISHING OBJECTION DEADLINES

notice are bound by the order and are enjoined from pursuing Successful Bidder or Bidders to recover on any claims they may have against Debtor; and (e) that the sale agreement or agreements were entered into in good faith, without collusion, and from arms' length bargaining positions. Debtor shall be deemed to have accepted a bid and the Successful Bidder determined only when the bid for the Assets has been approved by the Court at the Sale Hearing.

7.     The Break-Up Fee of Tricol's reasonable out-of-pocket expenses up to $200,000 is approved. Debtor is authorized to pay the Break-Up Fee in accordance with the terms set forth in the APA. In the event that Tricol is not the Successful Purchaser, the Break-Up Fee shall be treated as an administrative expense claim in the Bankruptcy Case payable solely from and secured by a first priority lien on the sale proceeds and any sale deposit under Section 364(d) of the Bankruptcy Code. As applicable, the Break-Up Fee shall be paid to Tricol at the closing of such sale or disposition of the sale deposit prior to the payment of the proceeds of such sale to any third party asserting a lien on the Assets, and shall be free and clear of any such lien.

8.     The Assumption Procedures are hereby approved as set forth below.

**Notice of Cure Procedures.** The Trustee will file a cure schedule (the "Cure Schedule") and serve such schedule and Assumption and Assignment Notice by first class mail on the parties to those executory contracts and unexpired leases that will be included in any sale and those other executory contracts and unexpired leases that may be included in the sale (the "Assumed Agreements") by **March 4, 2016**. The Cure Schedule will include the (i) Assumed Agreements; (ii) the name and contact information of the counterparty to each Assumed Agreement; and (iii) the proposed cure amount for each Assumed Agreement.

**Objections.** Any objection to the assumption and assignment of the Assumed Agreements identified on the Cure Schedule, including the cure amount set forth on such schedule and to adequate assurance of future performance must be filed with the Bankruptcy Court no later than **March 18, 2016**.

**Page 4 of 6** -     ORDER (A) APPROVING BID PROCEDURES, (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER SALE, AND (C) ESTABLISHING OBJECTION DEADLINES

**Resolution of Objections.** If no objection is timely filed to the assumption and assignment of an Assumed Agreement, the counterparty to such Assumed Agreement will be barred from objecting thereto and shall be deemed to consent to the assumption and assignment of such Assumed Agreement. If no objection is timely filed to the proposed cure amount with respect to an Assumed Agreement, then the cure amount set forth in the Cure Schedule shall be binding upon the non-debtor party to such Assumed Agreement for all purposes in this Chapter 11 case and will constitute a final determination of the total cure amounts required to be paid in connection with the assumption and assignment thereof.

9.       If a timely objection is filed to the assumption and assignment of any unexpired contract or unexpired lease and such objection cannot otherwise be resolved by the parties, the Bankruptcy Court may hear such objection at the Sale Hearing, or any adjourned date thereof. The pendency of a dispute relating to a proposed cure amount will not delay the closing of the sale, including the assumption and assignment of Assumed Agreements necessary to effectuate such closing, provided, that for any dispute relating to a proposed cure amount that is unresolved by the date of the closing of the sale, Debtor shall escrow the cure amount proposed with respect to such unresolved objection pending such resolution.

10.       The Sale Notice, substantially in the form attached hereto as Exhibit 2, is hereby approved.

11.       The failure of any third party to file and serve an objection as ordered and directed herein shall be deemed the consent of such a party to the sale and transfer of the Assets to Tricol or the Successful Purchaser (including the assumption and assignment of the Assumed Agreements and the fixing of any applicable Cure Costs).

12.       Pursuant to the Guidelines Regarding Motions for Sale of All or Substantially All Assets and Sale Procedures Motions adopted by the Bankruptcy Court on

**Page 5 of 6** - ORDER (A) APPROVING BID PROCEDURES, (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER SALE, AND (C) ESTABLISHING OBJECTION DEADLINES

March 8, 2010 (LBF 363), Debtor is hereby excused from the requirement of using Local Bankruptcy Form 760.5 [Notice of Intent to Sell Real or Personal Property, Compensate Real Estate Broker, and/or Pay and Secured Creditor's Fees and Costs; Motion for Authority to Sell Property Free and Clear of Liens; and Notice of Hearing].

13.     As provided by Bankruptcy Rule 6004(h), this Order shall not be stayed for 14 days after the entry thereof and shall be effective and enforceable immediately on its entry on the docket.

14.     Unless otherwise specified, all time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

# # #

I hereby certify that I have complied with the requirements of LBR 9021-1(a)(2)(A).


Presented by:

TONKON TORP LLP


By_____
    Albert N. Kennedy, OSB No. 821429
    Timothy J. Conway, OSB No. 851752
    888 S.W. Fifth Avenue, Suite 1600
    Portland, OR 97204-2099
    Telephone:   503-221-1440
    Facsimile:    503-274-8779
    E-mail:        al.kennedy@tonkon.com
               tim.conway@tonkon.com
    Attorneys for Debtor

cc:     List of Interested Parties

036291/00001/3567879v4

**Page 6 of 6** -   ORDER (A) APPROVING BID PROCEDURES, (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER SALE, AND (C) ESTABLISHING OBJECTION DEADLINES

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Case 16-30119-pcm11    Doc 16    Filed 01/15/16

# EXHIBIT 1
## Bid Procedures

1  **Albert N. Kennedy**, OSB No. 821429 (Lead Attorney)
        Direct Dial:  (503) 802-2013
2       Facsimile:    (503) 972-3713
        E-Mail:       al.kennedy@tonkon.com
3  **Timothy J. Conway**, OSB No. 851752
        Direct Dial:  (503) 802-2027
4       Facsimile:    (503) 972-3737
        E-Mail:       tim.conway@tonkon.com
5  **TONKON TORP** LLP
   1600 Pioneer Tower
6  888 S.W. Fifth Avenue
   Portland, OR  97204
7
        Attorneys for Debtor
8

9

10                   UNITED STATES BANKRUPTCY COURT

11                         DISTRICT OF OREGON

12  In re                                | Case No.  16-30119-pcm11

13  HemCon Medical Technologies, Inc.,   | **BID PROCEDURES FOR THE SUBMISSION, RECEIPT AND ANALYSIS OF BIDS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS**

14                          Debtor.

15

16        These Bid Procedures have been approved by order of the United States
Bankruptcy Court for the District of Oregon (the "Court") in connection with the above-
17  captioned bankruptcy case of HemCon Medical Technologies, Inc. ("Debtor" or
"Seller") (the "Bid Procedures Order").

18

19        These Bid Procedures set forth the process by which Debtor is authorized to
conduct the sale (the "Sale") by auction (the "Auction") of substantially all of Debtor's
20  assets as more particularly described in the Asset Purchase Agreement (the "Assets").
These Bid Procedures also set forth the terms by which prospective bidders may qualify
21  for and participate in the Auction, thereby competing to make the highest or otherwise
best offer for the Assets.

22  **A.      Stalking Horse Bidder**

23        On January 6, 2016, Debtor and Tricol International Group limited ("Tricol")
entered into an Asset Purchase Agreement as the Stalking Horse APA ("APA") for the
24  acquisition of Debtor's assets as described in the APA.  Among other things, Tricol
agreed that Tricol or its newly formed affiliate would pay a purchase price for the Assets
25  in the sum (a) $1,600,000 plus (b) the total amount of the Assumed Liabilities, plus
(c) the amount required to maintain D&O tail insurance for Seller following the Closing
26  (up to a maximum of $150,000), plus (d) the total obligation owed by Seller under the

**Page 1 of 7** -  BID PROCEDURES FOR THE SUBMISSION, RECEIPT AND ANALYSIS OF
            BIDS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF
            DEBTOR'S ASSETS

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Exhibit 1
Page 1 of 7

Case 16-30119-pcm11    Doc 16    Filed 01/15/16

DIP Credit Facility (as defined in the APA), and (e) the total obligation owed under the Pre-Petition Loan (as defined in the APA) (the "Purchase Price"), subject to the outcome of the Auction and the entry of an order of the Court (the "Sale Order") approving the sale of the Assets; and Debtor agreed to pay to Tricol a break-up fee of Tricol's reasonable out-of-pocket expenses up to $200,000 (the "Break-Up Fee") in the event that the Court approves, and Debtor consummates, the acquisition of substantially all of the Assets by any Person or combination of Persons other than Tricol. The total value of the Purchase Price is approximately $3,600,000. A copy of the Asset Purchase Agreement has been filed with the Court and may be obtained by contacting counsel for Debtor, Albert N. Kennedy or Timothy J. Conway at (503) 221-1440.

## B.  Participation Requirements

To participate in the bidding process and to obtain access to due diligence materials, a person (other than Tricol) interested in purchasing the Assets (a "Potential Bidder") must deliver (unless previously delivered) to both Debtor and counsel for Debtor the following (the "Preliminary Bid Documents"):

(1)  An executed confidentiality agreement in form and substance acceptable to Debtor and its counsel;

(2)  Preliminary written proof by the Potential Bidder of its financial capacity to close the proposed transaction, including, but not limited to, its ability to satisfy the standards to provide adequate assurance of future performance of any contracts and leases to be assumed and assigned under Section 365 of the Bankruptcy Code, which may include current unaudited or verified financial statements of, or verified financial commitments (i.e., banking or capital references) obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach), the adequacy of which must be deemed satisfactory to Debtor in its business judgment.

As soon as practicable, and in any event within two business days after a Potential Bidder delivers the Preliminary Bid Documents, Debtor shall determine and notify the Potential Bidder whether such Potential Bidder has submitted acceptable Preliminary Bid Documents. Debtor shall work with Potential Bidders during the two business-day period (as it may be extended by Debtor) to attempt to correct or cure any deficiencies in any Preliminary Bid Documents. Only those Potential Bidders whose Preliminary Bid Documents have been deemed acceptable at the end of such two business-day period (as it may be extended by Debtor) (each, an "Acceptable Bidder") may conduct a due diligence review with respect to the Assets or submit bids to acquire the Assets. Tricol is deemed an Acceptable Bidder.

## C.  Obtaining Due Diligence Access

After receipt of an executed confidentiality agreement and notification of Acceptable Bidder status, Debtor will provide each Acceptable Bidder reasonable due diligence information, as requested, including access to any electronic data room, as soon as reasonably practicable after such request. Debtor shall be entitled to use its

**Page 2 of 7** -  BID PROCEDURES FOR THE SUBMISSION, RECEIPT AND ANALYSIS OF BIDS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS

TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Exhibit 1
Page 2 of 7

Case 16-30119-pcm11    Doc 16    Filed 01/15/16

business judgment in determining the extent to which a Potential Bidder is entitled to receive confidential competitive information.

### D. Bid Requirements

Any Acceptable Bidder that is interested in being a participant in the Auction and acquiring all or substantially all of the Assets (each a "Bidder") must submit a "Bid" as provided herein prior to 5:00 p.m. Pacific time on **March 18, 2016** (the "Bid Deadline"). Any such Bid must:

(1)    Identify the bidder, i.e., including any party for whom it may be bidding with or on behalf and whether the bidder is a party to any agreement limiting the bidders at the Auction and any relation of such parties to Debtor.

(2)    Contain (a) a signed definitive asset purchase agreement in substantially the form of the APA (a "Competing Purchase Agreement") and (b) a comparison of such Competing Purchase Agreement to the APA, showing all the differences between the two. A Competing Purchase Agreement must:

(i)    Be in form and substance satisfactory to Debtor;

(ii)    Clearly designate the assets to be acquired (which must be all or substantially all of the Assets);

(iii)    Provide for a purchase price with respect to such Assets in an amount that is at least equal to the Purchase Price, plus $250,000 (the "Initial Overbid Amount");

(iv)    Provide that the Bidder will forfeit the Sale Deposit (defined below), as liquidated damages if such purchaser defaults under the Competing Purchase Agreement;

(v)    Not be subject to any (a) financing contingency; (b) contingency relating to the completion of unperformed due diligence; (c) contingency relating to the approval of the Bidder's board of directors or other internal approvals or consents; or (d) any conditions precedent to the Bidder's obligation to purchase the Assets, other than those conditions included in the APA; and

(vi)    Not provide for the payment to the Bidder of any Break-Up Fee, topping fee, expense reimbursement or other similar fee or arrangement.

(3)    Include a deposit equal to $400,000 of the Bid (the "Sale Deposit") in the form of either a wire transfer to an account specified by Debtor or a certified check. The Sale Deposit shall be held in escrow by Debtor in a segregated account pending the closing of the sale. The full amount of the Sale Deposit shall be forfeited as liquidated damages if such Bidder is the Successful Purchaser (defined below) and fails to close the transaction because of a breach or failure to perform on the part of the Successful Purchaser.

**Page 3 of 7** - BID PROCEDURES FOR THE SUBMISSION, RECEIPT AND ANALYSIS OF BIDS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Exhibit 1
Page 3 of 7

Case 16-30119-pcm11   Doc 16   Filed 01/15/16

| | |
|---|---|
| 1 | (4) To the extent not previously provided to Debtor, be accompanied by evidence satisfactory to Debtor in its business judgment that the Bidder: is willing, authorized, capable and qualified financially, legally and otherwise, of performing all obligations under its proposed Competing Purchase Agreement in the event it submits the Successful Bid (as hereinafter defined) at the Auction, including its ability to provide adequate assurances under the Bankruptcy Code. |
| 2 | |
| 3 | |
| 4 | |
| 5 | (5) Be submitted to counsel for Debtor so as to be received not later than the Bid Deadline. Any Bid that meets all of the foregoing requirements, as determined by Debtor in its good faith discretion, shall be considered a "Qualified Bid." Counsel for Debtor shall, as soon as practicable, send a copy of each Qualified Bid received, if any, to the following parties: (i) counsel to Tricol; (ii) counsel to the secured lenders, (iii) counsel to the Official Committee of Unsecured Creditors of Debtor (the "Creditors Committee"), if any; and (iv) counsel to each Bidder submitting a Qualified Bid (or if a Bidder does not have counsel, to the Bidder). |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | **E.**    **Evaluation of Qualified Bids** |
| 11 |      Prior to the Auction, Debtor shall evaluate the Qualified Bids and identify the Qualified Bid that is, in Debtor's business judgment, the highest or otherwise best bid (the "Starting Bid"). No later than **March 22, 2016**, Debtor shall notify Tricol and all parties who have submitted Qualified Bids as to whether there will be an Auction, and if so, which Qualified Bid is the Starting Bid. |
| 12 | |
| 13 | |
| 14 | **F.**    **No Qualified Bids** |
| 15 |      If no Qualified Bids are received by the Bid Deadline, then the Auction will not occur and Tricol will be deemed the Successful Purchaser. Subject to the termination rights under the APA, Debtor will immediately pursue entry of a Sale Order by the Court approving the APA and authorizing the sale of the Assets to Tricol. |
| 16 | |
| 17 | |
| 18 | **G.**    **Auction** |
| 19 |      In the event Debtor determines that one or more Bids are Qualified Bids, then Debtor will conduct the Auction on **March 28, 2016 at 10:00 a.m. Pacific time** (the "Auction") with respect to the sale of the Assets at the offices of Tonkon Torp LLP, 888 SW Fifth Avenue, Suite 1600, Portland, OR 97204, or at such other location as may be designated by Debtor. |
| 20 | |
| 21 | |
| 22 |      The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"): |
| 23 | (1) The Qualified Bidders, including Tricol, shall appear in person or through duly-authorized representatives at the Auction. |
| 24 | |
| 25 | (2) Only Qualified Bidders, including Tricol, shall be entitled to bid at the Auction. |
| 26 | (3) Bidding at the Auction shall begin at the Starting Bid. |

**Page 4 of 7 -**   BID PROCEDURES FOR THE SUBMISSION, RECEIPT AND ANALYSIS OF
                BIDS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF
                DEBTOR'S ASSETS

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Exhibit 1
Page 4 of 7

Case 16-30119-pcm11    Doc 16    Filed 01/15/16

(4)     Subsequent bids at the Auction, including any bids by Tricol, shall be made in minimum increments of $200,000 or as otherwise agreed by the Bidders or as set by the Debtor.

(5)     For purposes of determining Tricol's bid amounts, Tricol shall receive a credit equal to the Break-Up Fee in each round of bidding.

(6)     All bidding will be open and transparent to all persons permitted to attend the Auction.

(7)     The bidding may be transcribed by a certified court reporter to ensure an accurate recording of the bidding at the Auction.

(8)     Each Qualified Bidder will be required to confirm on the record at the Auction that it has not colluded with any other person with respect to the bidding or the Sale.

(9)     The Auction shall be governed by such other procedures as may be announced by Debtor or its counsel from time to time at the Auction; provided that any such other procedures shall not be inconsistent with the Bid Procedures Order or any other order in Debtor's Chapter 11 case.

**H.     Acceptance of the Successful Bid**

Upon the conclusion of the Auction (if such Auction is conducted), Debtor, in the exercise of its reasonable, good-faith business judgment, shall identify the highest or otherwise best bid (the "Successful Bid").  The Qualified Bidder having submitted the Successful Bid will be deemed the "Successful Purchaser."  The Successful Purchaser and Debtor shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments or other documents evidencing and containing the terms upon which the Successful Bid was made.

Debtor will present the results of the Auction to the Court at the Sale Hearing, at which certain findings will be sought from the Court regarding the Auction, including, among other things, that (1) the Auction was conducted, and the Successful Purchaser was selected, in accordance with these Bid Procedures, (2) the Auction was fair in substance and procedure, (3) the Successful Bid was a Qualified Bid, and (4) consummation of the Sale contemplated by the Successful Bid is in the best interests of Debtor and its estate.

If an Auction is held, Debtor shall be deemed to have accepted a Qualified Bid only when (1) such bid is declared the Successful Bid at the Auction or by the Court, and (2) definitive documentation has been executed in respect thereof.  Such acceptance is conditioned on approval by the Court of the Successful Bid and the entry of an Order approving such Successful Bid.

**I.     Bankruptcy Court Approval of Sale**

A hearing to consider approval of the sale to the Successful Purchaser (or to approve the APA if no Auction is held) (the "Sale Hearing") and seek entry of a Sale Order is presently scheduled to take place at _____ **a.m. on March 30, 2016 Pacific**

**Page 5 of 7** -   BID PROCEDURES FOR THE SUBMISSION, RECEIPT AND ANALYSIS OF BIDS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Exhibit 1
Page 5 of 7

Case 16-30119-pcm11     Doc 16     Filed 01/15/16

**time** or at such other time as is announced at the auction by Debtor.  The Sale Hearing will be held before the Honorable Peter C. McKittrick, United States Bankruptcy Judge for the United States Bankruptcy Court for the District of Oregon, in Courtroom No. 1, 1001 SW Fifth Avenue, Portland, Oregon.  Debtor and the Successful Purchaser, once the Successful Purchaser has been determined, shall each use their commercially reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of a Sale Order in a form reasonably acceptable to Debtor and the Successful Purchaser.  Any objections to the sale must be filed with the Court by **5:00 p.m. Pacific time on March 18, 2016**.

The Sale Hearing may be continued to a later date by Debtor by sending notice to all prospective bidders prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party.

**J.     Designation of Back-Up Bidder**

Upon the conclusion of the Auction and the selection of the Successful Purchaser, Debtor shall select the person submitting the next highest or otherwise best bid (the "Back-Up Bidder").  The bid of the Back-Up Bidder shall remain open until the second business day following the closing of a sale to the Successful Purchaser.  If for any reason the Successful Purchaser is unable or unwilling to consummate an approved sale because of breach or failure to perform on the part of the Successful Purchaser, (1) it will forfeit its Sale Deposit to Debtor as liquidated damages in lieu of any other damages with respect to such breach, and (2) the Back-Up Bidder shall be deemed to be the Successful Purchaser.  The purchase price shall be the amount of such Back-Up Bidder's last bid, and Debtor shall be authorized to effectuate the sale to the Back-Up Bidder without further order of the Bankruptcy Court.  If, for any reason, the Back-Up Bidder fails to perform, Tricol agrees that if Debtor tenders full performance of all of its obligations under the APA to Tricol on or before April 30, 2016, and the APA is not otherwise materially breached by Debtor, Tricol shall purchase the Assets under the terms of Tricol's highest bid at the Auction and pursuant to the terms of the APA.

**K.     Closing**

Closing of the sale to the Successful Purchaser shall occur on or before **March 31, 2016** or the earliest practicable date after entry of the Sale Order, whichever comes first.

**L.     Break-Up Fee and DIP Credit Facility**

At the closing of the sale to the Successful Purchaser, if the Successful Purchaser is not Tricol, Debtor shall cause the closing agent to pay the Break-Up Fee and the total obligation owed by Debtor under the DIP Credit Facility to Tricol by wire transfer in immediately available funds to an account designated by Tricol.

**M.     Return of Sale Deposit**

The Sale Deposit of the Successful Purchaser shall, upon consummation of the sale, be credited to the purchase price paid by the Successful Purchaser.  If the Successful Purchaser fails to consummate the sale, then the full amount of the Sale Deposit shall be forfeited to, and be retained irrevocably by, Debtor.

**Page 6 of 7 -**   BID PROCEDURES FOR THE SUBMISSION, RECEIPT AND ANALYSIS OF BIDS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Exhibit 1
Page 6 of 7

Case 16-30119-pcm11    Doc 16    Filed 01/15/16

The Sale Deposit of any unsuccessful Qualified Bidder will be returned to such unsuccessful Qualified Bidder within two business days after (1) the conclusion of the Auction (if the Bidder does not submit the Successful Bid and is not designated the Back-Up Bidder) or (2) consummation of the sale (if the Bidder is designated the Back-Up Bidder).

**N.     Reservation of Rights to Modify Bid Procedures**

Debtor reserves the right to modify these Bid Procedures in any manner that will best promote the goals of the bidding process and may impose, at or prior to the Auction, additional customary terms and conditions on the sale, including, without limitation, extending the deadlines set forth in these Bid Procedures, adjourning the Auction at the Auction, and/or adjourning the Sale Hearing in open court without further notice.

DATED this _____ day of January, 2016.

TONKON TORP LLP

By _____
    Albert N. Kennedy, OSB No. 821429
    Timothy J. Conway, OSB No. 851752
    Attorneys for Debtor

036291/00001/3567574v2

Page 7 of 7 -   BID PROCEDURES FOR THE SUBMISSION, RECEIPT AND ANALYSIS OF
                BIDS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF
                DEBTOR'S ASSETS

TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Exhibit 1
Page 7 of 7

Case 16-30119-pcm11   Doc 16   Filed 01/15/16

# EXHIBIT 2
## Sale Notice

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF OREGON

In re

HemCon Medical Technologies,Inc.,

        Debtor.

Case No.  16-30119-pcm11

**NOTICE OF MOTION TO APPROVE SALE OF ASSETS TO TRICOL INTERNATIONAL GROUP LIMITED OR HIGHER AND BETTER BIDDER AT AUCTION, AUCTION, BIDDING PROCEDURES, SALE HEARING, AND OBJECTION DEADLINES**

      **PLEASE TAKE NOTICE** that HemCon Medical Technologies, Inc.( "Debtor") moved for approval of the sale of all or substantially all of its assets as more particularly described in the Asset Purchase Agreement described below (the "Assets") free and clear of all liens, claims, interests, and encumbrances to Tricol International Group Limited or its newly formed affiliate ("Tricol") if there are no higher and better offers from qualified bidders at an auction scheduled for **March 28, 2016** commencing at **10:00 a.m.**

      The sale to Tricol is pursuant to an Asset Purchase Agreement dated January 6, 2016 between Tricol and Debtor ("APA") for the sum of (a) $1,600,000 plus (b) the total amount of the Assumed Liabilities (as defined in the APA), plus (c) the amount required to maintain D&O tail insurance for Seller following the Closing (up to a maximum of $150,000), plus (d) the total obligation owed by Seller under the DIP Credit Facility (as defined in the APA), and (e) the total obligation owed under the Pre-Petition Loan (as defined in the APA).  The total Purchase Price is approximately $3,600,000.  A copy of the APA was filed with the Court, and may also be obtained by contacting Debtor's counsel.

      Debtor believes that the sale to Tricol is in the best interests of the estate for the following reasons:  (1) the sale will likely result in continued employment for many of Debtor's employees; (2) the sale will likely preserve business relationships and sales for vendors, customers and other parties who are presently doing business with Debtor; and (3) the sale will result in a prompt payment of a portion of the secured creditor's claim.

      The proposed order approving the sale provides that Tricol shall have no liability or responsibility for any liability or other obligation of Debtor arising under or related to the Assets other than as expressly set forth in theAPA, and that the transfer of the Assets to Tricol will not subject Tricol or its affiliates, successors or assigns, or their respective properties, to any liability for claims against Debtor or the Assets by reason of such transfer.

      **PLEASE TAKE FURTHER NOTICE** that, pursuant to 11 U.S.C. §§ 105 and 363, Debtor proposes to sell its assets to the Successful Bidder or Bidders and obtain an order providing and authorizing, *inter alia*, the following:  (1) that the sale is free and clear of all liens, claims, interests, obligation, and encumbrances; (2) that the Successful Bidder or Bidders have not assumed any liability or obligation (except as specifically assumed); (3)  that Successful Bidder or Bidders is not or are not successors to Debtor; (4) that all persons that have been served with this Notice are bound by the order and are enjoined from pursuing Successful Bidder or Bidders to recover on any claims they may have against Debtor; and (5) that the sale agreement or agreements were entered into in good faith, without collusion, and from arms' length bargaining positions.

      **PLEASE TAKE FURTHER NOTICE** that the Court entered an order authorizing Debtor to hold an auction to sell the Assets free and clear of all liens, claims, encumbrances and other

**Page 1 of 3 -**  NOTICE OF MOTION TO APPROVE SALE OF ASSETS TO TRICOL INTERNATIONAL GROUP LIMITED OR HIGHER AND BETTER BIDDER AT AUCTION, AUCTION, BIDDING PROCEDURES, SALE HEARING, AND OBJECTION DEADLINES

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Exhibit 2
Page 1 of 3

Case 16-30119-pcm11   Doc 16   Filed 01/15/16

interests, as provided in the APA if an overbid is received. The auction, if one occurs, is scheduled for **March 28, 2016 at 10:00 a.m. Pacific time** at the offices of Tonkon Torp LLP, 888 SW Fifth Avenue, Suite 1600, Portland, Oregon.

**PLEASE TAKE FURTHER NOTICE** that the Court entered an order approving bidding procedures in connection with the sale and the auction. A copy of the Bid Procedures can be obtained from Debtor's counsel.

**PLEASE TAKE FURTHER NOTICE** that competing bidders are required to submit competing bids in the minimum amount of $250,000 in excess of the Purchase Price and otherwise qualify as bidders in accordance with the approved bidding procedures prior to **5:00 p.m. Pacific time on March 18, 2016**.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the proposed sale to Tricol, or any higher and better bidder at the auction (the "Sale Hearing"), is scheduled to be held on **March 30, 2016 at _____ a.m. Pacific Time**, or at such later time as may be announced at the auction by Debtor, at the United States Bankruptcy Court for the District of Oregon, Courtroom __, 1001 SW Fifth Avenue, Portland, Oregon.

**PLEASE TAKE FURTHER NOTICE** that if you wish to object to the sale of the Assets, you must, on or before **March 18, 2016 at 5:00 p.m. Pacific time**, file a written objection to the sale with the Clerk of the Court, United States Bankruptcy Court for the District of Oregon, 1001 SW Fifth Avenue, Seventh Floor, Portland, Oregon 97204.

**PLEASE TAKE FURTHER NOTICE** that **March 18, 2016 at 5:00 p.m. Pacific time** (the "Deadline") is the deadline for any party to a contract or lease (the "Assumed Agreements") that Debtor proposes to assume and assign to Tricol (or other higher and better bidder at the auction) to object to the amount Debtor asserts must be paid to cure any existing defaults under the Assumed Agreements (the "Cure Amounts"). The Assumed Agreements and the Cure Amounts proposed by Tricol will be set forth on an Assumption and Assignment Notice mailed to parties to those executory contracts or unexpired leases on or before **March 4, 2016**.

**PLEASE TAKE FURTHER NOTICE** that any party to an Assumed Agreement who disagrees with the Cure Amount or who objects to the assumption of its Assumed Agreement or to the assignment of its Assumed Agreement, must, on or before **March 18, 2016**, file with the Clerk of the Court, United States Bankruptcy Court for the District of Oregon, 1001 SW Fifth Avenue, Seventh Floor, Portland, Oregon 97204, a written objection stating the specific facts upon which the objection is based.

**PLEASE TAKE FURTHER NOTICE** that unless a timely objection is filed as to a Cure Amount scheduled by Debtor, the Cure Amount scheduled by Debtor shall be binding upon the non-debtor party to such Assumed Agreement for all purposes in this Chapter 11 case and will constitute a final determination of the total Cure Amount required to be paid in connection with the assumption and assignment of such Assumed Agreement. Further, unless a timely objection is filed, no further evidence shall be required to satisfy the requirements for assumption and assignment, including, without limitation, any further evidence of adequate assurance of performance by Tricol or other qualified purchaser, and the nondebtor party to the Assumed Agreement shall be barred from objecting to the assumption and assignment of such Assumed Agreement and shall be deemed to consent to the assumption and assignment of the Assumed Agreement.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Cure Amounts and Debtor's proposed assumption and assignment of the Assumed Agreements is scheduled to be held on **March 30, 2016 at _____ a.m. Pacific time**, or at such later time as may be announced at the auction by Debtor, at the United States Bankruptcy Court for the District of Oregon, Courtroom ___, 1001 SW Fifth Avenue, Portland, Oregon.

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Exhibit 2
Page 2 of 3

Case 16-30119-pcm11    Doc 16    Filed 01/15/16

Copies of any of the pleadings or documents referenced herein may be obtained by contacting Debtor's counsel, Albert N. Kennedy (E-mail: albert.kennedy@tonkon.com; telephone: 503-802-2013) or Timothy J. Conway (E-mail: tim.conway@tonkon.com; telephone: 503-802-2027).

DATED this _____ day of January, 2016.

TONKON TORP LLP

By _____
      Timothy J. Conway, OSB No. 851752
      Attorneys for Debtor

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Case 16-30119-pcm11     Doc 16     Filed 01/15/16

Exhibit 2
Page 3 of 3

# EXHIBIT C

## Sale Notice

**DEBTOR'S MOTION FOR ORDER APPROVING (A) BID AND SALE PROCEDURES INCLUDING BREAK UP FEE TO TRICOL INTERNATIONAL GROUP LIMITED AS STALKING HORSE BIDDER, (B) SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS**

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>HemCon Medical Technologies,Inc.,<br><br>        Debtor. | Case No. 16-30119-pcm11<br><br>**NOTICE OF MOTION TO APPROVE SALE OF ASSETS TO TRICOL INTERNATIONAL GROUP LIMITED OR HIGHER AND BETTER BIDDER AT AUCTION, AUCTION, BIDDING PROCEDURES, SALE HEARING, AND OBJECTION DEADLINES** |

      **PLEASE TAKE NOTICE** that HemCon Medical Technologies, Inc.( "Debtor") moved for approval of the sale of all or substantially all of its assets as more particularly described in the Asset Purchase Agreement described below (the "Assets") free and clear of all liens, claims, interests, and encumbrances to Tricol International Group Limited or its newly formed affiliate ("Tricol") if there are no higher and better offers from qualified bidders at an auction scheduled for **March 28, 2016** commencing at **10:00 a.m.**

      The sale to Tricol is pursuant to an Asset Purchase Agreement dated January 6, 2016 between Tricol and Debtor ("APA") for the sum of (a) $1,600,000 plus (b) the total amount of the Assumed Liabilities (as defined in the APA), plus (c) the amount required to maintain D&O tail insurance for Seller following the Closing (up to a maximum of $150,000), plus (d) the total obligation owed by Seller under the DIP Credit Facility (as defined in the APA), and (e) the total obligation owed under the Pre-Petition Loan (as defined in the APA). The total Purchase Price is approximately $3,600,000. A copy of the APA was filed with the Court, and may also be obtained by contacting Debtor's counsel.

      Debtor believes that the sale to Tricol is in the best interests of the estate for the following reasons: (1) the sale will likely result in continued employment for many of Debtor's employees; (2) the sale will likely preserve business relationships and sales for vendors, customers and other parties who are presently doing business with Debtor; and (3) the sale will result in a prompt payment of a portion of the secured creditor's claim.

      The proposed order approving the sale provides that Tricol shall have no liability or responsibility for any liability or other obligation of Debtor arising under or related to the Assets other than as expressly set forth in theAPA, and that the transfer of the Assets to Tricol will not subject Tricol or its affiliates, successors or assigns, or their respective properties, to any liability for claims against Debtor or the Assets by reason of such transfer.

      **PLEASE TAKE FURTHER NOTICE** that, pursuant to 11 U.S.C. §§ 105 and 363, Debtor proposes to sell its assets to the Successful Bidder or Bidders and obtain an order providing and authorizing, *inter alia*, the following: (1) that the sale is free and clear of all liens, claims, interests, obligation, and encumbrances; (2) that the Successful Bidder or Bidders have not assumed any liability or obligation (except as specifically assumed); (3) that Successful Bidder or Bidders is not or are not successors to Debtor; (4) that all persons that have been served with this Notice are bound by the order and are enjoined from pursuing Successful Bidder or Bidders to recover on any claims they may have against Debtor; and (5) that the sale agreement or agreements were entered into in good faith, without collusion, and from arms' length bargaining positions.

      **PLEASE TAKE FURTHER NOTICE** that the Court entered an order authorizing Debtor to hold an auction to sell the Assets free and clear of all liens, claims, encumbrances and other

**Page 1 of 3 -** NOTICE OF MOTION TO APPROVE SALE OF ASSETS TO TRICOL INTERNATIONAL GROUP LIMITED OR HIGHER AND BETTER BIDDER AT AUCTION, AUCTION, BIDDING PROCEDURES, SALE HEARING, AND OBJECTION DEADLINES

**TONKON TORP** LLP<br>888 SW Fifth Avenue, Suite 1600<br>Portland, Oregon 97204<br>503-221-1440

Exhibit C<br>Page 1 of 3

interests, as provided in the APA if an overbid is received. The auction, if one occurs, is scheduled for **March 28, 2016 at 10:00 a.m. Pacific time** at the offices of Tonkon Torp LLP, 888 SW Fifth Avenue, Suite 1600, Portland, Oregon.

**PLEASE TAKE FURTHER NOTICE** that the Court entered an order approving bidding procedures in connection with the sale and the auction. A copy of the Bid Procedures can be obtained from Debtor's counsel.

**PLEASE TAKE FURTHER NOTICE** that competing bidders are required to submit competing bids in the minimum amount of $250,000 in excess of the Purchase Price and otherwise qualify as bidders in accordance with the approved bidding procedures prior to **5:00 p.m. Pacific time on March 18, 2016**.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the proposed sale to Tricol, or any higher and better bidder at the auction (the "Sale Hearing"), is scheduled to be held on **March 30, 2016 at _____ a.m. Pacific Time**, or at such later time as may be announced at the auction by Debtor, at the United States Bankruptcy Court for the District of Oregon, Courtroom __, 1001 SW Fifth Avenue, Portland, Oregon.

**PLEASE TAKE FURTHER NOTICE** that if you wish to object to the sale of the Assets, you must, on or before **March 18, 2016 at 5:00 p.m. Pacific time**, file a written objection to the sale with the Clerk of the Court, United States Bankruptcy Court for the District of Oregon, 1001 SW Fifth Avenue, Seventh Floor, Portland, Oregon 97204.

**PLEASE TAKE FURTHER NOTICE** that **March 18, 2016 at 5:00 p.m. Pacific time** (the "Deadline") is the deadline for any party to a contract or lease (the "Assumed Agreements") that Debtor proposes to assume and assign to Tricol (or other higher and better bidder at the auction) to object to the amount Debtor asserts must be paid to cure any existing defaults under the Assumed Agreements (the "Cure Amounts"). The Assumed Agreements and the Cure Amounts proposed by Tricol will be set forth on an Assumption and Assignment Notice mailed to parties to those executory contracts or unexpired leases on or before **March 4, 2016**.

**PLEASE TAKE FURTHER NOTICE** that any party to an Assumed Agreement who disagrees with the Cure Amount or who objects to the assumption of its Assumed Agreement or to the assignment of its Assumed Agreement, must, on or before **March 18, 2016**, file with the Clerk of the Court, United States Bankruptcy Court for the District of Oregon, 1001 SW Fifth Avenue, Seventh Floor, Portland, Oregon 97204, a written objection stating the specific facts upon which the objection is based.

**PLEASE TAKE FURTHER NOTICE** that unless a timely objection is filed as to a Cure Amount scheduled by Debtor, the Cure Amount scheduled by Debtor shall be binding upon the non-debtor party to such Assumed Agreement for all purposes in this Chapter 11 case and will constitute a final determination of the total Cure Amount required to be paid in connection with the assumption and assignment of such Assumed Agreement. Further, unless a timely objection is filed, no further evidence shall be required to satisfy the requirements for assumption and assignment, including, without limitation, any further evidence of adequate assurance of performance by Tricol or other qualified purchaser, and the nondebtor party to the Assumed Agreement shall be barred from objecting to the assumption and assignment of such Assumed Agreement and shall be deemed to consent to the assumption and assignment of the Assumed Agreement.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Cure Amounts and Debtor's proposed assumption and assignment of the Assumed Agreements is scheduled to be held on **March 30, 2016 at _____ a.m. Pacific time**, or at such later time as may be announced at the auction by Debtor, at the United States Bankruptcy Court for the District of Oregon, Courtroom ___, 1001 SW Fifth Avenue, Portland, Oregon.

**Page 2 of 3 -**   NOTICE OF MOTION TO APPROVE SALE OF ASSETS TO TRICOL INTERNATIONAL
GROUP LIMITED OR HIGHER AND BETTER BIDDER AT AUCTION, AUCTION, BIDDING
PROCEDURES, SALE HEARING, AND OBJECTION DEADLINES

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Exhibit C
Page 2 of 3

Case 16-30119-pcm11    Doc 16    Filed 01/15/16

Copies of any of the pleadings or documents referenced herein may be obtained by contacting Debtor's counsel, Albert N. Kennedy (E-mail: albert.kennedy@tonkon.com; telephone: 503-802-2013) or Timothy J. Conway (E-mail: tim.conway@tonkon.com; telephone: 503-802-2027).

DATED this _____ day of January, 2016.

TONKON TORP LLP

By _____
      Timothy J. Conway, OSB No. 851752
      Attorneys for Debtor

Exhibit C
Page 3 of 3

1    **CERTIFICATE OF SERVICE**

2          I hereby certify that I served the foregoing **DEBTOR'S MOTION FOR
ORDER APPROVING (A) BID AND SALE PROCEDURES INCLUDING BREAK UP**

3    **FEE TO TRICOL INTERNATIONAL GROUP LIMITED AS STALKING HORSE
BIDDER, (B) SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS,**

4    **CLAIMS AND ENCUMBRANCES, AND (C) ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS** on the parties indicated as "ECF" on the attached List of

5    Interested Parties by electronic means through the Court's Case Management/Electronic Case
File system on the date set forth below.

6

7          In addition, I served the foregoing on the parties indicated as "Non-ECF" on
the attached List of Interested Parties by mailing a copy thereof in a sealed, first-class

8    postage prepaid envelope, addressed to each party's last-known address and depositing in the
U.S. mail at Portland, Oregon on the date set forth below.

9
         DATED this 15th day of January, 2015.
10
                         TONKON TORP LLP
11

12                       By /s/ Timothy J. Conway
                            Albert N. Kennedy, OSB No. 821429
13                          Timothy J. Conway, OSB No. 851752
                            Of Attorneys for Debtor
14

15

16

17

18

19

20

21

22

23

24

25

26

**Page 1 of 1 -** CERTIFICATE OF SERVICE

## LIST OF INTERESTED PARTIES

### *In re HemCon Medical Technologies, Inc.*
### U.S. Bankruptcy Court Case No. 16-30119-pcm11

### ECF PARTICIPANTS

- TIMOTHY J CONWAY    tim.conway@tonkon.com, nancy.kennedy@tonkon.com
- ALBERT N KENNEDY    al.kennedy@tonkon.com,
  leslie.hurd@tonkon.com;andy.haro@tonkon.com;spencer.fisher@tonkon.com
- TARA J SCHLEICHER    tschleicher@fwwlaw.com, dfallon@fwwlaw.com;nlyman@fwwlaw.com
- US Trustee, Portland    USTPRegion18.PL.ECF@usdoj.gov

### NON-ECF PARTICIPANTS

**SECURED CREDITOR**

Sussex Associates, LP
24200 Southwest Freeway,
Ste 402-285
Rosenberg, TX 77471

Sussex Associates, LP
Paul Conrad CPA – RA
2238 Woodland Park Dr.
Houston, TX 77077

Sussex Associates, LP
c/o Silverton Investments, LLC – Gen'l
Partner
24200 Southwest Freeway,
Ste 402-285
Rosenberg, TX 77471

Sussex Associates, LP
c/o Silverton Investments, LLC – Gen'l
Partner
Attn: Alan F. Voight, Managing
Member
5834 Bridlewood Dr.
Richmond, TX 77469

Sussex Associates, LP
Silverton Investments, LLC – Gen'l Partner
Alan F. Voight, Managing Member
c/o Michael W. Stockton
One Arts Plaza, 1722 Routh St., Ste
1500
Dallas, TX 75201

**TOP 20 UNSECURED
CREDITORS**

Grace Christian Ministries, Inc.
15401 Bellaire Blvd
Houston, TX 77083

Innovize
500 Oak Grove Parkway
St. Paul, MN 55127

Barry Starkman
7447 SW Hergert Rd.
Cornelius, OR 97113-5127

Barry Starkman
c/o Jonathan B. Orleans
Pullman & Conley LLC
850 Main St.
Bridgeport, CT 06601

SSOE Group
7431 NW Evergreen Parkway, Suite
210
Portland, OR 97205

Icon Pool 3 West, LLC
Two North Riverside Plaza
Suite 2350
Chicago, IL 60606

Quality Bioresources, Inc.
1015 North Austin Street
Seguin, TX 78155

Miller Nash LLP
Attn: Erich W. Merrill
P.O. Box 3585
Portland, OR 97208-3585

Washington County Tax
155 N. First Ave. Rm 130
Hillsboro, OR 97214

Paul Taylor
14743 Himebaugh Plaza
Omaha, NE 68116

NSAI, Inc.
Nat'l Standards Auth. of Ireland
Finance & Administration
20 Trafalgar Square Suite 603
Nashua, NH 03063

WuXi AppTec, Inc.
1265 Kennestone Circle
Marietta, GA 30066

TSI Manufacturing LLC
60025 East Ridgeview Drive
Bend, OR 97702

Michael L. Larson Company, P.C.
5665 Meadows Road, Suite 310
Lake Oswego, OR 97035

Boyd Corporation
600 So McClure Road
Modesto, CA 95357

Larry Alloway
3814-B South Genoa Circle
Aurora, CO 80013

STERIS Isomedix (Libertyville)
2500 Commerce Drive
Libertyville, IL 60048

Healthcare Manufaktur GmbH
Gustav-Heinemann-Ufer 56
50968 Koln
Germany

Jared Peek
1440 208th Drive
Seward, NE 68434

Judy Wadhams
815 North 95th St.
Lincoln, NE 68505

**OTHER**

SEC
Attn: Bankruptcy Counsel
444 South Flower Street, Suite 900
Los Angeles, CA 90071-9591

Jeff Cohen
United States Securities and
Exchange Co.
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX 76102
E-mail: cohenja@sec.gov